## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| CITY OF HOLLYWOOD FIREFIGHTERS' PENSION FUND, on behalf of itself and all others similarly situated,<br><br>　　　　　　Plaintiff,<br><br>　　　　　v.<br><br>INSPIRE MEDICAL SYSTEMS, INC., TIMOTHY P. HERBERT, and RICHARD J. BUCHHOLZ,<br><br>　　　　　　Defendants. | Case No.: 0:23-cv-03884-NEB-DJF<br><br><u>CLASS ACTION</u><br><br><br>AMENDED CLASS ACTION COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

## <u>TABLE OF CONTENTS</u>

I.    NATURE OF THE ACTION ........................................................................................ 1

II.   JURISDICTION AND VENUE ................................................................................. 6

III.  PARTIES ................................................................................................................... 7

    A.    Lead Plaintiff ................................................................................................ 7

    B.    Defendants .................................................................................................... 7

        1.    Inspire Medical Systems, Inc. .......................................................... 7

        2.    The Individual Defendants ................................................................ 7

IV.   OVERVIEW OF THE FRAUD ................................................................................. 10

    A.    Background Of Inspire's Business And The Prior Authorization Process ........... 10

    B.    Inspire Touts The Company's Prior Authorization Approval Process As A "Pillar" Of Its Success And A "Competitive Strength" ...................................... 11

    C.    "*An Absolutely Massive Slowdown*": Former Employees Confirm That Unbeknownst To Investors, Defendants Made Radical Changes To The Prior Authorization Approval Process At The Beginning of 2023, Dramatically Harming Inspire's Business ............................................. 15

    D.    Defendants Concealed Their Radical Changes To The Process While Falsely Assuring Investors That They Had "Steadfastly Improved" Their "Conversion" Of Patient Contacts to Sales ........................................... 25

    E.    The Truth Is Revealed .................................................................................. 27

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ......................................................... 31

    A.    1Q 2023 Financial Results ........................................................................... 31

    B.    The May 16, 2023 RBC Capital Markets Global Healthcare Conference ........... 34

    C.    The 2Q 2023 Earnings Call .......................................................................... 36

    D.    The September 6, 2023 Wells Fargo Securities Healthcare Conference ............. 39

VI.   ADDITIONAL ALLEGATIONS OF SCIENTER ................................................... 41

VII.  LOSS CAUSATION ................................................................................................ 47

VIII. PRESUMPTION OF RELIANCE ........................................................................... 49

IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE
       BESPEAKS CAUTION DOCTRINE ............................................................................. 51

X.     CLASS ACTION ALLEGATIONS ................................................................................. 52

XI.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT............................................. 54

XII.   PRAYER FOR RELIEF ................................................................................................... 58

XIII.  JURY DEMAND ............................................................................................................. 59

Lead Plaintiff City of Hollywood Firefighters' Pension Fund ("Hollywood Fire" or "Lead Plaintiff"), by and through its attorneys, brings this federal securities class action on behalf of all persons or entities who purchased Inspire Medical Systems, Inc. ("Inspire" or the "Company") common stock between May 3, 2023 and November 7, 2023, inclusive ("Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. (the "Exchange Act"). Lead Plaintiff alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, it's counsel's investigation, which includes without limitation: (a) review and analysis of filings of Inspire and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of presentations, press releases, conference call transcripts, media and analyst reports made by or about the Company; (iii) review and analysis of other publicly-available information concerning Inspire; (iv) interviews with former Inspire employees and other persons with knowledge of the matters alleged herein; and (v) review and analysis of other materials and data concerning the Company.

Lead Plaintiff believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery, as many of the facts are known only by Defendants, or are exclusively within Defendants' custody or control.

## I.    NATURE OF THE ACTION

1.    Inspire is a medical company whose sole product is a device that treats obstructive sleep apnea.  Unlike CPAP machines, Inspire's device is surgically implanted, and thus does not require a patient to wear an uncomfortable mask while sleeping; however, this convenience comes at a high cost of $25,000 per implant.  Consequently, commercial insurers require a prospective patient to undergo a rigorous "prior authorization" process—including a thorough medical evaluation and extensive eligibility documentation—before they will reimburse Inspire for the device.  Given that Inspire earns 70% of its revenue from commercial insurance, it is critically important to the Company's business that this prior authorization process is completed quickly, efficiently, and correctly.

2.    To that end, in the years leading up to the Class Period, Inspire invested heavily in a system that it called the Prior Authorization Approval Process (the "Process" or the "PAAP"), which provided the Company with direct control over medical providers' prior authorization submissions and ensured that patients received prior authorization for the procedure as promptly as possible.  Inspire repeatedly stressed to investors that the Process was the key to the Company's success, as the PAAP was "***highly effective in working with patients and physicians to obtain prior authorizations for our Inspire system***."  Specifically, through the PAAP, Inspire's sales representatives and other employees worked hand in hand with medical providers to manage every step of the prior authorization process, from ensuring that medical tests were completed properly, to assisting medical providers in filling out forms, to advising on what steps to take if a patient was rejected by their insurer.  Indeed, the PAAP was so important to Inspire's business that

the Company's SEC filings boasted that the Process was a "***pillar of our reimbursement strategy***" and a "***competitive strength***" for the Company.

3.     While the Prior Authorization Approval Process was a success in increasing Inspire's sales—revenue grew 700% from 2018 to 2022—the Process was costly, and as a result, Inspire did not have a single profitable quarter in its first four and a half years as a public company.   Accordingly, and unbeknownst to investors, beginning January 1, 2023—just months before the start of the Class Period—Inspire made radical changes to the Process in order to slash the Company's costs.   Specifically, in stark contrast to Inspire's repeated statements about the vital importance of "working with patients and physicians" to obtain prior authorizations, the Company now did the exact opposite: it essentially removed itself from the prior authorization process.   Indeed, the Company stopped providing incentive compensation to its sales representatives to assist with patients' prior authorization submissions, and effectively outsourced the process entirely to medical providers and their staff—a decision that had a disastrous impact on Inspire's business, as providers were ill-equipped to handle the process on their own.  The result was an immediate and pronounced increase in delayed and even denied prior authorizations, leading to millions of dollars in lost sales.

4.     Numerous high-level former Inspire employees—including Senior Territory Managers from across the country who were directly responsible for the PAAP—uniformly confirmed that the Company made drastic changes to the Process in early 2023, leading to disastrous consequences.   As these former employees explained, Inspire changed its compensation structure to "***[take] the incentive away from us to help with the prior***

2

*authorizations*."  Instead, Senior Territory Managers were instructed to pass those tasks onto medical providers and their staff, and the result was an "***absolutely [] massive slowdown***" in the prior authorization process, with numerous applications being outright denied, precisely because providers "***were not very good at***" processing prior authorizations on their own.  As a result, Inspire's prior authorization "***approval percentage definitely went down dramatically by outsourcing the prior authorizations to the clinics***," and Inspire "lost patients that were waiting too long and decided to opt out of having the procedure done."  Significantly, these former employees confirmed that the Individual Defendants were well aware of these problems, as sales personnel reported these issues up the chain to Inspire executives, the Company's senior management saw first-hand a "***drastic shift***" in prior authorizations immediately after these changes, and Inspire's CEO, Defendant Herbert, specifically discussed these problems in Company meetings.

5.     Despite knowing full well of these issues, Defendants nevertheless falsely assured investors throughout the Class Period that the Prior Authorization Approval Process was growing even more effective and continuing to fuel Inspire's growth. Specifically, from the outset of the Class Period on May 2, 2023, Defendants highlighted to investors that Inspire had "***steadfastly improved our conversion of [patient] contact to patients receiving therapy***," and was thus seeing "***growth across all of our centers***." During an investor call on May 16, 2023, Defendant Herbert claimed that Inspire's efforts had made the prior authorization process dramatically faster, to the point where, in the past, Inspire required "4 to 6 months to get an insurance approval… ***Now we get approved in just 2 to 5 days***."  And as late in the Class Period as August 1, 2023—a full month into the

third quarter—Herbert again touted Inspire's supposedly improving "conversion" of patient contacts to sales, claiming that "***even with the typical summer slowdown in contact, we steadfastly improved our conversion of patients receiving therapy***." On the strength of Defendants' assurances, Inspire's stock price soared, reaching a Class-Period high of $330 per share on July 14, 2023.

6.     The truth was revealed on November 7, 2023, when Inspire announced its financial results for the third quarter of 2023. On that day, Inspire reported quarterly revenue that fell short of analyst expectations by as much as $10 million—a shortfall that represented the loss of approximately 400 procedures, and the first time Inspire had missed analyst estimates in its history as a public company. Significantly, during Inspire's earnings call on that day, Defendant Herbert revealed for the first time that the Company had made radical changes to the Prior Authorization Approval Process, and had in fact abandoned the intimate involvement in the Process that Defendants had characterized as the "pillar" of Inspire's business strategy and its primary "competitive strength." Indeed, Herbert admitted that back in January 2023—a full ten months earlier—the Company had made the decision to "***minimize our involvement with [our customers'] prior authorization process***." Herbert further admitted that Inspire's poor results were directly attributable to these changes to the PAAP, as "a significant number of our customers experienced challenges with their prior authorization submission process," leading to a "decrease in the number of submissions by our customers seeking prior authorization" and an "impact on the number of implant procedures."

4

7.    Tellingly, during the call, analysts were incredulous as to why Defendants did not disclose these issues earlier in the year, with a JPMorgan analyst pointedly asking "***when you knew about it and why not mention [these issues] on 2Q [call]***?"  In response, Herbert expressly admitted that Defendants knew that the changes Defendants had made to the Process were negatively impacting the Company's business throughout the Class Period, as they "***started to become evident***" ***in*** "***the second quarter***"—*i.e.*, the quarter beginning April 1, 2023.  Herbert further admitted that, as the Class Period continued, these problems did not improve, but in fact got worse—so much so that by "***the beginning of the third quarter***" in early July 2023, Defendants "***realized we needed to take some corrective action***" and "implemented that change."

8.    In reaction to this news, Inspire's stock price plummeted from a price of $161.74 per share on November 7, 2023, to a price of $129.95 per share on November 8, 2023—a drop of $31.79 per share, or almost 20%, on extraordinary heavy trading volume.

9.    Following the Company's earnings call, analysts excoriated Defendants for failing to disclose these problems earlier.  For example, Truist emphasized that the "***controversy this quarter***" was around the previously undisclosed change "***implemented early in the year that ultimately put the burden of pre-authorizations submissions more into customers hands***," and that "***[d]uring Q2***"—*i.e.*, April-June 2023—Inspire management "***began to realize there was a consistent slowdown in prior authorization submissions occurring***."    JPMorgan similarly underscored that the Company's results were due to the previously undisclosed "***change in the way the [C]ompany navigates the prior authorization process***," which led to "***a slowdown in prior authorization***

*submissions as the [C]ompany began to off-load this process to centers*" that resulted in a loss of "*~400 procedures*."  Finally, Oppenheimer also emphasized management's lack of transparency in a report headlined "***Prior-Auth[orization] Problems [are] Unclear***," which concluded that Defendants' explanation of the prior authorization problem was "***confusing***."

10.    Investors who purchased Inspire common stock at prices inflated by Defendants' materially false and misleading statements and material omissions have suffered substantial losses as a result of Defendants' violations of the federal securities laws.  This action seeks redress on behalf of these aggrieved shareholders.

## II.    JURISDICTION AND VENUE

11.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  A substantial portion of the acts in furtherance of the alleged fraud, including the preparation and dissemination of materially false and misleading information and the effects of the fraud, have occurred in this Judicial District.  In addition, the Company's headquarters is located in this District at 5500 Wayzata Boulevard, Suite 1600, Golden Valley, MN 55416.

14.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and a national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiff

15.    Lead Plaintiff City of Hollywood Firefighters' Pension Fund is a public pension fund based in Hollywood, Florida that provides benefits for eligible firefighters and their beneficiaries in Hollywood, Florida.  As set forth in the certification filed in this action, Lead Plaintiff purchased Inspire common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and misleading statements and/or material omissions alleged herein.  *See* ECF No. 1-1.

### B.    Defendants

#### 1.    Inspire Medical Systems, Inc.

16.    Defendant Inspire is incorporated under the laws of Delaware, with its headquarters located in Golden Valley, Minnesota. Inspire's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "INSP."

#### 2.    The Individual Defendants

17.    Defendant Timothy P. Herbert ("Herbert") has served as Inspire's President, Chief Executive Officer ("CEO"), and a member of Inspire's Board of Directors (the "Board") since 2007.  During the Class Period, Defendant Herbert made materially false

and misleading statements and omissions on May 2, 2023, May 16, 2023, August 2, 2023, and September 6, 2023.

18.    Defendant Richard J. Buchholz ("Buchholz") has served as Inspire's Chief Financial Officer ("CFO") since 2014.  During the Class Period, Defendant Buchholz made materially false and misleading statements and omissions on September 6, 2023.

19.    Defendants Herbert and Buchholz (collectively, the "Individual Defendants," and together with Inspire, "Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and retail and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and thus the Individual Defendants had the ability and opportunity to prevent the issuance of these reports and press releases or cause them to be corrected. Because of their positions and access to material non-public information available to them, and because the Individual Defendants were present at Company meetings where these issues were discussed, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

20.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Inspire, were privy to confidential, proprietary, and material

adverse non-public information concerning Inspire, its operations, finances, financial condition, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.    The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Inspire's business.

22.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Inspire's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had

9

become materially misleading or untrue, so the market price of Inspire's securities would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## IV.  OVERVIEW OF THE FRAUD

### A.  Background Of Inspire's Business And The Prior Authorization Process

23.  Inspire is a medical technology company whose sole product is a device designed to treat obstructive sleep apnea (the "Inspire device"). The Inspire device is surgically implanted into a patient's chest, where it acts as a "closed-loop solution that continuously monitors a patient's breathing and delivers mild hypoglossal nerve stimulation to maintain an open airway" – effectively causing the patient's tongue to move each time they take a breath in order to keep the patient's airway open. The Inspire device purports to be the only FDA-approved obstructive sleep apnea device that treats the root cause of sleep apnea by working inside the body with the patient's natural breathing process. As such, the device is primarily targeted at patients who have difficulties with other, more obstructive treatments, such as Continuous Positive Airway Pressure ("CPAP") machines, which require patients to wear an uncomfortable mask while sleeping. Inspire derives substantially all of its revenue from sales of its device, for which it receives an average sale price of $25,000 per implant.

24.  Inspire held its IPO in May 2018. As a young public company, it was critical to investors that the Company deliver rapid revenue growth, and that it met or exceeded

analyst expectations.  Following its IPO, Inspire delivered exactly that, ***growing its revenue 700%*** from 2018 to 2022, and meeting or exceeding analyst expectations every quarter.

25.     Leading up to the Class Period, the vast majority of Inspire's revenue—approximately 70%—came from commercial insurance reimbursements for Inspire devices, with the remaining revenue coming from Medicare and other sources.  As such, commercial insurance patients were the main focus of Inspire's business strategy.

26.     Significantly, in order to reimburse Inspire for its expensive device, commercial insurance companies required a rigorous "prior authorization" process.  This meant that each patient had to undergo a robust, multi-step medical evaluation, and that medical providers would then have to submit extensive documentation of a patient's eligibility in order for an insurer to approve the procedure.

27.     Among other things, the prior authorization process required a patient to demonstrate difficulties with other sleep apnea treatments and an appropriate medical history.  Patients were also required to undergo extensive testing of respiratory and cardiovascular functions during an overnight, observed "sleep study" in a medical center or hospital, including a drug-induced sleep endoscopy.  And, after all of these steps were completed, the medical provider's office staff would have to fill out complex forms and provide extensive documentation in order for the patient to be approved for the procedure.

## B.     Inspire Touts The Company's Prior Authorization Approval Process As A "Pillar" Of Its Success And A "Competitive Strength"

28.     To make the prior authorization process faster, smoother, and more likely to succeed, Inspire developed the Prior Authorization Approval Process—an intensive, multi-

faceted system to increase the likelihood that patients sought out and were granted prior authorization for the Inspire device. This Process was crucial to the Company's success.

29. *First,* Inspire's Prior Authorization Approval Process involved extensive efforts to get patients in the door of medical providers' offices to obtain prior authorizations. Among other things, Inspire ran television, print, and online marketing campaigns touting its device, and engaged directly with ENT doctors and sleep centers, all to encourage prospective patients to seek a medical evaluation for prior authorization for its device. To that end, Inspire opened its own call center—the Advisor Care Program— to promptly schedule callers for an evaluation at a participating medical office.

30. *Second*, and significantly, Inspire's Prior Authorization Approval Process featured dedicated teams who worked directly with medical providers to ensure that the prior authorization process was completed quickly and correctly. Inspire ran a "market access team" from its central offices who were experts in the prior authorization process, and also extensively trained its sales representatives in the process. Working in tandem, sales representatives and market access team members would assist medical providers with, among other things, determining what medical tests to perform, participating in the observation of sleep studies and endoscopies, assisting in filling out prior authorization applications, and advising on next steps and appeals if a prior authorization was denied.

31. The Prior Authorization Approval Process was critical to not only bringing patients into Inspire's sales pipeline, but in ensuring that the Company's strong sales growth continued. Specifically, Inspire could not ship its device and recognize a sale (i.e. revenue) until the patient's prior authorization had been approved by their insurance

company and a surgery had been scheduled. Thus, any delay in the prior authorization process delayed Inspire's ability to recognize revenue. Further, any delays risked Inspire losing the sale altogether, as a patient could simply lose interest in receiving the implant if the process took too long. Similarly, the requirements for prior authorization were often strict and complex, and if applications were put together incorrectly, insurers could simply reject them, causing Inspire to lose out on the revenue entirely.

32.    Accordingly, the PAAP was the key to Inspire's success, and in turn, the Company made clear that the key to the PAAP was the fact that Inspire was directly involved in assisting patients and medical providers to complete the prior authorization approval process. Indeed, the Company's 2022 Form 10-K, which was filed with the SEC on February 10, 2023 ("2022 10-K"), specifically highlighted under a section entitled "***Our Competitive Strengths***" the fact that the Company maintained a "[d]edicated team focused on providing market access for patients and providers," and "***helps patients and providers work with payors to secure prior authorization approvals in advance of initial treatment***." The 2022 10-K further emphasized to investors that this "refined, efficient approach" was highly material to the Company's business, as the PAAP was "***highly effective***" and "successful in helping to secure reimbursement from hundreds of commercial payors to date":

**Our Competitive Strengths**

We believe the continued growth of our company will be driven by the following competitive strengths:

* * *

13

***Dedicated team focused on providing market access for patients and providers***. We have a refined, efficient approach to advance patients, once identified, to placement of the Inspire system. When required, our dedicated market access team helps patients and providers work with payors to secure prior authorization approvals in advance of initial treatment. In addition, this team proactively works with payors to establish positive coverage policies when needed by highlighting the compelling clinical data and the value of our Inspire therapy. This highly effective team has been successful in helping to secure reimbursement from hundreds of commercial payors to date, and positive coverage policies from most U.S. commercial payors, including virtually all large national payors.

33.     Similarly, Inspire made clear that the Prior Authorization Approval Process—and the close involvement of the Company's professionals in the approval process—was so important to the Company's success that it was one of two "core" pillars of the Company's reimbursement strategy.   Significantly, the 2022 10-K not only represented how "highly effective" this process was in securing authorization, but it also unequivocally stated that the process would continue and not change:

**Prior Authorization Approval Process**

A second pillar of our reimbursement strategy includes leveraging our market access team to assist patients and physicians in obtaining appropriate prior authorization approvals in advance of treatment. We believe our market access team is highly effective in working with patients and physicians to obtain prior authorizations for our Inspire system including assisting with the appeals process. We have received hundreds of prior authorization approvals from all of the largest commercial payors, for example Anthem, Cigna, Blue Cross Blue Shield, United Healthcare, and Humana. ***We believe we will continue to benefit from this efficient prior authorization process.***

34.     Analysts responded favorably to Defendants' positive representations concerning Inspire's PAAP, highlighting that the Process was one of the keys to the Company's success in the years leading up to the Class Period.  For example, a September

14

2020 Baird report highlighted Inspire's "***clinical support team that guides local physicians and patients through prior authorization***."  And an April 2022 Truist report cited Inspire's "***years of experience navigating the challenging reimbursement landscape***," as a "***sustainable competitive advantage***."

**C.    "*An Absolutely Massive Slowdown*": Former Employees Confirm That Unbeknownst To Investors, Defendants Made Radical Changes To The Prior Authorization Approval Process At The Beginning of 2023, Dramatically Harming Inspire's Business**

35.    Despite the fact that the Company generated substantial revenue from the Prior Authorization Approval Process, the Process carried extensive operating costs. Indeed, Inspire did not have a single profitable quarter in its first four and a half years as a public company.  Accordingly, at the end of 2022, the Company was searching for ways to cut costs.  And as demand for Inspire's product grew, Inspire knew that it would have to hire more and more employees in order to maintain the PAAP, which would only increase expenses and make it even more difficult for the Company to reach profitability.

36.    Consequently, unbeknownst to investors, at the end of 2022, Inspire implemented a plan to significantly reduce costs by making dramatic changes to the Prior Authorization Approval Process.  Specifically, by no later than January 1, 2023, Inspire ceased offering assistance with prior authorizations to medical providers, leaving medical offices entirely on their own to handle the complex process.  Further, Inspire restructured its incentive compensation so that sales representatives were no longer incentivized to ensure that medical providers completed each step of the complex process quickly and correctly.  These changes meant that Inspire's employees would no longer provide

assistance to medical providers with determining the appropriate tests to undertake; they would no longer advise providers with how to conduct the tests; they would no longer assist in compiling a patient's data and filling out their forms; and Inspire employees would no longer assist in appealing a rejection by an insurer.

37.    Thus, as Defendants expressly admitted at the end of the Class Period, rather than being intimately involved in every step of the prior authorization process—which Defendants repeatedly emphasized was a "core pillar of the Company's reimbursement strategy"—Defendants now had decided to "*minimize our involvement with [our customers'] prior authorization process*."  In short, Defendants' changes to the PAAP represented an extreme departure from the Company's prior practices, as Inspire's employees were essentially no longer involved in the prior authorization process, and certainly not to the extent that the Company had repeatedly portrayed to the market in its SEC filings for years.

38.    Inspire's radical changes to the Prior Authorization Approval Process were disastrous for its business.  Unlike Inspire's highly experienced employees, many medical offices did not have the staffing or expertise to manage the prior authorization process, and could not handle the volume and complexity of prior authorizations, with severe consequences for Inspire.  This led to many prior authorizations simply piling up unsubmitted in medical offices—either being delayed by months, or never being submitted at all.  In addition, many medical providers' staff submitted prior authorizations improperly—with inadequate documentation or incorrect information—leading to outright rejections by insurers.  And unlike Inspire's well-trained employees who were experts in

16

the prior authorization process, medical office staff did not know how to handle the appeals process when patients were rejected.  Finally, deprived of regular contact with medical providers throughout the authorization process, Inspire lost visibility into its sales pipeline.

39.    Numerous former senior Inspire employees uniformly confirmed the magnitude of Inspire's changes to the Process, as well as the immediate negative impact that those changes had on the Company's business.  Significantly, these employees included Senior Territory Managers who had worked directly within the Prior Authorization Approval Process at geographically dispersed locations across the country, and who were directly responsible for developing their respective markets and ensuring that the prior authorization process for their respective territories was performed efficiently and correctly.  For example, FE 1,[1] a former Senior Territory Manager for the Company in the greater Chicago area, explained that, at the end of 2022, Inspire's sales reps and prior authorization team were faced with a growing number of requested prior authorizations. However, she explained, the Company did not want to invest money in hiring additional employees to effectively manage the additional work that those requests created.  Instead, FE 1 explained that the Company thought it could reduce costs by passing off these tasks onto medical providers and their office staff.   As FE 1 explained, as part of these cost-

---

[1] FE 1 worked for Inspire from roughly the beginning of 2019 through the beginning of 2024, first as a Territory Manager and then as Senior Territory Manager for the greater Chicago area (with the latter role being her position throughout the Class Period), and was responsible for market development in that area.  During the Class Period, she reported to Regional Sales Manager Dan Phalen.  "FE _" refers herein to anonymous former Inspire employees.  To protect anonymity, all anonymous former employees are referred to herein using feminine gender pronouns.

cutting changes, the Company changed its compensation structure such that "they took the incentive away from us to help with the prior authorizations."

40.    FE 1 confirmed that the impact of these changes was disastrous. She recalled that, once Inspire implemented these changes at the beginning of 2023, the Company immediately lost all visibility into its revenue forecasting, because it no longer had any idea how many patients were in queue to receive the implant: "That definitely affected their accuracy of forecasting revenue because *we lost the visibility of patient surgeries in the funnel*." In addition, FE 1 said that it quickly became apparent that medical centers could not handle the prior authorizations on their own, as the providers lacked both the staffing and the knowhow to complete the "intricate" process. As FE 1 explained, prior to 2023, "Inspire did these [prior authorizations] every day and now the clinics were doing them weekly and [they] were not very good at it." FE 1 said that this led not only to stalled procedures, but outright denials by insurers: "they had more denials with forgetting documentation. *The approval percentage definitely went down dramatically by outsourcing the prior authorizations to the clinics. It was not a good setup for success*."

41.    Another former Inspire Territory Manager, FE 2,[2] explained that, before the changes, the Prior Authorization Approval Process had been critical to the Company's

---

[2] FE 2 was a Territory Manager at Inspire from March 2022 to April 2023 in two different geographic territories, and was responsible for managing patient care from post-implant through to final sleep study, and establishing a network of surgeons to provide best care for patients across a region. FE 2 reported to a Regional Manager. FE 2 was interviewed by AlphaSense Expert Insights on December 1, 2023, and her interview was published on the AlphaSense platform on December 7, 2023.

success, explaining that "the Inspire prior authorization team was so good. ***They were our best weapon in our offices and in getting patients on the table quicker***," and thus dramatically boosted Inspire's sales.

42.    FE 2 explained that, due to the complexity of the prior authorization process, the Inspire sales representatives' intervention was so critical that it often meant "***the difference between losing a patient and maybe keeping a patient***" for Inspire's product. As an example, FE 2 described a situation where a patient with Blue Cross Blue Shield insurance might have test results showing an Apnea-Hypopnea Index ("AHI") that fell slightly below the requirements for insurance.  Inspire's employees would be able to use their expertise and knowledge to help the medical provider re-evaluate the patient so that they could get approved, whereas if the medical provider undertook the authorization process on their own, the patient would just "fall to the wayside":

> I'll tell you a way in which we've been able to affect that process. For example, an office submits a patient packet to the Inspire auth team. We, the rep, get notified, as well as the office, as soon as our auth team reviews the intake packet.  Say, the patient has an AHI of 16 events/hr and it's a Blue Cross Blue Shield patient and the requirement is 20 events/hr, so right away, ***within one business day, we're alerted, "Hey, this is never going to get approved. We can't even submit this***." You could submit it, but it's going to get kicked back. ***We know right away this patient needs to do another sleep study***, and hopefully, their AHI is 20 events/hr ***versus if this office was doing that independently, it would be weeks before we ever, or maybe we never hear about it, and then that patient just falls to the wayside***. "***Hey, you're not going to be approved. Blue Cross denied it,***" versus if you, the rep, know this, I'm calling that office, I'm calling that staff person saying, "Hey, we need to talk to this patient. They need to do an in-lab sleep study because their home sleep study, their AHI was too low, but if they do an in-lab, they're probably going to be above 20 events/hr and we can get that patient approved."  ***That's the difference between losing a patient and maybe keeping a patient.***

19

43.     From the moment the Company decided to abandon the principles of the Prior Authorization Approval Process and leave the prior authorization process in medical providers' hands, however, Inspire employees were no longer providing this expertise, and thus FE 2 knew Inspire would lose sales.  As such, she vocally opposed the changes, which she knew would take away "visibility" into the Company's sales pipeline and would "slow down" the prior authorization process.  As FE 2 explained:

> They were starting to do that [leave the medical providers to do prior authorizations on their own when[] I was still there. The ask was to get [the medical] offices independent. *I personally had zero motivation to do that because it takes away, from a rep perspective, your visibility into what's going on. We, as reps, really relied on that prior auth process.*.. they were asking us to do that, and I was like, "*Absolutely not*."

44.     FE 2 further explained that making these dramatic changes to Inspire's prior authorization team immediately "slow[ed] down the time that it takes from patient to get submitted to patient on table."  As FE 2 explained, "*It really slows down that process versus the Inspire team*…if [the Inspire team is] doing it, you can affect the process and get patients implanted quicker. *I think it is absolutely a massive slowdown*."

45.     As FE 2 further explained, it was never possible to adequately train medical office staffers to handle the prior authorization process themselves because "the authorization process is always going to be complicated just because there are so many criteria that you need to make sure are met . . . they're never going to do it as quickly as the dedicated Inspire team."  As she explained, the staff within medical offices typically had too much turnover and too little training to effectively submit complex prior authorizations for Inspire devices:

[T]hese people who manage the prior authorization process inside the physician's office, there's a lot of turnover in that job. You get your amazing auth girl [i.e. prior authorization staffer] trained up to where she understands these are exactly the things that need to be submitted to insurance, these are the criteria. Once you get that person trained up, who knows how long she's going to be with the practice? It's a revolving door in most offices, so it's a never-ending task of the territory manager to continue to train those people…***they're never going to be as quick and efficient as the dedicated Inspire team***.

46.     FE 3,[3] another former Inspire Territory Manager, similarly corroborated that Inspire's changes to its Prior Authorization Approval Process had been disastrous. FE 3 explained that Inspire had previously offered extensive prior authorization assistance to accounts in order to ensure that all the "I's were dotted and Ts were crossed" and the prior authorizations were submitted in a timely fashion.  FE 3 corroborated other former employees' explanations that, under the old system, Inspire employees had been incentivized to assist medical providers at every step of the way to ensure that the prior authorizations were going to be approved, but that, at the end of 2022, the Company decided to stop offering this prior authorization assistance to their accounts.  As a result, FE 3 said, without the help of the PAAP, ENTs and hospitals stopped prioritizing the processing of Inspire implant prior authorization applications, and sales dropped off.

47.     FE 3 explained that many of these medical providers had small, understaffed departments for processing prior authorizations that could not keep up with the patient flow without Inspire's assistance.  In many cases, she said, there would only be one medical

---

[3] FE 3 worked for Inspire as a Territory Manager in Iowa from June 2021 through October 2023.  She was responsible for sales of Inspire's device within her geographic area.  She reported to Regional Manager Tom Tesar.

office staffer working on prior authorizations for an entire group of ENTs. Moreover, these staffers were tasked with not only submitting prior authorizations for Inspire devices, but for a number of other products from other companies. As FE 3 explained, once the changes were made, "[i]n my geographic location, *there was one person trying to handle several hundred prior authorizations and trying to keep up with the demand. The demand was higher than the supply of people being able to submit these prior authorizations*."

48.    As a result, FE 3 explained, Inspire's changes resulted in a dramatic reduction in prior authorizations being processed in a timely manner during the Class Period. Specifically, FE 3 explained that, prior to these changes, the time from submission of a prior authorization had typically been less than 30 days, but after the changes, the timeline typically got pushed out to at least 60 to 90 days. FE 3 explained that these delays caused patients to decide not to have the implant because they were waiting so long for the prior authorization approval. As FE 3 stated, "*[Inspire] lost patients that were waiting too long and decided to opt out of having the procedure done*." When asked if she personally experienced patients deciding to opt out of having the Inspire implant because of the prior authorization approval delays, she replied: "*Absolutely*," explaining that "*patients quickly lost interest*" when their procedures were delayed.

49.    FE 3 further confirmed that Defendants realized *early in 2023* that the changes were causing significant problems for the Company, and that Inspire management quickly realized that they "*didn't have their finger on the pulse*," due to the loss of visibility into the process. In fact, Inspire management quickly discovered that, following

these changes, there had been a "***drastic shift***" in the timelines of when the prior authorizations were submitted and when the procedures were done.

50.    FE 4,[4] another former Inspire Territory Manager, similarly corroborated these accounts.  FE 4 explained that the prior authorization process was extremely complex, and that, prior to 2023, she was heavily involved in the process for each patient.  For example, FE 4 explained that "certain criteria needed to be met" in order to receive prior authorization, including a Body Mass Index (BMI) lower than 32, failure to tolerate other treatments like CPAP, and a qualifying Apnea Hypopnea Index (AHI) score (a measure of the number of apneas a person has per hour while sleeping) of 15-20.  FE 4 further explained that, prior to 2023, she would routinely be involved in the Drug Induced Sleep Endoscopy procedure that was often required to obtain prior authorization.

51.    FE 4 said that in January 2023, however, she was notified by her immediate supervisor that Inspire was changing the prior authorization process so that, instead of Inspire being responsible for prior authorizations, the responsibility would be placed on the clinics and physicians performing the Inspire procedure.  This change was also reflected in an organizational memo that FE 4 received.  FE 4 said that she knew right away that this would be problematic and warned her immediate supervisor of her concern with these changes.

52.    FE 4 explained that Inspire did little to prepare medical offices for the change in prior authorization policy, essentially distributing a one-page "marketing piece" to the

---

[4] FE 4 was a Territory Manager for Inspire in the Wisconsin area from mid-2020 through June 2023.

providers in the beginning of 2023 that notified them of the changes. She recalled that after the marketing piece was distributed, several doctors' offices "pushed back" with the Company against being responsible for patient prior authorizations, but that medical providers' concerns fell on deaf ears.

53.    As a result of these problems, Inspire management became aware of a steep drop-off in prior authorizations early in 2023, which they knew would eventually have a significant negative impact on their sales revenue. Because of the complexity of the prior authorization process, there was a long lead time from when a patient first sought out a medical evaluation to the time the patient (once approved) scheduled the surgery—often 4-6 months. However, Inspire only recognized revenue once a surgery was scheduled and its product was shipped, and thus the prior authorization decline began to more dramatically impact the Company's revenue during the Class Period.

54.    Indeed, as former employees confirmed, during the Class Period, Inspire's senior officers were well aware of these problems, which ultimately led to hundreds of lost procedures and millions of dollars in lost revenue. One former Inspire Territory Manager, FE 4, explained that management carefully tracked the entire prior authorization process for patients—all the way from initial contact through prior authorization through surgery—using Microsoft Dynamics software, and thus Defendants Herbert and Buchholz had real-time access to detailed metrics demonstrating this slowdown.

55.    Similarly, former Inspire Senior Territory Manager, FE 1, confirmed that numerous employees, including his manager and his Area Vice President, "***were all referencing this up to the CEO. This started pretty early in the process***." And the same

senior territory manager recalled being on a Company conference call no later than the second quarter of 2023 in which CEO Herbert himself discussed the slowdown in prior authorizations.

### D. Defendants Concealed Their Radical Changes To The Process While Falsely Assuring Investors That They Had "Steadfastly Improved" Their "Conversion" Of Patient Contacts To Sales

56. Despite knowing full well that the Company's changes to the Prior Authorization Approval Process had resulted in a steep decline in prior authorizations, Defendants did not disclose this highly material information to the market. Instead, Defendants did the exact opposite: throughout the Class Period, Defendants made highly positive statements about Inspire's business success and the PAAP, while concealing that the Company's changes to the Process were having disastrous effects on its business.

57. Specifically, during an earnings call held on May 2, 2023—one day before the start of the Class Period—Defendant Herbert made positive statements about the Process, touting a supposed "improvement" in the Company's prior authorization process, and stating that Inspire had **"steadfastly improved our conversion of contact to patients receiving therapy** ..."—*i.e.*, had improved the rate at which patients who made initial inquiries about Inspire devices wound up getting the implant. Further, Herbert assured investors that the amount of time this "conversion" was taking was improving, and insisted that the Company was seeing "**signs of improvement in the patient pathway and specifically by reducing the time from patient contact to implant**."

58. Herbert further touted what he described as a new "digital scheduling" system, through which he claimed that the Company's Advisor Care Program call center

was dramatically improving the prior authorization process. Specifically, Herbert stated that the Company's "digital scheduling pilot continues to make strides and we are currently experiencing a ***30% improvement in physician appointments*** in the pilot centers compared to traditional phone and e-mail scheduling through our Advisor Care Program and are adding technology to support the next wave of participating centers."

59.     Analysts reacted favorably to Defendants' positive statements. For example, Piper Sandler opined that the Prior Authorization Approval Process was giving Inspire a "[s]trong [s]tart to 2023," including because the Company "has implemented a number of DTC (direct-to-consumer) initiatives, which have started to bear fruit in Q1…[including] the digital schedule pilot program," and because of the Company's website generating "19,000 related physician contacts in Q1." In turn, Inspire's stock price increased markedly after Defendants' positive statements, climbing 7% in one day—from a close of $257.30 on May 2, 2023 to a close of $275.22 on May 3, 2023.

60.     On May 16, 2023, Defendant Herbert again made highly positive statements about the Company's Process. On that date, Herbert expressly claimed that Inspire's prior authorization process was actually *improving* and *speeding up*, stating that, while it had once taken "4 to 6 months to get an insurance approval…***Now we get approved in just 2 to 5 days***."

61.     Similarly, on August 1, 2023, in its earnings conference call for the second quarter of 2023, Inspire *again* touted the success of the PAAP, which had led to supposed "improvement" in "conversion" from patient contacts to sales. Specifically, Defendant Herbert stated that "***even with the typical summer slowdown in contact, we steadfastly***

26

*improved our conversion of patients receiving therapy.*"    Similarly, Herbert touted

"*continued growth across all of our centers,*" and stated that the Company's "*efficiency*

*and conversions of patients through implant continues to be strong*."  Again, Defendants

did not breathe a word of the negative impact that their changes to the PAAP were having

on Inspire's business.   And analysts again reacted favorably to Defendants' positive

representations, with Mizuho noting in an August 2, 2023 report that Inspire's "initiatives

[are] continuing to bear fruit to Inspire implant conversions."

       **E.**    **The Truth Is Revealed**

      62.    On November 7, 2023, after market close, Inspire issued a press release

reporting its financial results for the third quarter of 2023, including disappointing total

revenue of $153.3 million—the first time in Inspire's history as a public company that it

missed analyst revenue estimates.  The press release attributed the poor results to a "decline

in prior authorization submissions," which Defendants blamed on a "pilot program

regarding prior authorization submissions by our customers" that had been implemented

*ten months earlier* at the start of 2023.  The adoption of this "pilot program," and the

resulting decline in prior authorization submissions, had cost the Company roughly 400

implant procedures, and thus created a $10 million shortfall in revenue.  Specifically, the

press release quoted CEO Herbert explaining that:

> *Early in the year*, we implemented a pilot program regarding prior
> authorization submissions by our customers, and in ***tracking the results of***
> ***the program***, *we observed a decline in prior authorization submissions for*
> *patients seeking Inspire therapy*.  After recognizing this trend, we
> reinvigorated our efforts to facilitate patient access to Inspire therapy by
> more closely engaging with our customers with the prior authorization

submission process, including involving our corporate prior authorization team to assure consistency and accuracy of submissions.

63.     Significantly, during Inspire's earnings call the same evening, Defendants revealed that in implementing this pilot program, the Company had made radical changes to the Prior Authorization Approval Process—abandoning the very practices and procedures that it had previously characterized as the "pillar of our reimbursement strategy" and a "competitive strength" of the Company.  Indeed, in stark contrast to Defendants' repeated statements about how closely involved they were in "working with patients and physicians to obtain prior authorizations" and how the Company was "focused on assisting patients and physicians in obtaining prior approvals," Herbert now admitted that the opposite was true: that Inspire's revenue shortfall was entirely due to a decision "in early 2023" to "*minimize our involvement with [our customers'] prior authorization process*"—a dramatic change to Inspire's business model that Defendants had never once previously disclosed to investors.  Herbert further explained that, as a result of these changes, "*a significant number of our customer[s] experienced challenges with their prior authorization submission process*," which led to a "decrease in the number of submissions by our customers seeking prior authorization" and an "impact on the number of implant procedures."

64.     Notably, Defendant Herbert further admitted that the Company had known about these issues long before November 7, 2023, and in fact, by no later than April 2023, just before the start of the Class Period.  Indeed, during the call, analysts were incredulous as to why Defendants did not disclose these issues earlier in the year, with a JPMorgan

analyst noting that the issue likely "*overlapped with the second quarter call*" and pointedly asking "*why not mention on 2Q [call]*?"  In response, Herbert expressly admitted that the prior authorization problems had "*started to become evident maybe a little bit in the second quarter*" —*i.e.*, even before the start of the Class Period, in the quarter beginning April 1, 2023—and that by "*the beginning of the third quarter*," the problems had become so significant that the Company was forced to "*take some corrective action*" and reverse the changes it had made to the Process.

65.    On these revelations, the price of Inspire stock dropped $31.79 per share— nearly *20% in a single day*—from a closing price of $161.74 per share on November 7, 2023, down to a closing price of $129.95 per share on November 8, 2023, on unusually high volume, wiping out over $920 million in market capitalization in a single day.

66.    Following the Company's earnings call, analysts excoriated Defendants for their failure to disclose this material adverse information earlier and for management's lack of transparency in discussing the issue.  For example, Truist noted that the "*controversy this quarter*" was around the previously undisclosed changes to the Prior Authorization Approval Process "*implemented early in the year that put the burden of pre-authorizations submissions more into customers hands*," which led to "slowing private insurance prior-auth submissions."  Truist further noted that Inspire management had been aware of the problems during the Class Period, stating that "*during Q2*" Inspire management "*began to realize there was a consistent slowdown in prior authorization submissions … moving through the year into the summer months*," and that by "*the early*

part of the [third] quarter (i.e. July)," the slowdown had "negatively impacted procedure volume."

67.     Wells Fargo similarly observed that Inspire management had "**noted a slowdown in P[rior] A[uthorizations] in early Q3**" (i.e. by July 2023) and that "**the signs were probably there in Q2**" (i.e. April-June 2023).   And JPMorgan analysts—the same analysts who expressed shock at the Company's non-disclosure during the earnings call— also reported that the Company's results were due to the previously undisclosed "**change in the way the Company navigates the prior authorization process**," which led to "**a slowdown in prior authorization submissions as the Company began to offload this process to centers**."   The JP Morgan analysts lamented that "**this wasn't the quarter we were hoping for**," as the newly disclosed changes to the PAAP had "**resulted in a $7-10M shortfall**" and a loss of "**~400 procedures.**"

68.     Oppenheimer criticized Inspire management's lack of transparency in a report titled "**Soft FY23 Guide, Prior-Auth[orization] Problems [are] Unclear**," which stated that Inspire's "[d]ecrease in the number of prior[]authorizations [was] due to process challenges" and opined that the "**[p]rior auth[orization] issue [was] confusing**."   And other analysts similarly noted that the Company's first ever earnings miss was the "self-inflicted" result of the previously undisclosed changes to the PAAP.   For example, UBS noted that, due to the "decline in prior authorization submissions," this marked "**the first quarter since INSP's 2018 IPO where the company missed the Street's sales expectations**."   Similarly, Wolfe Research noted the likely $10 million in revenue lost and pointed out that "**since [the] IPO [the] company has never 'not beat' [expectations]**" until

that quarter. Piper Sandler described the Company's results as "disappointing" and "*[s]elf-[i]nflicted*," noting that "a number of centers faced difficulties in the transition and the subsequent decline in prior authorization submissions led to a slowdown in INSP procedures in early Q3."

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. 1Q 2023 Financial Results

69. On May 2, 2023, after market close, Inspire reported its financial results for the first quarter of 2023 ("1Q 2023"). During the earnings conference call for the quarter, Defendant Herbert spoke positively about the Prior Authorization Approval Process, claiming that Inspire had "***steadfastly improved our conversion of contact to patients receiving therapy***"— *i.e.*, had improved the rate at which patients who made initial inquiries about Inspire devices wound up getting the implant. Further, Herbert assured investors of improvement in the amount of time this "conversion" was taking—touting a significant "***reduc[tion in] the time from patient contact to implant***." Specifically, Herbert noted:

> In the first quarter, the number of visitors to our website surpassed 3.4 million, which is significant. The website is the introduction for patients and the source of the growth in therapy adoption. In January of 2022, we initiated our first national media campaign, which resulted in a onetime spike in website visitors surpassing the 3.4 million in the first quarter, but the current volume has us in a very strong position entering 2023. From these visits, we had over 19,000 physician contacts ***and have steadfastly improved our conversion of contact to patients receiving therapy*** ... And finally, our focus continues towards increasing surgeon capacity, and ***we see signs of improvement in the patient pathway and specifically by reducing the time from patient contact to implant*** …

70.     The statements in paragraph 69 were materially false and misleading and omitted material facts needed to make them not misleading.  In reality, Inspire had decidedly *not* "steadfastly improved [its] conversion of contact to patients receiving therapy" and had *not* "reduc[ed] the time from patient contact to implant," but rather the exact opposite was true. Far from "improvement," Inspire was already seeing a dramatic *worsening* of the process and timing of conversion of contact to patients receiving therapy. Specifically, as former employees confirmed, and as Defendant Herbert later admitted, unbeknownst to investors, Defendants had made drastic changes to the PAAP, so that rather than being closely involved in every step of the prior authorization process, Defendants now "***minimize[d] our involvement with [our customers'] prior authorization process***." These changes not only caused prior authorizations to take far longer, but had caused many procedures to either get outright rejected by insurers, or had caused patients to give up on getting the surgery as the wait became too long.

71.     Indeed, according to former employees directly involved in the PAAP, Inspire experienced "***absolutely a massive slowdown***" in prior authorizations, "***lost patients that were waiting too long and decided to opt out of having the procedure done***," and "had more denials with forgetting documentation," such that "***its approval percentage [by insurers] definitely went down dramatically***."  And further, Defendants later admitted that they *knew* about these problems by the time they made these statements, as they had

been "*tracking the results*" of the changes, and the problems had "*started to become evident … in the second quarter*" —*i.e.*, the quarter beginning April 1, 2023.

72.    During the same earnings call, Defendant Herbert also touted the PAAP's new "digital scheduling pilot," specifically stating that the "digital scheduling pilot continues to make strides and we are currently experiencing a *30% improvement in physician appointments in the pilot centers compared to traditional phone and e-mail scheduling through our Advisor Care Program* and are adding technology to support the next wave of participating centers."

73.    The statements in paragraph 72 were materially false and misleading and omitted material facts needed to make them not misleading.  Specifically, it was misleading to tout the digital scheduling pilot—a key aspect of the PAAP—without also disclosing that, at the same time, Defendants had radically changed the Process by "*minimiz[ing] our involvement with [our customers'] prior authorization process*," as well as the fact that this decision caused hundreds of lost sales and millions of dollars in lost revenue.  Indeed, according to former employees directly involved in the PAAP, Inspire experienced "*absolutely a massive slowdown*," in prior authorizations, "*lost patients that were waiting too long and decided to opt out of having the procedure done*," and "had more denials with forgetting documentation," such that "*its approval percentage [by insurers] definitely went down dramatically*."  And further, Defendants later admitted that they *knew* about these problems by the time they made these statements, as they had been "*tracking the results*" of the changes, and the problems had "*started to become evident … in the second quarter*" —*i.e.*, the quarter beginning April 1, 2023.

**B.    The May 16, 2023 RBC Capital Markets Global Healthcare Conference**

74.    On May 16, 2023, Inspire presented at the RBC Capital Markets Global Healthcare Conference.  During the conference, Defendant Herbert made a series of positive statements regarding the Prior Authorization Approval Process, without disclosing the highly material information that Defendants had dramatically changed that Process and were no longer intimately involved in helping patients obtain authorization for Inspire's procedure.  Specifically, Herbert explained that Inspire was incentivizing its sales representatives to foster a higher "utilization" (i.e. more procedures per center), which he said had been "***well received***."  Herbert further claimed that the Company was helping providers to submit their prior authorizations, stating that the Company was "in the phase of teaching centers … to help them just kind of submit their own prior authorizations." Moreover, Herbert claimed that, overall, Inspire had *dramatically sped up* the PAAP, such that while the approval process had once taken "4 to 6 months," now it typically took "***just 2 to 5 days***" to obtain insurance approval:

> [Sales reps] used to be [compensated based on] something called PET, patients expecting therapy, that we had for the first five years because we used to remember it could take 4 to 6 months to get an insurance approval. ***Now we get approved in just 2 to 5 days***. ***So we really are in the phase of teaching center[s] that - to help them just kind of submit their own prior authorizations***.  So now we need to do a transition of sales team a little bit and we incent them more on having high utilized centers, high utilization centers.  As we talked about, primary purpose, center with the highest utilization has the best patient outcomes.  So if a center has two procedures a month, they get a certain bonus level.  If they have four a month, it goes up.  Six a month.  Eight a month.  So it's an accelerator based on the utilization of centers to incent the sales reps or the territory managers to really focus on high utilization, which in turn is going to drive high patient outcomes.  Started January 1 and ***it's been well received so far***.  The sales force really is able to understand the need to have an incentive like that and

they know how to really get behind it and be able to drive the utilization. ***So it's been very well received***.

75.    The statements in paragraph 74 were materially false and misleading and omitted material facts needed to make them not misleading.  Specifically, as former employees confirmed, and as Defendant Herbert later admitted, Inspire's Prior Authorization Approval Process had *not* sped up to as little as "2 to 5 days" but had, in fact, dramatically *worsened* and *slowed down* due to the Company's changes to the Process—specifically the Company's undisclosed decision to "***minimize our involvement with [our customers'] prior authorization process***" at the beginning of 2023.

76.    Further, by May 16, 2023, Defendants already knew that the changes they had made to their PAAP *had already* led to lost sales, as they later admitted they had been "tracking" the problem even before this statement was made.  Indeed, according to former employees directly involved in the PAAP, Inspire experienced "***absolutely a massive slowdown***" in prior authorizations, "***lost patients that were waiting too long and decided to opt out of having the procedure done***," and "had more denials with forgetting documentation," such that "***its approval percentage [by insurers] definitely went down dramatically***."   And moreover, Defendants later admitted that they *knew* about these problems by the time they made these statements, as they had been "***tracking the results***," of the changes, and the problems had "***started to become evident … in the second quarter***"—*i.e.*, the quarter beginning April 1, 2023.

77.    Additionally, Inspire was *not* "teaching" centers to "help them … submit their own prior authorizations," but rather, Inspire had radically changed its PAAP, and

had *stopped* helping centers to submit prior authorizations, instead leaving the medical providers (who lacked adequate staffing and expertise) to figure things out for themselves. Indeed, as FE 4 explained, Inspire did almost nothing to prepare medical offices for the change in prior authorization policy, essentially distributing a one-page "marketing piece" to the providers in the beginning of 2023 that notified them of the changes, and medical providers "pushed back." As Defendants knew and were directly warned about by employees including Territory Managers, Regional Managers, and Area Vice Presidents, many medical providers did not actually have the staffing or knowhow to submit those authorizations timely or correctly, and the result almost inevitably would be loss of customers and delay or loss of revenue.

### C.    The 2Q 2023 Earnings Call

78.    On August 1, 2023, Inspire reported its financial results for the second quarter of 2023. During the Company's earnings call that day, Herbert *again* spoke positively about the Prior Authorization Approval Process, going so far as to claim that Inspire had "steadfastly improved our conversion of patients receiving therapy." Specifically, Herbert stated:

> In the second quarter, the number of visitors to our website surpassed 2.9 million. From these visits, we had over 12,000 physician contacts. ***And even with the typical summer slowdown in contact, we steadfastly improved our conversion of patients receiving therapy.***

79.    The statements in paragraph 78 were materially false and misleading and omitted material facts needed to make them not misleading. Indeed, at the end of the Class Period—and after analysts noted that the issue "***probably overlapped with the second***

36

*quarter call*" and asked "*why not mention on 2Q [call]*?"—Defendants expressly admitted that the problems stemming from their changes to the Prior Authorization Approval Process "*started to become evident*" *months* earlier during the Company's second quarter. In fact, by "*the beginning of the third quarter*"—*i.e.*, a full month prior in early July 2023—the problems had become so significant that Defendants were forced to "*take some corrective action*" and reverse the changes they had made to the Process.

80.    Moreover, as former employees confirmed, and as Defendants later admitted, Inspire had *not* "steadfastly improved [its] conversion of patients receiving therapy," but, instead, by removing its sales representatives from the prior authorization process to cut costs, Inspire had caused a massive *slowdown* in conversion of patients receiving therapy, and had further caused many patients to simply give up on seeking the therapy as their prior authorizations were delayed.    Indeed, according to former employees directly involved in the Prior Authorization Approval Process, Inspire experienced "*absolutely a massive slowdown*," in prior authorizations, "*lost patients that were waiting too long and decided to opt out of having the procedure done*," and "had more denials with forgetting documentation," such that "*its approval percentage [by insurers] definitely went down dramatically*."

81.    Also during the call, an analyst with Truist Securities asked Defendant Herbert whether there was a "backlog or pent-up demand that's continuing to come in and support strong results?"    In response, Defendant Herbert unequivocally stated "Yes," touting the Company's supposed "*growth across all of our centers*," and reaffirmed that

the Company's "conversion" rate—the rate at which patients who made initial contact about Inspire's device wound up having the device implanted—"***continues to be strong***":

Richard Samuel Newitter Truist Securities, Inc., Research Division:

And then kind of a generic question with respect to the utilization backdrop for a number of elective procedures out there. It's been strong in the first half, above trend. I know you guys are in a different situation, so underpenetrated into this huge TAM. But ***I'm curious to the extent to which you're seeing any kind of backlog or pent-up demand that's continuing to come in and support strong results***? And if you are, what the outlook is from a contribution standpoint as we move into the back half?

Timothy P. Herbert CEO, President & Director:

***Yes, we are***. I think ***we're seeing continued growth across all of our centers***. Obviously, ***same-store sales drove the growth in Q2, as it did in Q1, and I think will continue to do so as we move forward***. I think that we're excited, again, about the pop that we saw with Medicare in the second quarter. And I think that kind of overwhelmed a little bit more of the commercial cases, which will come on strong in the second half. So the demand continues to be there. As you mentioned, Rich, we continue to be underpenetrated in the TAM. And we still have limitations on the number of surgeons performing the procedures. So we still need to continue to address that and work the backlog of patients. But absolutely, people want to have -- step in and have their obstructive sleep apnea taken care of. Demand from our direct-to-consumer continues to be very effective. Our contacts are high. ***Our efficiency and conversions of patients through implant continues to be strong.*** We just got to continue to open up more OR time by training and getting ENTs to commit more of their time to these patients.

82.    The statements in paragraph 81 were materially false and misleading and omitted material facts needed to make them not misleading.  Again, Defendants knew that they had dramatically changed the Prior Authorization Approval Process eight months earlier and were no longer involved in managing patients' prior authorization submissions to insurers—i.e. they had "***minimize[d] our involvement with [our customers']  prior authorization process***"—and they knew that sales were suffering as a result.  As

Defendants further knew, Inspire's "efficiency and conversions of patients through implant" had not "continued to be strong," but instead had *weakened dramatically* for the same reasons stated in paragraphs 79 and 80.  Similarly, Inspire was not achieving "growth across all of [its] centers" but was experiencing severe delays, denials, and lost sales due to the negative impact the change in the Process was having. Indeed, according to former employees directly involved in the Process, Inspire experienced "***absolutely a massive slowdown***," in prior authorizations, "***lost patients that were waiting too long and decided to opt out of having the procedure done***," and "had more denials with forgetting documentation," such that "***its approval percentage [by insurers] definitely went down dramatically***."

### D.    The September 6, 2023 Wells Fargo Securities Healthcare Conference

83.    On September 6, 2023, Inspire presented at the Wells Fargo Securities Healthcare Conference, during which Defendants made additional positive statements about the Company's business, without disclosing the highly material information that Defendants had dramatically changed the Prior Authorization Approval Process at the beginning of 2023 and were no longer intimately involved in helping patients obtain authorization for Inspire's procedure.  During the conference, a Wells Fargo analyst asked Defendant Buchholz about Inspire's guidance, which he said "implies more seasonality that we've typically seen."  Consequently, the analyst asked whether there was "anything different about this year?"  In response, Defendant Buchholz described a "little bit higher mix of Medicare vs commercial" in the Company's business, but said it would not be a "headwind," because "***we have a robust pipeline of patients awaiting therapy***":

<u>Lawrence H. Biegelsen Wells Fargo Securities, LLC, Research Division</u>:

I wanted to touch upon the outlook, Rick. How are you thinking about seasonality this year? I mean you guys have a pretty seasonal business when we look at prior years. Anything different about this year? The guidance implies more seasonality than we've typically seen.

<u>Richard J. Buchholz Chief Financial Officer</u>

Yes. I mean we haven't changed our guidance philosophy at all since day 1, which is just now over 5 years since we've been a public company. And we did mention in the second quarter that we had a little bit higher mix of Medicare versus commercial. But that's similar to other companies that have called that out. But really, we expect that to revert back to a heavier commercial mix in the second half of the year because we do have a little bit more pronounced seasonality in the fourth quarter because of the deductible plans resetting because the majority of our -- more than the majority of our procedures are commercial cases.

<u>Lawrence H. Biegelsen Wells Fargo Securities, LLC, Research Division</u>:

I mean on the Medicare, there's been -- on the Medicare mix in Q2, there's been some concern among investors that, based on what some of the managed care companies have said, that there's been some like pent-up demand, some bolus of patients that came through in the second quarter. And you talked about the mix reverting. Is this a headwind to you guys, this mix issue?

<u>Richard J. Buchholz Chief Financial Officer</u>:

**No. I mean we're -- we have a robust pipeline of patients awaiting therapy. So don't expect that to be a headwind**.

84.     The statements in paragraph 83 were materially false and misleading and omitted material facts needed to make them not misleading.  Again, Defendants knew that they had dramatically changed the Prior Authorization Approval Process at the beginning of the year and that they were no longer involved in managing patients' prior authorization submissions to insurers—they had "**minimize[d] our involvement with [our customers']**

**prior authorization process**"—and they knew that sales were suffering as a result.  Thus,

in reality, and as Herbert later admitted, Defendants knew by this time that the loss of commercial prior authorizations *already was* a headwind, as Inspire was already losing millions of dollars in sales due to changes in the PAAP.

85.     Indeed, at the end of the Class Period—and after analysts noted that the issue "***probably overlapped with the second quarter call***" and asked "***why not mention on 2Q [call]***?"—Defendants expressly admitted that the problems stemming from their changes to the PAAP "***started to become evident***" *months* earlier during the Company's second quarter.  In fact, by "***the beginning of the third quarter***"—*i.e.*, a full month prior in early July 2023—the problems had become so significant that Defendants were forced to "***take some corrective action***" and reverse the changes they had made to the Process.  As such, Inspire did not have a "robust pipeline of patients awaiting therapy," but was already well into a quarter where it knew that it was *losing millions of dollars in sales* due to prior authorization failures.   Furthermore, according to former employees directly involved in the Process, Defendants were well aware that Inspire experienced "***absolutely a massive slowdown***," in prior authorizations, "***lost patients that were waiting too long and decided to opt out of having the procedure done***," and "had more denials with forgetting documentation," such that "***its approval percentage [by insurers] definitely went down dramatically***."

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

86.     As alleged above, numerous facts raise a strong inference that Defendants knew, or were deliberately reckless in disregarding, the true facts

87.    *Defendants themselves touted the Prior Authorization Approval Process as the key to the Company's success, repeatedly calling the Process a "pillar of our reimbursement strategy" and a "competitive strength."*  Inspire's Form 10-Ks described the PAAP extensively as an integral part of the Company's business, describing it in detail on multiple pages.  For example, Inspire's 2022 Form 10-K stated that the Company's "Prior Authorization Approval Process" was a "***pillar of our reimbursement strategy***" which, it explained, "includes leveraging our market access team to assist patients and physicians in obtaining appropriate prior authorization approvals in advance of treatment." Inspire's 10-K further touted the team's effectiveness, asserting that "***our market access team is highly effective in working with patients and physicians to obtain prior authorizations for our Inspire system*** including assisting with the appeals process," and affirming that "we will continue to benefit from this efficient prior authorization process."

88.    Similarly, elsewhere in the 10-K, Inspire referred to the PAAP as one of "***Our Competitive Strengths***." Inspire touted its "[d]edicated team focused on providing market access for patients and advisors," and explained that "[w]e have ***a refined, efficient approach to advance patients, once identified, to placement of the Inspire system***," and that "***our dedicated market access team helps patients and providers work with payors to secure prior authorization approvals in advance of initial treatment***."  Inspire's Form 10-K further stated that "a subset of our 25-person reimbursement team, which we refer to as our market access team, ***is focused on assisting patients and physicians in obtaining prior authorization approvals from commercial payors on a case-by-case basis in advance of treatment with our Inspire therapy***."

89.    And additionally, Inspire's 10-K highlighted that its PAAP included a "holistic and targeted approach to market development and patient engagement," which involved a "methodical approach to market development which centers on active engagement across three key stakeholders in the OSA treatment paradigm: physicians, sleep centers, and patients."  As the 10-K explained, *"[o]ur sales force is focused on building long-lasting relationships with ENT physicians and sleep centers as we support physicians through all aspects of a case-from diagnosis to surgical support to patient follow-up*."

90.    The fact that the Prior Authorization Approval Process was a "pillar" of the business and "competitive strength" meant that Inspire's most senior executives—including the individual Defendants—would obviously have been closely following, and indeed directly implementing, any changes to the Process and their impacts on the business, and thus is evidence that Defendants' statements during the Class Period were knowingly or recklessly false and misleading.

91.    *Defendants admitted at the end of the Class Period that they were well aware, as of January 1, 2023, that they had "minimize[d] our involvement with [our customers'] prior authorization process"—a radical change that Defendants concealed from investors.*  During Inspire's November 7, 2023 earnings call, Defendant Herbert admitted that the Company's Class Period prior authorization problems had been the direct result of Defendants' decision to "*minimize our involvement with [our customers'] prior authorization process*."  Herbert further admitted that these massive changes to the Prior Authorization Process had been made at the very beginning of 2023, yet Defendants never

told investors that they had made these dramatic changes to the Process, in spite of it being touted as a "pillar of our reimbursement strategy" and a "competitive strength." Herbert's admission that he had made highly material and previously undisclosed changes to a critical part of the Company's business prior to the start of the Class Period is evidence that Defendants' statements during the Class Period were knowingly or recklessly false and misleading.

92.    *Defendants further admitted to being aware of the problems the Prior Authorization Approval Process changes were causing by no later than the second quarter of 2023.* During Inspire's November 7, 2023 earnings call, Defendant Herbert admitted that the Company had "tracked the decrease in the number of submissions by our customers seeking prior authorization to the Inspire procedure, resulting in a short-term impact on the number of Implant procedures ***during the early part of the third quarter***." Later on in the call, and in response to an analyst question, Defendant Herbert admitted that he had known about the problems even earlier, during the second quarter. Specifically, when the analyst pointed out that "***you started to learn about this early in the third quarter [and] I imagine it probably overlapped with the second quarter call***,"—i.e. the Company's earnings call on August 1, 2023—and asked "***just wondering when you knew about it and why not mention on 2Q***?" Defendant Herbert responded by admitting that the prior authorization problems had "***started to become evident maybe a little bit in the second quarter***." Defendants' admissions thus evidence that they knew, or were deliberately reckless in not knowing, that their statements during the Class Period were false and misleading.

93.    *Defendant Herbert specifically averred that he "tracked" prior authorization submissions*.    During the Company's November 7, 2023 earnings call, Herbert noted that the Company had specifically "**tracked the decrease in the number of submissions by our customers seeking prior authorization to the Inspire procedure**" during the Class Period.    Additionally, Defendant Herbert specifically admitted that the Company had been "**tracking the results of the program**" [i.e. the changes to the PAAP] throughout the class period.    Herbert's admission that he had "tracked" the decline in prior authorizations during the Class Period is evidence that his statements during the Class Period were knowingly or recklessly false and misleading.

94.    *Analysts were incredulous that Defendants did not disclose the material issues with the Prior Authorization Approval Process earlier, specifically highlighting the fact that Defendants had known of these problems at the time they made their false and misleading statements*.    During and after Inspire's November 7, 2023 earnings call, analysts specifically highlighted the fact that Defendants had already known of their prior authorization problems at the times when they made positive statements during their May and August 2023 investor calls.    For example, a JPMorgan analyst pointed out to Herbert that "**I imagine [these issues] probably overlapped with the second quarter call**," and thus questioned "**when you knew about it and why not mention on 2Q**."    A Truist report similarly emphasized that, **by the second quarter, "mgmt…began to realize there was a consistent slowdown in prior authorization submissions occurring**."    Oppenheimer likewise highlighted management's lack of transparency in a report headlined "Prior-Auth[orization] Problems [are] Unclear," which concluded that management's explanation

of the prior authorization issue was "confusing." The fact that analysts believed that Defendants were aware of, and should have disclosed, their prior authorization problems earlier during the Class Period, is further evidence that Defendants either knew or were deliberately reckless in not knowing that their statements were false and misleading when made.

95.     *FE 1 confirmed that Defendant Herbert was specifically aware of the prior authorization problems by early in the Class Period*. FE 1 confirmed that upper levels of management and even the CEO were *undeniably* hearing about the Company's prior authorization problems from "early in the process," i.e. early in 2023. FE 1 stated that employees including her manager and the Area Vice President "***were all referencing this up to the CEO. This started pretty early in the process***." Indeed, FE 1 recalled a meeting no later than the second quarter of 2023 in which the CEO himself discussed Inspire's problems with prior authorizations. The fact that multiple employees were directly warning the CEO of prior authorization problems during the Class Period is evidence that Defendants' statements were knowingly or recklessly false and misleading when made.

96.     *Former employees confirmed that Defendants tracked prior authorizations using a Microsoft Dynamics platform*. FE 4 confirmed that Inspire's executives used Microsoft Dynamics software, to monitor patients' progress through the entire process, all the way from setting up new accounts to seeking prior authorization to scheduling surgery. Defendants' access to this information through their Microsoft Dynamics platform during the Class Period is further evidence that their statements were knowingly or recklessly false and misleading when made.

46

97.    *Sales of the Inspire device comprised all of Inspire's revenue, and commercial insurance reimbursements were the vast majority of that revenue*.  Throughout the Class Period, Inspire had only one product, the Inspire device, accounting for all of its revenue.  Moreover, historically 70% of Inspire's revenue had come from commercial insurance reimbursements, which required prior authorizations.  Sales of the device and the prior authorization process were thus both central to Inspire's business, and Inspire's CEO and CFO would obviously have been aware of substantial changes in the speed and quantity of prior authorizations and the number of units sold.  The centrality of commercial reimbursements to Inspire's business is evidence that Defendants' statements were knowingly or recklessly false and misleading when made.

98.    *Inspire's plan to make changes to the Prior Authorization Approval Process was itself critically important*.  With the exception of the fourth quarter of 2022, Inspire had never had a single profitable quarter in its history as a public company.  Cutting expenses was thus essential to Inspire's business, and Defendants would have been intensely interested in the impact of their changes to the Prior Authorization Approval Process, particularly given that Defendant Herbert himself averred that the Company was "educating" medical centers to do prior authorizations on their own.  The importance of Inspire's 2023 changes to the PAAP is evidence that Defendants' statements were knowingly or recklessly false and misleading when made.

## VII.    LOSS CAUSATION

99.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market.

This artificially inflated the prices of the Company's common stock and operated as a fraud or deceit on the Class.  When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of the Company's stock fell precipitously, as the prior artificial inflation came out of the price.

100.    On November 7, 2023, after market close, Inspire reported its financial results for the third quarter of 2023.  Inspire reported results that missed analyst expectations for the first time ever in the Company's history as a public company, i.e. since its IPO.  Inspire further revealed that it had seen a marked "***decrease in the number of submissions by our customers seeking prior authorization to the Inspire procedure,***" resulting in an "***impact on the number of implant procedures***."  Defendants explained that these problems had been the direct result of a "pilot program" to "***minimize our involvement with [our customers'] prior authorization process***,"—a radical change to one of the "pillars" of the Company's business strategy that it had never previously disclosed.  Consequently, Defendants explained, "***a significant number of our customers experienced challenges with their prior authorization submission process***."    And Defendants further admitted that they had known of these issues as early as the second quarter of 2023, yet had not disclosed them on their investor calls during the Class Period.

101.    On these revelations, the price of Inspire's shares dropped $31.79 per share, or more than 19.6%, from a closing price of $161.74 per share on November 7, 2023, down to a closing price of $129.95 per share on November 8, 2023.

102.   Analysts criticized Inspire for its non-disclosure, and uniformly attributed Inspire's revenue miss to the slowdown in prior authorizations resulting from its previously undisclosed changes to the Prior Authorization Process.  For example, during the earnings call a JPMorgan analyst noted that the problems "overlapped with the second quarter call" and asked "why not mention on 2Q [call]?"  Truist noted that the "controversy this quarter" was around the previously undisclosed changes to the PAAP "implemented early in the year that ultimately put the burden of pre-authorizations submissions more into customers hands," which led to "slowing private insurance prior-auth submissions,"  and further noted that "during Q2"  Inspire management "began to realize there was a consistent slowdown in prior authorization submissions …moving through the year into the summer months," and that by "the early part of the [third] quarter (i.e. July)," the slowdown had "negatively impacted procedure volume."  JPMorgan analysts reported that the Company's results were due to the previously undisclosed "change in the way the Company navigates the prior authorization process," which led to "a slowdown in prior authorization submissions as the Company began to off-load this process to centers."  The JP Morgan analysts lamented that "[t]his wasn't the quarter we were hoping for," as the newly disclosed changes to the PAAP had "resulted in a $7-10M shortfall" and a loss of "~400 procedures."  And UBS noted that, due to the "decline in prior authorization submissions," this marked "the first quarter since INSP's 2018 IPO where the company missed the Street's sales expectations."

## VIII.  PRESUMPTION OF RELIANCE

103.   At all relevant times, the market for Inspire common stock was open, efficient, and well-developed for the following reasons, among others:

49

a.    Inspire's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.    As a regulated issuer, Inspire filed periodic reports with the SEC and NYSE;

c.    Inspire regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wideranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.    Inspire was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

104.    As a result of the foregoing, the market for Inspire's securities reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Inspire's securities. All purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of Inspire's common stock at artificially inflated prices, and a presumption of reliance applies.

105.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material

omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Inspire's business and operations—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

106.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

107.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or

misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of Inspire who knew that such statement was false when made.

## X.    CLASS ACTION ALLEGATIONS

108.    Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all persons or entities who purchased, or otherwise acquired Inspire's common stock between May 3, 2023 and November 7, 2023, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of Inspire at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

109.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Inspire shares were actively traded on the NYSE. As of April 3, 2024, there were over 30 million shares of Inspire common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the proposed Class. Class members who purchased Inspire securities may be identified from records maintained by the Company,

or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

110.   Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

111.   Lead Plaintiff will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

112.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

    a.   whether the federal securities laws were violated by Defendants' acts and omissions, as alleged herein;

    b.   whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

    c.   whether Defendants acted with scienter; and

    d.   the proper way to measure damages.

113.   A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT ONE

#### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
#### (Against All Defendants)

114.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

115.    This Count is asserted on behalf of all members of the Class against Inspire and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

116.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

117.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and other investors similarly situated in connection with their purchases of Inspire common stock during the Class Period.

118.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Inspire common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the other members of the Class, regarding, among other things, Inspire's business and operations; (b) artificially inflate and maintain the market price of Inspire stock; and (c) cause Lead Plaintiff and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

119.    Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

120.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Inspire common stock, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

121.   Lead Plaintiff and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Inspire common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiff and the other members of the Class would not have purchased Inspire common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

122.   As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Inspire common stock during the Class Period.

## COUNT TWO

### For Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

123.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

124.   This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

125.   During their tenures as officers and/or directors of Inspire, each of these Individual Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act. *See* ¶¶ 17-22. By reason of their positions of control

and authority as officers and/or directors of Inspire, these Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Individual Defendants were able to and did control, directly and indirectly, the content of the public statements made by Inspire during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

126.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company. Defendants Herbert and Buchholz signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by Inspire during the Class Period. The Individual Defendants were also directly involved in providing false information, and they certified and approved the false statements disseminated by Inspire during the Class Period. As a result of the foregoing, the Individual Defendants, together and individually, were controlling persons of Inspire within the meaning of Section 20(a) of the Exchange Act.

127.    As set forth above, Inspire violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

128.    By virtue of their positions as controlling persons of Inspire, and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as,

the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class, who purchased or otherwise acquired Inspire common stock. As detailed above in ¶¶ 17-22, during the respective times these Individual Defendants served as officers and/or directors of Inspire, each of these Individual Defendants was culpable for the material misstatements and omissions made by the Company.

129.    As a direct and proximate result of these Individual Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or other acquisition of Inspire common stock.

## XII.    PRAYER FOR RELIEF

130.    WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a.    Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.    Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiff and the other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c.    Awarding Lead Plaintiff and other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

       d.      Awarding such equitable/injunctive or other relief for the benefit of

the Class as the Court may deem just and proper.

## XIII.  JURY DEMAND

131.    Lead Plaintiff demands a trial by jury.

Dated: April 19, 2024                    Respectfully submitted,

                                         **LOCKRIDGE GRINDAL NAUEN PLLP**

                                         */s/ Kate M. Baxter-Kauf*
                                         Gregg M. Fishbein (Bar No. 0202009)
                                         Kate Baxter-Kauf (Bar No. 392037)
                                         100 Washington Avenue S, Suite 2200
                                         Minneapolis, MN 55401
                                         Tel.: (612) 596-4007
                                         Fax: (612) 339-0981
                                         gmfishbein@locklaw.com
                                         kmbaxter-kauf@locklaw.com

                                         *Local Counsel for Lead Plaintiff*

                                         **SAXENA WHITE P.A.**
                                         Lester R. Hooker (admitted *pro hac vice*)
                                         7777 Glades Road, Suite 300
                                         Boca Raton, FL 33434
                                         Tel.: (561) 394-3399
                                         Fax: (561) 394-3382
                                         lhooker@saxenawhite.com

                                         -and-

                                         **SAXENA WHITE P.A.**
                                         Steven B. Singer (*pro hac vice* forthcoming)
                                         Joshua H. Saltzman (*pro hac vice* forthcoming)
                                         Marco A. Dueñas (admitted *pro hac vice*)
                                         10 Bank Street, Suite 882
                                         White Plains, NY 10606
                                         Tel.: (914) 437-8551
                                         Fax: (888) 216-2220
                                         jsaltzman@saxenawhite.com
                                         mduenas@saxenawhite.com

                                         *Lead Counsel for Lead Plaintiff*

                                         **KLAUSNER KAUFMAN JENSEN**
                                         **& LEVINSON**
                                         Robert D. Klausner (admitted *pro hac vice*)
                                         7080 NW 4th Street

Plantation, FL 33317
Tel.: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Lead Plaintiff*