**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| CITY OF HOLLYWOOD FIREFIGHTERS' PENSION FUND, individually and on behalf of those similarly situated, | File No. 0:23-cv-03884-NEB-DJF |
| Plaintiff, | |
| vs. | **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT** |
| INSPIRE MEDICAL SYSTEMS, INC.; TIMOTHY P. HERBERT; and RICHARD J. BUCHHOLZ, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

BACKGROUND....................................................................................................... 2

I.     Inspire Launches A Product To Treat Obstructive Sleep Apnea........................ 2

II.    Government And Commercial Sources Cover Payment Of The Inspire Device, With The Mix Varying Seasonally. ............................................................. 3

III.   Much Of Inspire's Revenue Is From Implants For Which Insurers Require Prior Authorizations. ............................................................................... 4

IV.   In January 2023, Inspire Implements A Prior Authorization Pilot Program And Makes Related Changes To Its Sales Incentive Compensation. ............................................................................................................ 6

V.    Shortly After The Launch, Herbert Discloses The PA Pilot And Sales Incentive Change And Expresses Optimism About Their Potential. ................. 7

VI.   Throughout 2023, Herbert And Buchholz Make Optimistic, Factually Accurate Statements About *Other* Aspects Of Inspire's Business Unrelated to the PA Pilot........................................................................................ 9

VII.  Inspire Monitors Its PA Pilot During 2023 And Addresses Problems Once They Become Evident. ........................................................................... 10

VIII. On November 7, 2023, Inspire Announces Quarterly Revenue Lower Than Certain Analyst Projections And Explains That The PA Pilot Had Likely Resulted In "Delays" In Revenue Recognition. ..................................... 12

IX.   Inspire's Stock Price Falls Following The November 7 Announcement, Then Quickly Recovers As 2023 Annual Revenue Beats Forecasts.................. 14

STANDARD OF REVIEW................................................................................... 15

ARGUMENT ........................................................................................................ 15

I.    Plaintiff Fails To Plead Any Actionable Misstatements or Omissions. ........... 16

    A.   Herbert's Statements At The May 16 Conference Regarding The Average Speed Of Approvals Were Not False or Misleading. ............... 17

        1.   There was no duty to disclose "issues" with the PA Pilot as of May 16, 2023.............................................................................. 18

        2.   The May 16, 2023 RBC Conference Call statements were not false or misleading................................................................... 21

B.  Herbert's Statement Regarding Inspire's "Improving" "Patient Contact to Implant" Timeline Was Not False or Materially Misleading. ............................................................................. 24

C.  Herbert's Statement Regarding Inspire's "Digital Scheduling Pilot" Was Not False or Materially Misleading. ........................................ 26

D.  Herbert's Statements Regarding Inspire's "Improving" Patient "Conversion Rates" Were Not False or Materially Misleading. ............. 27

E.  Statements Regarding Inspire's "Continued Growth" and "Robust Patient Pipeline" Were Not False or Materially Misleading. ................... 29

II.  The Complaint Fails to Plead Specific Facts Giving Rise To A Strong Inference Of Scienter. ................................................................................. 32

A.  Plaintiff Does Not Allege Any Discernable Motive For Defendants to Commit Fraud. .................................................................... 32

B.  Plaintiff's Other Scienter Allegations Are Equally Meritless. ................. 34

1.  Core-operations allegations have not been recognized in the Eighth Circuit, and would fail in any event. ........................... 34

2.  Knowledge and awareness of potential issues with the PA Pilot do not establish a strong inference of scienter. ................... 36

3.  Out-of-context statements of some analysts do not establish a strong inference of scienter. ......................................... 38

4.  The confidential-witness allegations do not establish a strong inference of scienter. ......................................................... 39

C.  The More Cogent and Compelling Inference Is That Defendants Disclosed Problems Once They Became Known. ................................... 42

III.  The Claim Against Buchholz Fails For Additional Reasons. ............................ 43

IV.  Plaintiff Fails To Plead Control Person Claims. ................................................ 43

CONCLUSION ................................................................................................................ 43

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ............................................................................ 31

*Elam v. Neidorff*,
  544 F.3d 921 (8th Cir. 2008) .............................................................18, 33, 34

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) ..................................................................... 32, 41

*In re 3M Co. Sec. Litig.*,
  2021 WL 4482987 (D. Minn. Sept. 30, 2021)...........................2, 22, 33, 34

*In re Apogee Enter., Inc. Sec. Litig.*,
  2020 WL 1445856 (D. Minn. Mar. 25, 2020) ......................................*passim*

*In re Bank of Am. Corp.*,
  2011 WL 740902 (N.D. Cal. 2011) ................................................................ 37

*In re Biogen Sec. Litig.*,
  857 F.3d 34 (1st Cir. 2017) ...................................................................... 34, 39

*In re Bos. Sci. Corp. Sec. Litig.*,
  686 F.3d 21 (1st Cir. 2012) .......................................................................... 40

*In re Ceridian Corp. Sec. Litig.*,
  542 F.3d 240 (8th Cir. 2008) ........................................................................ 36

*In re Cerner Corp. Sec. Litig.*,
  425 F.3d 1079 (8th Cir. 2005) .............................................................. 15, 29

*In re Digi Int'l, Inc. Sec. Litig.*,
  6 F. Supp. 2d 1089 (D. Minn. 1998)............................................................ 32

*In re InvenSense, Inc. Sec. Litig.*,
  2017 WL 11673462 (N.D. Cal. Apr. 12, 2017) ......................................... 27

*In re K-tel Int'l, Inc. Sec. Litig.*,
  300 F.3d 881 (8th Cir. 2002) ........................................................................ 32

*In re Navarre Corp. Sec. Litig.*,
    299 F.3d 735 (8th Cir. 2002) ................................................................. 32

*In re Patterson Cos., Inc. Secs., Deriv. & ERISA Litig.*,
    479 F. Supp. 2d 1014 (D. Minn. 2007) .................................................. 42

*In re Read-Rite Corp. Sec. Litig.*,
    335 F.3d 843 (9th Cir. 2003) ................................................................. 34

*In re Sanofi Aventis Sec. Litig.*,
    774 F. Supp. 2d 549 (S.D.N.Y. 2011) .................................................... 35

*In re Stratasys Ltd. Sec. Litig.*,
    864 F.3d 879 (8th Cir. 2017) ...........................................................*passim*

*In re Stratays Sec. Litig.*,
    2016 WL 3636992 (D. Minn. June 30, 2016) ................................... 20, 25

*In re Target Corp. Sec. Litig.*,
    955 F.3d 738 (8th Cir. 2020) .......................................................14, 23, 42

*In re Target Sec. Litig.*,
    275 F. Supp. 3d 1063 (D. Minn. 2017) .................................................. 30

*In re XM Satellite Radio Holdings Sec. Litig.*,
    479 F. Supp. 2d 165 (D.D.C. 2007) ....................................................... 23

*Kushner v. Beverly Enters., Inc.*,
    317 F.3d 820 (8th Cir. 2003) ................................................................. 42

*Macquarie Infra. Corp. v. Moab Partners, LP*,
    601 U.S. 257 (2024) .........................................................................15, 26

*Mart v. Tactile Sys. Tech., Inc.*,
    595 F. Supp. 3d 788 (D. Minn. 2022) .................................................... 33

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ................................................................................. 15

*McAdams v. McCord*,
    584 F.3d 1111 (8th Cir. 2009) ............................................................... 15

*Norfolk County Ret. Sys. v. Tempur-Pedic Int'l, Inc.*,
    22 F. Supp. 3d 669 (E.D. Ky. 2014) ...................................................... 23

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,*
    575 U.S. 175 (2015) ................................................................................................16, 29

*Oregon Pub. Empls. Ret. Fund v. Apollo Group Inc.,*
    774 F.3d 598 (9th Cir. 2014) ................................................................................. 23

*Plymouth Cty. Ret. Sys. v. Patterson Co., Inc.,*
    2019 WL 3336119 (D. Minn. July 25, 2019).......................................................... 26

*Podraza v. Whiting,*
    790 F.3d 828 (8th Cir. 2015) ............................................................................. 2, 31

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,*
    759 F.3d 1051 (9th Cir. 2014) ............................................................................... 34

*Reckstin Family Trust v. C3.ai, Inc.,*
    --- F. Supp. 3d ---, 2024 WL 734497 (N.D. Cal. Feb. 22, 2024) ................................ 2

*Rosenzweig v. Azurix Corp.,*
    332 F.3d 854 (5th Cir. 2003) ................................................................................. 34

*Sakkal v. Anaplan, Inc.,*
    557 F. Supp. 3d 988 (N.D. Cal. 2021)................................................................... 40

*Shoemaker v. Cardiovascular Sys., Inc.,*
    300 F. Supp. 3d 1046 (D. Minn. 2018).............................................................20, 40

*Southland Securities Corp. v. INSpire Ins. Solutions, Inc.,*
    365 F.3d 353 (5th Cir. 2004) ................................................................................. 37

*Steamfitters Local 448 Pension & Ret. Sec. Funds v. Sleep Number Corp.,*
    2023 WL 4421688 (D. Minn. July 10, 2023).......................................................20, 32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ................................................................................14, 31, 41

*Trs. of Welfare & Pension Funds v. Medtronic PLC,*
    2024 WL 1332262 (D. Minn. Mar. 28, 2024) ...................................................*passim*

*United States v. Kline,*
    199 F. Supp. 2d 922 (D. Minn. 2002)....................................................................... 3

*West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.,*
    495 F. Supp. 3d 622 (N.D. Ill. 2020).................................................................... 30

v

## Statutes, Rules & Regulations

17 C.F.R. § 240.10b-5.................................................................................................... 15

15 U.S.C. § 78j(b).................................................................................................14, 15, 42

15 U.S.C. § 78t(a) ....................................................................................................... 14, 42

15 U.S.C. § 78u-4(b)(1) .................................................................................................. 14

15 U.S.C. § 78u-4(b)(2)(A)............................................................................................. 14

15 U.S.C. § 78u-4(c)(1)................................................................................................... 42

15 U.S.C. § 78u-4(c)(3)(ii) ............................................................................................. 42

## INTRODUCTION

Plaintiff accuses Inspire Medical Systems, Inc. ("Inspire") and its longtime CEO (Tim Herbert) and CFO (Rick Buchholz) of committing securities fraud by waiting too long to disclose that a pilot program Inspire implemented in January 2023 was not successful. The Complaint alleges that problems with the pilot program—which related to the process for submitting prior-authorization requests to insurers for Inspire's industry-leading medical device—led to "delays" in Inspire recognizing revenue in 2023, and that these problems should have been disclosed before November 2023. The Complaint is fatally deficient, and should be dismissed, for two fundamental reasons.

*First*, Plaintiff fails to identify any false or misleading statement. Many of the statements Plaintiff cites were made *before* the pilot-program issues had manifested, and so they could not be false or misleading. Other statements were about completely unrelated topics; were vague, non-actionable puffery; were true; or all three.

*Second*, the Complaint includes no plausible allegations of scienter, much less particular facts giving rise to the "cogent and compelling" inference of scienter the securities laws require. There are *zero* allegations suggesting Defendants had any motive to defraud investors—there are no insider-trading or executive compensation allegations. Nor does the Complaint allege specific facts suggesting Herbert or Buchholz *knew* about the delays or problems before disclosing them. The allegations attributed to "confidential former employees" included in the Complaint are vague and unpersuasive. The Court should dismiss the Complaint with prejudice.

1

## BACKGROUND

### I.   Inspire Launches A Product To Treat Obstructive Sleep Apnea.

Inspire is a medical-device company headquartered in Golden Valley, Minnesota. (¶16.)[1] It was founded in 2007, when it was spun off from Medtronic. (Ex.3 (2022 10-K) at 20.)[2] Inspire became a publicly traded company in May 2018, and as of the end of 2022 had about 750 employees. (*Id.* at 33, 36; ¶24.) Defendant Timothy Herbert has served as Inspire's President and CEO since 2007. (¶17.) Defendant Richard Buchholz has served as Inspire's CFO since 2014. (¶18.)

Inspire's core product (the "Inspire Device") is an implantable device designed to treat obstructive sleep apnea ("OSA"), a chronic disease that occurs when breathing is interrupted during sleep by a partially or completely blocked airway. (¶23; Ex.3 (2022 10-K) at 6.) If untreated, OSA "increases the risk of high blood pressure, hypertension, heart failure, stroke, coronary artery disease, and other life-threatening diseases." (Ex.3 (2022 10-K) at 6.)

---

[1] All citations to "¶" are to the Amended Complaint (Dkt. 28). All citations to "Ex." are to exhibits attached to the Declaration of Jeffrey P. Justman.

[2] The Court may take judicial notice of Inspire's publicly available SEC filings, press releases, earnings call transcripts, investor conference transcripts, and analyst reports. *See Podraza v. Whiting*, 790 F.3d 828, 833 (8th Cir. 2015) (SEC filings); *In re Apogee Enter., Inc. Sec. Litig.*, 2020 WL 1445856, at *7 n.6 (D. Minn. Mar. 25, 2020) (Brasel, J.) (press releases and call transcripts); *Trs. of Welfare & Pension Funds v. Medtronic PLC*, 2024 WL 1332262, at *28 n.35 (D. Minn. Mar. 28, 2024) (conference transcripts); *In re 3M Co. Sec. Litig.*, 2021 WL 4482987, at *8, *10 (D. Minn. Sept. 30, 2021) (Brasel, J.) (analyst reports); *Reckstin Family Trust v. C3.ai, Inc.*, --- F. Supp. 3d ---, 2024 WL 734497, at *5 (N.D. Cal. Feb. 22, 2024) (collecting cases).

The Inspire Device is an alternative to a continuous positive airway pressure ("CPAP") machine, which delivers pressurized air via a mask connected through a hose to a bedside air pump. (*Id.*) The cumbersome nature of the CPAP mask can decrease patient compliance, increasing health risks. (*Id.*) The Inspire Device, in comparison, is a "closed-loop, minimally invasive solution" that is "surgically implanted into a patient's chest." (*Id.*; ¶23.)

The Inspire Device received FDA approval in 2014 and has been used to treat tens of thousands of patients at over 1,000 medical centers since then. (¶23; Ex.3 (2022 10-K) at 6.) Inspire's direct-to-consumer marketing strategy and innovative product have driven remarkable growth, benefiting patients and shareholders alike. Inspire shares opened at $24.49 following its 2018 IPO, and now trade at approximately $135 per share. (Ex.21 (Stock Price Chart).)[3] During this period, Inspire's revenue has grown by over 700%, from about $50 million in 2018 to $625 million in 2023. (¶24; Ex.1 (2018 10-K) at 89; Ex.19 (2023 10-K) at 94.)

## II. Government And Commercial Sources Cover Payment Of The Inspire Device, With The Mix Varying Seasonally.

Inspire sells Inspire Devices to hospitals and ambulatory surgery centers—its customers—who implant them in patients. (Ex.3 (2022 10-K) at 7.) Inspire's customers are then typically reimbursed by either commercial or government-based third-party

---

[3] The Court may take judicial notice of Inspire's share price history. *See United States v. Kline*, 199 F. Supp. 2d 922, 928 (D. Minn. 2002).

payors. (*Id.*) Annually, about 70% of implants are covered by commercial insurers, and about 30% by government payors. (¶25; Ex.3 (2022 10-K) at 19.)

While the split between commercial payors and government payors is 70/30 on an annual basis, the ratio varies by quarter due to the "seasonality" of Inspire's business. Typically, in the first half of the year, a disproportionate share of procedures are paid for by government payors, with commercial insurance more heavily weighted to the second half. (Ex.3 (2022 10-K) at 33.) This is because "in the first quarter, many U.S. patients' insurance deductibles reset, requiring more out-of-pocket costs." (*Id.*) This in turn "negatively impacts" Inspire's commercial sales during the first part of the year. (*Id.*) By contrast, the second half of the year skews commercial as patients meet their annual insurance deductibles and schedule procedures. (*Id.*) Inspire warns investors that its revenue "has fluctuated, and may continue to fluctuate, from quarter to quarter due to a variety of factors," including "seasonality." (*Id.* at 41, 76-77.)

## III.  Much Of Inspire's Revenue Is From Implants For Which Insurers Require Prior Authorizations.

Commercial insurers require patients to receive "prior authorization" before they will cover the purchase and implantation of an Inspire Device. (¶26; Ex.3 (2022 10-K) at 74.) Due to the unique requirements of the various insurer policies that provide coverage for Inspire's products, the process for obtaining prior authorizations is complex and requires Inspire's customers to submit "extensive documentation." (¶¶26-27.) Failure to accurately prepare this documentation can result in denied claims, which

would prevent the patient from receiving an Inspire implant to treat their OSA. Given its knowledge and experience with the various insurer policy requirements, Inspire provides assistance with the prior authorization process as a means of facilitating patient access to its products. Inspire has successfully assisted patients with "obtaining prior authorization approvals" (¶32; Ex.3 (2022 10-K) at 7), including "hundreds of prior authorization approvals from all of the largest commercial payors[.]" (¶32; Ex.3 (2022 10-K) at 19.) This in turn has resulted in insurer approval times for the Inspire Device falling from "4 to 6 months" a few years ago to as little as "2 to 5 days" today. (¶74; Ex.8 (May 16, 2023 RBC Conf. Tr.) at 10; *see also* Ex.5 (Mar. 6, 2023 Truist Rep.) at 1 ("prior authorization timelines [were] reduced from months to days/ weeks").

Still, customers must obtain prior authorization on a "per-patient" basis. (Ex.3 (2022 10-K) at 74.) Inspire's salesforce and corporate market access team provide assistance with the preparation and submission of requests for prior authorizations "when required." (¶30; Ex.3 (2022 10-K) at 7-8.) Plaintiff claims that Inspire's involvement in the prior authorization process "was critical to [Inspire's] success." (¶¶28, 32.)

**IV.    In January 2023, Inspire Implements A Prior Authorization Pilot Program And Makes Related Changes To Its Sales Incentive Compensation.**

In January 2023, Inspire made two efforts to begin lessening its involvement in customers' submission of prior-authorization requests, both of which were disclosed.

First, Inspire started a "pilot program" testing a different approach to prior authorization (the "**PA Pilot**"). (¶62; Ex.13 (Nov. 7, 2023 Press Release).) Inspire encouraged certain of its customers—those believed to be most familiar with the prior authorization process—to submit the prior-authorization requests themselves, rather than having Inspire employees support the process. (¶¶36-37, 63; Ex.14 (Nov. 7, 2023 Call Tr.) at 5, 8.) As its name suggests, this PA Pilot was limited to a small percentage of Inspire's customers.

Second, Inspire changed the compensation of its sales employees to eliminate the component of incentive compensation associated with supporting the prior authorization process. This change was intended to encourage increased utilization of the company's products at existing customers with the goal of further enhancing patient outcomes. (¶¶36, 39.)

The goal of the PA Pilot was to test the ability of a subset of Inspire's customers to independently support the prior-authorization process and, if successful, then "leverage the learnings" to see if the approach could be "scale[d]" across all of Inspire's customers. (Ex.14 (Nov. 7, 2023 Call Tr.) at 8, 12.) The goal of the sales incentive

change was also to shift the sales team's focus to "[higher] utilization at existing centers." (*Id.* at 4-5, 10.)

This desire for customer independence in handling prior authorization submissions for their own procedures "is a natural transition for all new therapies," as "the time it takes to prepare [for] a procedure" becomes "significantly reduced" with additional "practice." (*Id.* at 15-16.) Inspire believed the two initiatives would succeed because, among other things, "the confidence in getting approvals from insurance companies with prior authorization ha[d] gotten extremely high," given Inspire's development of favorable coverage policies through years of hard work. (*Id.* at 10.)

## V.    Shortly After The Launch, Herbert Discloses The PA Pilot And Sales Incentive Change And Expresses Optimism About Their Potential.

The Complaint generally alleges fraud in not disclosing changes in the prior-authorization program, but that is incorrect: these two initiatives were disclosed before and at the beginning of the Class Period.

*First*, on February 7, 2023, on Inspire's 2022 fourth-quarter earnings call, Herbert advised investors that Inspire had "modified [its] incentive compensation to focus on [higher] utilization at existing centers." (Ex.14 (Feb. 7, 2023 Call Tr.) at 4-5, 10.) Herbert explained that, as Inspire "continue[d] to mature," it was "important that [it] shift from individual patient count to more utilization at site." (*Id.*) Thus, under the new program, incentive compensation would "really focus more on the utilization site." (*Id.*) Herbert noted that this change had been discussed "at the national sales meeting just a week

ago," and that the sales team was "very excited about . . . the prospects moving forward." (*Id.*)

*Second*, on March 6, 2023, a third-party analyst, Truist, released a report summarizing discussions with Inspire's management. While immaterial, Truist reported the change in sales compensation and the shift of resources from the prior authorization process, stating that with "much of the prior-authorization process getting streamlined/automated, *mgmt. feels very comfortable diverting time and resources from prior-authorization focus to (more important and relevant) go-forward areas*." (Ex.5 (Mar. 6, 2023 Truist Rep.) at 1.)

*Third*, on May 2, 2023 (the first day of the Class Period), Herbert again told investors that, as "we talked about previously," "we have changed the compensation structure with the territory managers to really focus on higher utilization at existing centers." (Ex.7 (May 2, 2023 Call Tr.) at 12.)

*Finally*, on May 16, 2023, at the RBC Capital Markets Global Health Conference, Herbert observed that Inspire was "in the phase of teaching center[s] that - to help them just kind of submit their own prior authorizations." (¶74; Ex.8 (May 16, 2023 RBC Conf. Tr.) at 10-11.) Herbert added that the changes had "[s]tarted January 1" and had "been well received so far." (*Id.*)

8

**VI.**   **Throughout 2023, Herbert And Buchholz Make Optimistic, Factually Accurate Statements About** *Other* **Aspects Of Inspire's Business Unrelated to the PA Pilot.**

Inspire's management also discussed with investors other aspects of Inspire's business unrelated to the PA Pilot or sales incentive change, which statements Plaintiff erroneously tries to conflate with the PA Pilot:

**Reducing Time From "Patient Contact to Implant."** On the May 2, 2023 earnings call (2023 Q1), Herbert noted that Inspire was "see[ing] signs of improvement in the patient pathway and specifically by reducing the time from patient contact to implant, which continues to be approximately 6 months." (¶69; Ex.7 (May 2, 2023 Call Tr.) at 5.)

**Digital Scheduling Pilot.** Herbert also occasionally discussed a different Inspire pilot program, the "digital scheduling pilot," which had been implemented a year earlier, in 2022. (¶¶29, 58; Ex.7 (May 2, 2023 Call Tr.) at 5.)

**Improving Website Patient "Conversion" Rates.** On both the May 2 (2023 Q1) and August 1 (2023 Q2) earnings calls, Herbert commented on the growing number of visits to Inspire's website that were resulting in patients contacting physicians. (¶¶69, 78, 81; Ex.7 (May 2, 2023 Call Tr.) at 5; Ex.10 (Aug. 1, 2023 Call Tr.) at 5, 13.) In particular, Herbert stated that Inspire had "steadfastly improved our conversion of" website "contact[s] to patients receiving therapy." (*Id.*)

**Statements About Inspire's General Business Prospects.** On the August 1 (2023 Q2) earnings call and at a September 6, 2023 Wells Fargo Securities Healthcare

9

Conference, both Herbert and Buchholz made positive statements about Inspire's business trajectory. (¶¶81, 83; Ex.10 (Aug. 1, 2023 Call Tr.) at 12-13; Ex.11 (Sept. 6, 2023 WF Conf. Tr.) at 10-11.) On the August 2 call, Herbert said that Inspire was "seeing continued growth across all its centers . . . and I think we will continue to do so moving forward." (¶81.) At the September 6 conference, Buchholz stated that Inspire had a "robust pipeline of patients awaiting therapy." (¶83.)

None of these categories of statements addressed the PA Pilot or the related sales incentive change.

## VII.   Inspire Monitors Its PA Pilot During 2023 And Addresses Problems Once They Become Evident.

Throughout 2023, information regarding the impact of the PA Pilot and the sales incentive change trickled in. According to Plaintiff, Inspire's PA Pilot customers were "ill equipped" to handle the prior authorization submission process themselves and so those centers experienced a "massive slowdown" in prior authorization processing times. (¶¶3, 44-45.) As support, Plaintiff relies almost entirely on allegations made by four confidential former sales employees ("FEs") (¶¶39-55). Each of these former employees is echelons lower on the organizational chart than the Individual Defendants. (*See* Ex.20 (org chart).)

According to one former employee who had worked in Iowa, whereas before the PA Pilot, "the time from submission of a prior authorization [to surgery] had typically been less than 30 days . . . after the changes, the timeline typically got pushed

out to at least 60 to 90 days." (¶48.) Consequently, Plaintiff alleges, Inspire experienced an "increase in delayed and even denied prior authorizations." (¶3; *see also* ¶¶40, 44, 46, 53 (other statements further discussing the initiatives' negative impact).) The Complaint, however, does not quantify either the number of procedures that were ultimately denied because of these delays or the ultimate financial impact (if any) of the delays on Inspire's business.[4] It merely quotes Herbert's statement on the November 7, 2023 (2023 Q3) earnings call that delays in prior authorization had "started to become evident maybe a little bit in the second quarter [*April-June*]," while omitting that management did not receive "strong confirmation" of an issue with the PA Pilot "until early in the third quarter [*July-September*]." (¶64; Ex.14 (Nov. 7, 2023 Call Tr.) at 8.)

Inspire's ability to track the impact of the PA Pilot was hindered by a "loss of visibility" into prior authorization submissions that occurred when Inspire no longer supported the prior authorization submission process. (*See* ¶40 (the Pilot "definitely affected [Inspire's] accuracy of forecasting revenue because we lost the visibility of patient surgeries in the funnel"); ¶49 ("[D]ue to the loss of visibility into the process,"

---

[4] While the Complaint alleges that the PA Pilot "cost the Company roughly 400 implant procedures, and thus created a $10 million shortfall in revenue" (¶62), this characterization contorts the only supporting sources beyond all recognition. The sole basis is that a JP Morgan analyst—not Inspire—projected that Inspire would earn $10 million more in revenue in Q3 2023 than it did, and if one divides that amount by an implant cost of $25,000, the result is 400. (¶¶1, 6, 67.) Such reasoning ignores the fact that the $10 million "shortfall" is purely a JP Morgan creation, as JP Morgan admitted (Ex.17 (Nov. 7, 2023 JPM Rep.) at 1), assumes that every dollar related to the PA Pilot, and also ignores that, as described below, *annual* revenue beat Inspire's own estimate, suggesting that procedures were not lost.

"Inspire management quickly realized that they 'didn't have the finger on the pulse'").) Inspire's lack of visibility into prior authorization submissions by centers was further compounded by the fact that it occurred during Q1 and Q2, when commercial-payor implants are lower as insurance deductibles reset. (*Supra* at 3-4 (discussing seasonality); ¶81; Ex.10 (Aug. 1, 2023 Call Tr.) at 10, 12 (noting that Inspire "expect[ed] our percentages to move back to more traditional ratios" in the second half of the year as "the high deductible [expiration] really . . . drive[s] the fourth quarter" growth).)

Once Inspire determined "early in the third quarter" that the PA Pilot was delaying submissions of some number of prior authorizations, Inspire "reinvigorated [its] efforts to facilitate access to Inspire therapy" through more direct involvement in the process. (¶64; Ex.14 (Nov. 7 Call Tr.) at 5, 8.) "As a result of these efforts throughout the quarter, the number of prior authorizations for patients seeking Inspire began to stabilize[.]" (Ex.14 (Nov. 7 Call Tr.) at 5.)

## VIII. On November 7, 2023, Inspire Announces Quarterly Revenue Lower Than Certain Analyst Projections And Explains That The PA Pilot Had Likely Resulted In "Delays" In Revenue Recognition.

On November 7, 2023, Inspire announced its quarterly results. (¶62.) Third-quarter revenues were $153.3 million, a "40% increase over the same quarter last year." (*Id.*; Ex.13 (Nov. 7, 2023 Press Release); Ex.12 (Nov. 7, 2023 10-Q) at 44, 48.) Inspire does not publish any quarterly projections, but *analysts* make their own estimates, and Inspire's Q3 revenue was below the projections of some analysts. (*See, e.g.*, Ex.17 (Nov. 7, 2023 JPM Rep.) (US revenue was "$7-10M" lower than JP Morgan's "own

12

expectations") (¶67).) Still, Inspire's results aligned with—and even beat—other analysts' estimates. (*See, e.g.*, Ex.16 (Nov. 7, 2023 Wells Fargo Rep.) (Inspire "beat our $149.4MM estimate") (¶67).) And at $153.3 million, Inspire's actual Q3 revenues were just short of the "Street's" $154.5 million "consensus"—a "miss" of only 0.8%. (*Id.*)

Herbert provided context for Inspire's third-quarter results in an accompanying press release and earnings call, stating that the Pilot's "implementa[tion]" had led to a "decline in prior authorization submissions" which had, in turn, caused a "**short-term impact** on the number of implant procedures early in the third quarter." (¶¶62-64; Ex.13 (Nov. 7, 2023 Press Release).) Inspire's 10-Q similarly observed that quarterly revenue had been "adversely affected by certain changes in our prior authorization support." (Ex.12 (Nov. 7, 2023 10-Q) at 44.)

At the same time, Herbert expressed confidence that the PA Pilot would not have a negative impact on *annual* revenue. (*See, e.g.*, Ex.13 (Nov. 7, 2023 Press Release).) In fact, Inspire **increased** its annual revenue projection range, from "$600 million to $610 million," to "$608 million to $612 million." (*Id.*)

This increased revenue projection made sense because, as Herbert explained in response to analyst questions (not quoted in the Complaint), the PA Pilot had largely led to "**delays**" in scheduling procedures that resulted in only **deferred** revenue—material revenue was not **lost**. (Ex.14 (Nov. 7, 2023 Call Tr.) at 10.) Thus, Inspire expected to "capture a lot of these patients" impacted by prior authorization delays in either Q4 2023 or Q1 2024. (*Id.* at 11.) Inspire was later proven right.

13

**IX.    Inspire's Stock Price Falls Following The November 7 Announcement, Then Quickly Recovers As 2023 Annual Revenue Beats Forecasts.**

Following the third-quarter earnings release, Inspire's stock price fell from $161.74 a share on November 7 to $129.95 on November 8. (¶65; Ex.21 (Stock Price Chart).) Although Plaintiff describes this decrease as "disastrous" for Inspire's business (¶¶4, 6, 62), stock-price fluctuations are not an unusual occurrence. As a relatively young medical device company without a history of profitability, Inspire's stock price is particularly subject to fluctuation based on analyst and market speculation. (Ex.3 (2022 10-K) at 68-69.) For example, Inspire stock had traded around $250 per share at the end of 2022, and had already dipped to $150 in October 2023, even before the third-quarter earnings release. (Ex.21 (Stock Price Chart).)

Moreover, the stock price decrease proved transient, as Inspire beat even its increased annual guidance for 2023. On February 9, 2024, Inspire filed its 2023 10-K stating it 2023 full-year revenue of $624.8 million. (*See* Ex.19 (2023 10-K).) This was $12 million *more than* even its *increased* third-quarter projection. (*Id.* at 94.) Inspire's stock price landed at $194.87 on February 10, following a rapid climb from the November 8, 2023 low of $129.95. (Ex.21 (Stock Price Chart).) Inspire's strong Q4 performance was consistent with its view that, to the extent PA Pilot issues impacted revenue at all, its impact was merely to defer some revenue to quarters following Q3 2023. (Ex.14 (Nov. 7, 2023 Call Tr.) at 10.)

14

## STANDARD OF REVIEW

Complaints alleging federal securities fraud violations are subject to heightened pleading standards under the Private Securities Litigation Reform Act (PSLRA). *See In re Target Corp. Sec. Litig.*, 955 F.3d 738, 742 (8th Cir. 2020). The PSLRA was enacted "[a]s a check against abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). To satisfy the PSLRA, a complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" 15 U.S.C. § 78u-4(b)(1). Further, "with respect to each" allegedly misleading statement or omission, the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *i.e.*, "scienter." *Id.* § 78u-4(b)(2)(A); *Target*, 955 F.3d at 742. To qualify as "strong," "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

## ARGUMENT

To state a claim under Section 10(b) of the Exchange Act, Plaintiff must allege that each defendant (1) made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *McAdams v. McCord*, 584 F.3d 1111, 1113 (8th Cir. 2009). Because Plaintiff fails to allege (1) an actionable misrepresentation or (2) scienter, the Court should dismiss the Complaint.

15

**I.    Plaintiff Fails To Plead Any Actionable Misstatements or Omissions.**

To survive dismissal, "a complaint may not rest on mere allegations that fraud has occurred." *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1083 (8th Cir. 2005). "Instead, the complaint must indicate *why* the alleged misstatements would have been false or misleading" *when* "they were made." *Id.* "Fraud by hindsight" is not actionable. *In re Stratasys Ltd. Sec. Litig.*, 864 F.3d 879, 883 (8th Cir. 2017).

Further, a statement is not "false or misleading" simply because it omits information. *See Macquarie Infra. Corp. v. Moab Partners, LP*, 601 U.S. 257, 264 (2024) ("Rule 10b-5(b) does not proscribe pure omissions."). There is no "affirmative duty" under the securities laws "to disclose any and all material information." *Id.*; *accord Trustees of Welfare & Pension Funds of Local 464A v. Medtronic PLC*, -- F. Supp. 3d ---, 2024 WL 1332262, at *11 (D. Minn. Mar. 28, 2024). "Companies can control what they have to disclose . . . by controlling what they say to the market." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011).

"Vague" or "optimistic" rhetoric—called "puffery"—is not actionable because it "cannot be supported by objective data or otherwise subject to verification by proof." *Stratasys*, 864 F.3d at 882. "Subjective statements of opinion" are likewise not actionable unless the plaintiff also alleges that the speaker literally "did not believe" the statement or that the speaker knowingly omitted a "particular (and material) fact[] . . . whose omission ma[de] the opinion statement at issue misleading to a reasonable person[.]"

16

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).

Meeting this standard "is no small task." *Id.*

Here, Plaintiff identifies five alleged misstatements. None is actionable.

## A.    Herbert's Statements At The May 16 Conference Regarding The Average Speed Of Approvals Were Not False or Misleading.

Plaintiff challenges various statements Herbert made at the May 16, 2023 RBC

Capital Markets Global Healthcare Conference about the average time from prior

authorization submission to approval, including those in bolded italics here:

> Herbert: We also have some additional variable comps that we put in there. It used to be something called PET, patients expecting therapy, that we had for the first five years because we used to remember it could take 4 to 6 months to get an insurance approval. ***Now we get approved in just 2 to 5 days. So we really are in the phase of teaching center[s] that - to help them just kind of submit their own prior authorizations.* . . .**
>
> Started January 1 and ***it's been well received so far.*** The salesforce really is able to understand the need to have an incentive like that and they know how to really get behind it and be able to drive the utilization. ***So it's been very well received.***

(¶74 (emphasis in Complaint); Ex.8 (May 16, 2023 RBC Conf. Tr.) at 10-11.)

Plaintiff claims that the bolded statements were "materially false or misleading"

because Herbert failed to disclose that the PA Pilot was "dramatically" "slow[ing]

down" the approval process, that the Pilot "had already led to lost sales," and that

Inspire had done "almost nothing to prepare medical offices for the change in prior

authorization policy." (¶¶75-77.)[5] These allegations fail for two reasons.

---

[5] When Plaintiff refers to the PA Pilot, it appears to be referring to both the Pilot itself *and* the sales compensation changes that incentivized increased center utilization and disincentivized work on prior authorizations. (*See* ¶¶3-4, 36, 39 (describing the changes

### 1.    There was no duty to disclose "issues" with the PA Pilot as of May 16, 2023.

First, Plaintiff's allegations fail because they are all based on a false premise: that, as of May 16, 2023, the PA Pilot was *already* having a *materially* negative impact on Inspire's business, and that Inspire knew about the material negative impact and had connected it to the PA Pilot such that any disclosures regarding the PA Pilot should have been qualified. There are no factual allegations supporting such knowledge.

The Pilot began on January 1, 2023. (¶36.) Herbert made the allegedly misleading statements about the Pilot on May 16, 2023. Notably, the Complaint concedes that Inspire's management did not receive "strong confirmation" that the Pilot was delaying some prior authorization submissions and potentially impacting revenue "until early in the third quarter," *i.e.,* after July 1, 2023. (¶¶63-64; Ex.14 (Nov. 7, 2023 Call Tr.) at 5, 8.) Herbert cannot be faulted in May for failing to qualify any statements about the PA Pilot with information about a problem that did not exist, or that he was unaware of, until much later. That is classic "fraud by hindsight" pleading. *See, e.g.*, *Elam v. Neidorff*, 544 F.3d 921, 927 (8th Cir. 2008) (allegation of falsity insufficient if "the pleading fails to point to any . . . information . . . as of" the date of the statement "that indicated that" the statement was false).

---

as a singular process of "remov[ing] [Inspire] from the prior authorization process").) To be consistent, Defendants will use the term "PA Pilot" to refer to both the Pilot and the sales compensation incentive change.

18

Plaintiff might respond that Herbert stated that "problems with the PA Pilot had "*started* to become evident *maybe a little bit* in the second quarter," *i.e.*, sometime between April 1 and June 30. (¶64; Ex.14 (Nov. 7 Call Tr.) at 8.) But that kind of vague, backwards-looking statement is not nearly specific enough to show that, as of *May 16*, the Pilot was having a *materially* negative effect on Inspire's business.

This Court's decision in *Apogee* is on point. There, an executive-defendant made optimistic statements about a new acquisition in May 2017. 2020 WL 1445856, at *3. The acquisition ultimately harmed the company-defendant's business. In April 2018, the executive admitted on an earnings call that "in hindsight" the company had "realized that the problems [with the acquisition] were more substantial" than it originally thought as it "got more involved in the business in the second half of" 2017. *Id.* at *4-5. The plaintiff claimed that this statement proved that the optimistic May 2017 statements were false when made, presumably because May is close to the "second half of" the year.

This Court dismissed the complaint, reasoning that Plaintiff's "reliance on" the backward-looking statement "fail[ed] to allege with particularity any facts indicating that" a "significan[t] . . . problem" existed "on May 1, 2017," and thus did not "convert an allegation of fraud by hindsight into actionable fraud." *Id.* at *9-10. So too here.

Plaintiff's former employee ("FE") allegations do not change the calculus; they are unduly vague as to both timing and materiality. (¶¶39-55.) The FEs generally allege that the PA Pilot resulted in "stalled procedures" (¶40), "outright denials" due to

19

"forgotten documentation" (*id.*), "a massive slowdown" in prior authorization numbers (¶44), "a drastic shift in" prior authorization "timelines" (¶49), and frustrated medical providers (¶¶51-52). The FEs do not, however, allege either **when** these problems manifested or **how many** procedures were impacted as a result. And to the extent the FEs provide general time ranges, none suggest that the PA Pilot was having a materially detrimental impact on Inspire's business as of May 16. (*See, e.g.*, ¶49 (FE3 alleging that "significant problems" arose "early in 2023," without elaborating on the scope or financial impact of the problem at that time); ¶55 (FE1 recalling a "Company conference call no later than the second quarter [*April-June*] of 2023" where Herbert allegedly "discussed the slowdown in prior authorizations," without elaborating on the scope or financial impact of the problem at that time).)

That these vague allegations are attributed to confidential sources is legally significant. "Unlike other factual allegations in a complaint, courts are not required to wholly accept as true statements from a confidential witness." *Shoemaker v. Cardiovascular Sys., Inc.*, 300 F. Supp. 3d 1046, 1055 (D. Minn. 2018). This is especially so where, as here, the statements are "vague as to timing or content (or both)," and are offered by "low-level retail employee[s] many layers removed from top management." *Steamfitters Local 448 Pension & Ret. Sec. Funds v. Sleep Number Corp.*, 2023 WL 4421688, at *8-9 (D. Minn. July 10, 2023).

In *Steamfitters*, for example, Judge Schiltz discounted confidential-witness statements describing "inventory issues" caused by a winter storm because the

20

statements did not allege with particularity that "as of" the date of the allegedly misleading statements, defendant "had suffered such a severe disruption in its supply chain that its ability to fulfill customer orders was *materially* impaired." *Id.* at *9 (emphasis added). "Vague allegations" about "high-level meetings," "alarm bells," and "supply chain" disruptions during a broad, multi-week period were insufficient. *Id.* at *8-10. *See also, e.g., Medtronic,* 2024 WL 1332262, at *17, *20 (discounting "purely anecdotal" statements about "product issues" and "setbacks" from a former "territory manager"); *In re Stratays Sec. Litig.,* 2016 WL 3636992, at *9 (D. Minn. June 30, 2016) (discounting statements from "nine former [] employees" that described the product defects "at a high level of generality" and were "extremely vague with respect to the timeframes to which their allegations relate").

This reasoning applies with equal force here. Nothing in the low-level FE allegations shows that problems with the PA Pilot had caused material harm to the Company's business as of May 16, 2023. The allegations accordingly do not support any allegation of falsity under the PSLRA.

### 2. The May 16, 2023 RBC Conference Call statements were not false or misleading.

In addition to its failure to allege that Herbert knew by May 16, 2023 that the PA Pilot had "issues" materially impacting Inspire's business, the Complaint also fails to allege that any of the statements Herbert made was false or materially misleading.

*First*, the Complaint takes issue with Herbert's statement that the Inspire Device used to "take 4 to 6 months to get an insurance approval," whereas "now we get approved in just 2 to 5 days." (¶75.) But Plaintiff doesn't allege that anything in that sentence was factually inaccurate, much less materially so. At most, it vaguely claims that the "Approval Process" had "worsened and slowed down." (*Id.*) But this tells the Court nothing about how long it was taking insurers to approve submissions *actually made* in May 2023. It is perfectly consistent with Plaintiff's allegation that to the extent the approval process had "slowed down," some number of submissions were not made at all. (*See, e.g.*, ¶38 (alleging that the PA Pilot led to "prior authorizations simply piling up unsubmitted in medical offices").) But of course, un-submitted approval requests would not be counted when calculating an average time between submission and approval. In short, it is not clear that Plaintiff is even addressing what Herbert was talking about, *i.e.*, the average time between submissions to insurers and receipt of insurer approval.

Nor does the Complaint allege any facts indicating that the historical trend Herbert was actually addressing—a general shortening of the time between submissions to insurers and receipt of their approvals over many years—had suddenly reversed in May 2023. *See 3M*, 2021 WL 4482987, at *8, *13 ("reasonable investors" read "public statements . . . together and in context"). Indeed, the Complaint's allegations about Inspire's "over 700% growth" between 2018 and 2022 suggest that insurers were indeed

22

approving the Inspire Device more quickly on average in 2023 than they were in 2018, as the Device became more broadly accepted. (¶24.)

*Second*, nothing in the statement that Inspire was "in the phase of teaching center[s] . . . to . . . just kind of submit their own prior authorization" (¶75) was false or misleading. For starters, it bears emphasis that, in this statement, Herbert is disclosing some of *the very information Plaintiff claims was not disclosed*. (*Contra* ¶56 (claiming that Defendants did not disclose that they "were no longer intimately involved in helping patients obtain authorization").) Thus, to the extent Plaintiff continues to base its claim on Defendants' alleged failure to disclose the PA Pilot at all, its *own complaint* undermines such an allegation.

Plaintiff may also quibble with Herbert's use of the word "teaching," but there is nothing false or misleading about that terminology either. Indeed, the Complaint elsewhere concedes that, in January 2023, Inspire did start "teaching center[s] . . . to . . . submit their own prior authorization[s]." (*See, e.g.*, ¶45 (describing efforts to "train[] up" medical providers on prior authorization); ¶52 (describing a "one-page" document Inspire sent to Pilot centers "notif[ying] them of the" Pilot).)

Nor was Herbert required to characterize Inspire's "teaching" as insufficient or poorly executed. (*Contra* ¶77.) Executives do not violate the securities laws by failing to describe a newly implemented measure in "precisely the manner that Plaintiffs would have preferred," *Medtronic*, 2024 WL 1332262, at *15, or by not using pejorative terms, *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 181 (D.D.C. 2007). And

23

in any event, "teaching" is a subjective term not amenable to "verification by proof," and thus not actionable. *Stratasys*, 864 F.3d at 882; *see Oregon Pub. Empls. Ret. Fund v. Apollo Group Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) (defendant's "use of general terms like 'educational content' and 'teaching resources' provided nothing concrete upon which [the plaintiffs] could rely").

*Finally*, the Complaint highlights Herbert's remark that the incentive compensation changes had "been well received so far." (¶74.) The phrase "well received so far" is non-actionable because it is not verifiable. *See, e.g.*, *Target*, 955 F.3d at 743 n.2 ("we feel really good about where we are today" is "inactionable puffery"); *Norfolk County Ret. Sys. v. Tempur-Pedic Int'l, Inc.*, 22 F. Supp. 3d 669, 687 (E.D. Ky. 2014) (statement that product "continues to be well-received by retailers" was "non-material, vague puffery"). Nor is it relevant that Plaintiff has found, at most, four former employees who were allegedly not happy about the change. Inspire has over 750 employees and more former employees beyond that. (*Supra* at 2.) Four out of at least 750 is an insignificant percentage that cannot render the statement false or misleading.

**B.    Herbert's Statement Regarding Inspire's "Improving" "Patient Contact to Implant" Timeline Was Not False or Materially Misleading.**

Plaintiff next challenges Herbert's statement in Inspire's May 2, 2023 earnings call that Inspire was "see[ing] signs of improvement in the patient pathway and specifically by reducing the time from patient contact to implant, which continues to be approximately six months." (¶69; Ex.7 (May 2, 2023 Call Tr.) at 5.).) Plaintiff claims that

24

this statement was "materially false or misleading" because Inspire was allegedly "already seeing a dramatic worsening of the" timeline from "contact to patients receiving therapy." (¶¶70-71.)

This allegation fails for some the same reasons Plaintiff's May 16 allegations fail, and more besides. For one, the Complaint does not allege that material "issues" with the PA Pilot had manifested by May 2 such that Herbert was required to qualify any statements about the PA Pilot. (*Supra* Argument § I.A.1.) In addition, even if there was a "worsening of the process and timing of conversion of contact to patients receiving therapy" as of May 2 (¶70), Plaintiffs pleads no *facts* suggesting that those delays were so severe as to render Herbert's "approximately" "six month" timeline inaccurate. (*Cf.* ¶48 (FE3 allegation that, at an unknown point in time, for an unknown number of procedures, the PA Pilot delayed prior authorization submissions by an additional "30 to 60 days")). Again, Plaintiff fails to draw a clear connection between the problem Herbert allegedly failed to disclose and the statistic it claims to be misleading. *See, e.g.*, *Stratasys*, 2016 WL 3636992, at *8 (dismissing allegations on this basis).

Notably, too, Inspire continued to use this "six month" figure even after the November 7 "corrective disclosure." (*See, e.g.*, Ex.15 (Nov. 7, 2023 8-K Presentation) at 27; Ex.20 (Feb. 6, 2024 8-K Presentation) at 26.) Thus, there is no reason to think that Herbert's "approximate[]" six-month number was *ever* inaccurate.

25

### C.    Herbert's Statement Regarding Inspire's "Digital Scheduling Pilot" Was Not False or Materially Misleading.

Plaintiff also challenges Herbert's statement on the May 2 earnings call that Inspire's "digital scheduling pilot" had led to a "30% improvement in physician appointments in the pilot centers compared to traditional phone and e-mail scheduling through our Advisor Care Program[.]" (¶72; Ex.15 (May 2, 2023 Call Tr.) at 5.) This allegation fails for the simple reason that the *digital* scheduling pilot was a different pilot project having nothing to do with the PA Pilot.

Judicially noticeable facts make this abundantly clear. The digital scheduling pilot had started in 2022, a year before the PA Pilot. (*See* Ex.2 (Feb. 7, 2023 Call Tr.) at 3, 19-20.) It addressed "scheduling" of appointments—not prior authorization submissions. (*Id.*; *see also* ¶¶29, 58 (noting this change in approach to "scheduling").) And as Inspire's publicly-filed investor presentations show, appointment scheduling occurs much earlier in the "patient journey" than prior authorization, and thus a slowdown in prior authorization would not impact digital scheduling with physicians (*see* Ex.15 (Nov. 7, 2023 8-K) at 31) (yellow highlighting is added):

26



In any event, the Complaint fails to explain why Herbert needed to disclose delays in prior authorization submissions in order to make a statement about a "digital scheduling pilot" "clear and complete." *Macquarie*, 601 U.S. at 264. The securities laws do not fault executives for failing to make "attenuated" disclosures of this sort. *See Plymouth Cty. Ret. Sys. v. Patterson Co., Inc.*, 2019 WL 3336119, at *17 (D. Minn. July 25, 2019) ("The connection between the alleged inaccurate statement and the underlying conduct" . . . "may not be too attenuated").

**D.    Herbert's Statements Regarding Inspire's "Improving" Patient "Conversion Rates" Were Not False or Materially Misleading.**

Next, Plaintiff challenges statements Herbert made on the May 2 and August 1, 2023 earnings calls to the effect that Inspire was "steadfastly improv[ing]" "conversion"

27

of website visits and physician "contacts" into patients actually "receiving therapy."

(¶¶69, 78, 81.) The Complaint attacks the following statements:

> In the first quarter, the number of visitors to our website surpassed 3.4 million, which is significant. . . . From these visits, we had over 19,000 physician contacts **and have steadfastly improved our conversion of contact to patients receiving therapy**.

(¶69 (emphasis in Complaint); Ex.7 (May 2, 2023 Call Tr.) at 5; *see also* ¶¶78, 81, citing Ex.10 (Aug. 1, 2023 Call Tr.) at 5, 13 (discussing similar information for Q2).)

These allegations fail because there is a mismatch between the statement identified as false or misleading and the PA Pilot "issues" Plaintiff claims Herbert failed to disclose. The improving "conversion rate" in the cited paragraphs concerns the **percentage of people** who visit Inspire's **website**, have contact with physicians, and ultimately become Inspire patients. (*See* Ex.7 (May 2, 2023 Call Tr.) at 5 (noting that "3.4 million" "website visitors" led to "19,000 physician contacts").) The PA Pilot, by contrast, affected the **speed at which** prior authorization requests were being submitted. (*See* ¶¶48-49 (alleging a "drastic shift in the timelines of when prior authorizations were submitted").) The Complaint offers no reason to think the former had any material connection to the latter. This is fatal. *See, e.g., In re InvenSense, Inc. Sec. Litig.*, 2017 WL 11673462, at *3 (N.D. Cal. Apr. 12, 2017) (dismissing securities fraud claim due to analogous "mismatch").

28

**E.     Statements Regarding Inspire's "Continued Growth" and "Robust Patient Pipeline" Were Not False or Materially Misleading.**

Finally, Plaintiff challenges generally optimistic statements Herbert and Buchholz made about demand for the Inspire Device on August 1 and September 6, 2023. In response to an analyst's question about whether he was seeing any "backlog or pent-up demand that's continuing to come in," Herbert responded "Yes, we are. I think we're seeing continued growth across all of our centers. Obviously, same-store sales drove the growth in Q2, as it did in Q1, and I think will continue to do so as we move forward." (¶81; Ex.10 (Aug. 1, 2023 Call Tr.) at 12-13.)

Similarly, in response to a question about whether there was "some like pent-up demand, some bolus of patients that came through in the second quarter," and whether the Medicare and commercial mix was "a headwind to you guys," Buchholz responded: "No. I mean we're -- we have a robust pipeline of patients awaiting therapy. So don't expect that to be a headwind." (¶83 Ex.11 (Sept. 6, 2023 WF Conf. Tr.) at 10-11.)

Plaintiff claims that Herbert's and Buchholz's statements were "materially false and misleading" because Inspire "was experiencing severe delays, denials, and lost sales due to the negative impact [the Pilot] was having," and because the Pilot "*already was* a headwind" hurting Inspire's business. (¶¶82, 84-85).) For several reasons, neither statement is actionable.

*First*, Herbert's August 1 statement—"*I think* we're seeing continued growth . . . and will continue to do so as we move forward"—is a subjective opinion, and can be

29

actionable only if Herbert literally "did not believe" the statement or if he knowingly omitted a "particular (and material) fact[] . . . whose omission ma[de] the opinion statement at issue misleading to a reasonable person[.]" *Omnicare*, 575 U.S. at 194.

But Plaintiff does not allege that Herbert didn't believe that Inspire was seeing "continued growth across all [its] centers" as of August 1. Nor does Plaintiff allege a "particular (and material) fact" that Herbert needed to disclose to prevent the statement from becoming materially misleading. The Complaint alleges only that the PA Pilot "issues" had manifested by approximately August 1. (*Supra* at 10 (citing ¶64 & Ex.14 ("early in the third quarter")).) Plaintiff does not allege that those problems were so severe that Hebert knew they would inhibit Inspire from "growing" in the "back half" of 2023, which is what the analyst asked about. *See Cerner*, 425 F.3d at 1083–84 (affirming dismissal where complaint failed to allege company lost a material number of deals, and where there was "no indication on the face of the complaint that even a material loss of deals necessarily rendered [defendant] unable to achieve its projected earnings"); *Apogee*, 2020 WL 1445856, at *9-10 (noting the importance of viewing analyst exchanges in context). Indeed, the Complaint alleges nothing specific about the PA Pilot's ultimate effect on Inspire's growth.

Second, ***Herbert's statement was factually accurate***: Inspire *did* grow—substantially—in the second half of 2023. In fact, Inspire's fourth-quarter results were so strong that the company exceeded its 2023 revenue target by over $12 million—and its 2022 revenue by over $200 million. (*Supra* at 14.) "[I]n contrast to many securities-

30

fraud actions," Inspire's "financial predictions were actually fairly accurate." *Stratasys*, 2016 WL3636992, at *11 (finding statements about "financial performance" not misleading when they were later proven accurate). Thus, even assuming the PA Pilot problems prevented Inspire's third-*quarter* revenue from growing as much as some *analysts* projected it would (though still increasing 40% year-over-year), that does not suggest that Herbert's more general statement about "seeing continued growth" in the "back half" of the year was inaccurate or materially misleading.

For similar reasons, Buchholz's September 6 statement is not actionable either. For one, Buchholz's claim of a "robust patient pipeline" foreclosing any "headwinds" is a classic example of inactionable puffery. *See, e.g.*, *West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 653-54 (N.D. Ill. 2020) ("the word 'robust' is vague"). Equally important, Plaintiff again fails to allege any specific facts suggesting that the PA Pilot delays were so severe as of September 6 that Inspire's "patient pipeline" could not fairly be described as "robust." If anything, Inspire's ultimate 2023 revenue proved the opposite: that Inspire's "patient pipeline" as of September 2023 *was* "robust." (*Supra* at 13-14.)

Because none of the statements identified in the Complaint is false or misleading, the Court can dismiss on that basis alone. *See In re Target Sec. Litig.*, 275 F. Supp. 3d 1063, 1082 & n.10 (D. Minn. 2017).

## II.    The Complaint Fails to Plead Specific Facts Giving Rise To A Strong Inference Of Scienter.

The Complaint also should be dismissed for the independent reason that it fails to plead specific facts giving rise to a strong inference of scienter. *Tellabs*, 551 U.S. at 314.

Scienter "can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." *Podraza v. Whiting*, 790 F.3d 828, 836 (8th Cir. 2015). In deciding whether a complaint adequately alleges facts giving rise to a strong inference of scienter, courts must "compare plausible, nonculpable explanations for the defendant's conduct with inferences favoring the plaintiff." *Id.* at 837. A complaint provides a strong inference of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* When compared against the plausible, nonculpable explanations, the Complaint does not meet this exacting standard.

### A.    Plaintiff Does Not Allege Any Discernable Motive For Defendants to Commit Fraud.

Significantly, the Complaint fails to allege *any* motive for committing the alleged fraud. To raise a strong inference of scienter on a "motive and opportunity" theory, Plaintiff must allege that Defendants "benefitted in some concrete and personal way from the purported fraud." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan*

32

*Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). The Complaint is deafeningly silent on this point: there are no allegations about any executive's incentive compensation, for example, *In re Digi Int'l, Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1098 (D. Minn. 1998), or insider trading, *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 747 (8th Cir. 2002), or any other reason why Defendants would be motivated to hide issues with the PA Pilot from investors until November 2023.

To the extent the Complaint alleges the PA Pilot issues had any financial impact, it was a delay in recognizing revenue, from Q3 to Q4, 2023. (*Supra* at 13-14.) And the alleged fraud, according to Plaintiff, was not disclosing earlier than November 2023—in Q1 or Q2, 2023—that the PA Pilot delayed prior authorization submissions that would eventually lead to delayed revenue. But Plaintiff never alleges *any* conceivable benefit from not disclosing issues that would lead to revenue being deferred by a quarter or two. That is because there was no benefit, and accordingly, no motive.

"Without a showing of motive or opportunity [to commit fraud], other allegations tending to show scienter would have to be particularly strong in order to meet the [PSLRA] standard." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001) (similar); *see Steamfitters*, 2023 WL 4421688, at *11 (allegations that statements "might" have been misleading were "particularly" insufficient without allegations of motive). Here, the other allegations touching on scienter are particularly weak, and cannot compensate for the complete lack of motive allegations.

**B.    Plaintiff's Other Scienter Allegations Are Equally Meritless.**

Plaintiffs' scant scienter allegations comprise only 13 paragraphs and largely repeat themselves. (¶¶86-98.) The Complaint alleges Defendants must have intended to mislead investors because (1) prior authorizations were "key to the Company's success," a "pillar" of Inspire's "competitive strengths," and facilitated sales comprising "all of Inspire's revenue" (¶¶87-90, 97-98)—what is known as the "core operations" theory; (2) Defendants later admitted to being aware of problems with the PA Pilot (¶¶91-93); (3) some analysts were purportedly "incredulous" after the fact (¶94); and (4) low-level former employees repeated hearsay from their superiors about management tracking prior authorization problems. (¶¶95-96). None suffices, whether alone or in combination.

**1.    Core-operations allegations have not been recognized in the Eighth Circuit, and would fail in any event.**

Nearly half of the Complaint's scienter paragraphs allege that because prior authorizations were "key to the Company's success," a "pillar" of Inspire's "competitive strengths," and generated sales comprising "all of Inspire's revenue," Defendants must have known that their statements concerning the PA Pilot were false. (¶¶87-90, 97-98.) This is what is known as the "core operations" theory, and the Eighth Circuit has "not yet decided whether a plaintiff can use this 'core operations' theory to plead scienter." *Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 821 (D. Minn. 2022); *see also Elam*, 544 F.3d at 929; *In re 3M*, 2021 WL 4482987, at *21.

34

As the Eighth Circuit noted in *Elam*, the "Fifth and Ninth Circuits have rejected" the core-operations theory of scienter. *See In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 848 (9th Cir. 2003); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003). Since then, more decisions have either rejected it or limited its application. *See Yates v. Municipal Mortg. & Equity LLC*, 744 F.3d 874, 890 (4th Cir. 2014); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (allegations regarding "core operation" were insufficient absent "specific admissions by . . . corporate executives of detailed involvement in the minutia of a company's operations").

Moreover, the doctrine doesn't salvage scienter anyway. Plaintiff must point to core-operations facts that *contradict* Defendants' statements about the PA Pilot *at the time* they were made. *See Elam*, 544 F.3d at 929; *In re 3M*, 2021 WL 4482987, at *21. Plaintiff cannot do that, because nothing about statements made in May or August of 2023 were false *when made*. *See In re Biogen Sec. Litig.*, 857 F.3d 34, 42 (1st Cir. 2017) (affirming dismissal where "core operations allegations" were "consistent with" statements).

Plaintiff's core-operations allegations, moreover, are exactly the sort of conditional, "would have" allegations that this and other courts have found lacking. The Complaint alleges that Defendants "would obviously have been closely following, and indeed directly implementing, any changes to the Process and their impacts on the business, and thus is evidence that Defendants' statements during the Class Period were knowingly or recklessly false and misleading." (¶90.) That is far too conclusory. *See Elam*, 544 F.3d at 929; *In re 3M*, 2021 WL 4482987, at *21.

35

### 2. Knowledge and awareness of potential issues with the PA Pilot do not establish a strong inference of scienter.

Next, the Complaint alleges that Defendants must have had the requisite mental state because of certain "admissions" Herbert made in November 2023 about Inspire's tracking or knowledge of problems with the PA Pilot earlier in the year. (¶¶91-93.) These allegations fail for several reasons.

First, some of the allegations are based on the false premise that implementation of the PA Pilot itself was "previously undisclosed." (¶91.) As explained above, however, Investors knew by March that Inspire was "diverting time and resources from prior-authorization focus to (more important and relevant) go-forward areas," (Ex.5 (Mar. 6, 2023 Truist Rep.) at 1), and by May that it was "in the phase of teaching center[s] that - to help them just kind of submit their own prior authorizations." (¶74.)

Second, to the extent that the Complaint alleges Inspire knew of any significant problems with implementation of the PA Pilot before disclosing them in November, its allegations are too vague and self-contradictory. "[A]wareness of a problem on its own is not enough to demonstrate that a defendant acted with the requisite mental state." *Medtronic*, 2024 WL 1332262, at *27; *see also, e.g.*, *In re Sanofi Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 534 (S.D.N.Y. 2011) (alleged knowledge of problems with the design of clinical trials was insufficient to support an inference of scienter). The Complaint cites Herbert's November 7 statement that problems "started to become evident maybe a little bit in the second quarter." (¶92.) But Inspire's management did not receive

"strong confirmation" of problems with the PA Pilot "until early in the third quarter." (¶¶63-64; Ex.14 (Nov. 7, 2023 Call Tr.) at 5, 8.) And it disclosed those problems on the next earnings call.

Third, the Complaint and Inspire's SEC filings provide more compelling and cogent reasons why Inspire did *not* fully appreciate the extent of the problems with the PA Pilot until the third quarter: (1) Inspire "lost . . . visibility" into the timing and number of prior authorization submissions once pilot centers began submitting their own prior authorization paperwork (¶¶38, 40, 43, 49); and (2) the seasonality of Inspire's business, which "negatively impacts" Inspire's commercial sales during the first part of the year. (Ex.3 (2022 10-K) at 41.) Inspire only got "strong" confirmation that its commercial versus government payor revenue numbers *weren't* merely seasonal, in the third quarter, because the loss in visibility led to issues in the "tracking of data." (Ex.14 (Nov. 7, 2023 Call Tr.) at 8.)

In any event, it is implausible that Herbert admitted to an intent to defraud in November merely by stating that "prior authorization problems had 'started to become evident maybe a little bit in the second quarter.'" (¶92). *See In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 244 (8th Cir. 2008). If anything, these statements support an inference of candor on Herbert's part.[6]

---

[6] Plaintiff's allegation that Herbert personally "tracked the decrease in the number of submissions by our customers" (¶93) is not supported by the transcript it cites. The November 7, 2023 transcript states merely that Inspire ("we") tracked the "decrease in the number of submissions by our customers seeking prior authorization," but it does

### 3.   Out-of-context statements of some analysts do not establish a strong inference of scienter.

Next, Plaintiff alleges that the Court can infer scienter because some analysts were "incredulous" after learning of the problems with the PA Pilot. (¶94.) This allegation fails for two reasons.

First, the Complaint cites no authority, and Inspire is aware of none, that a Court may infer an intent to defraud based upon the post-hoc reaction of a third-party analyst or other investor. *Cf. Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 375 (5th Cir. 2004) (rejecting statements made in analyst report as evidence of scienter because "[n]one of the statements in the Prospectus cited by the plaintiffs are attributed to any of the individual defendants").

Second, even if analyst reactions could give rise to an inference of scienter, *these* analyst reports can't, because Plaintiff improperly misquotes or cherry picks from them. Instead, they confirm that analysts fully expected Inspire to quickly resolve the problems based on a long history of transparency. JP Morgan characterized Inspire's Q3 performance as a "blip on a nearly perfect track record," and further stated that "[c]onsidering this management team's track record, and the fact that procedures are basically fully booked through December and now into January, we think this team has

---

not state that *Herbert* did this, and does not state *when* Inspire learned there was a "decrease." And merely stating that Inspire tracked numbers "during the Class Period" cannot give rise to an inference of scienter. *See In re Bank of Am. Corp.*, 2011 WL 740902, at *11 (N.D. Cal. 2011) (concluding broad timing allegations were "too vague and conclusory to support a strong inference of scienter").

38

a good handle on 4Q and can return to its prior beat and raise trajectory." (Ex.17 (Nov. 7, 2023 JPM Rep.) at 1.) Truist, characterizing the PA Pilot issue as "unexpected" and "transient," emphasized that Inspire had "one of the more trustworthy and competitive execution-oriented mgmt. teams in our universe and we think they deserve the benefit of the doubt." (Ex.18 (Nov. 8, 2023 Truist Rep.) at 1.) Contrary to Plaintiff's allegations, taken as a whole, the analyst reports show that Defendants "learned of problems [with the PA Pilot] over time and disclosed them, as opposed to learning of them" and hiding them. *Apogee*, 2020 WL 1445856, at *13. They do not support an inference of scienter.

### 4.    The confidential-witness allegations do not establish a strong inference of scienter.

Finally, the Complaint cites statements from two confidential witnesses—FE1 and FE4—as support for scienter. Neither adds anything to the scienter calculus.

FE1 was a "Senior Territory Manager" in the greater-Chicago area. (¶39 n.1.) According to FE1, Inspire's "upper levels of management and even the CEO were *undeniably* hearing about the Company's prior authorization problems from 'early in the process,' i.e. early in 2023." (¶95 (emphasis in original).) This allegation fails because FE1 has no personal knowledge of that; because it's vague as to what was being "referenced" up to the CEO; and does not state *when* any of this happened beyond that it occurred "no later than" sometime in "the second quarter." (*Id.*) FE1 cannot provide that level of detail because she is passing along hearsay from her "manager" and the

39

"Area Vice President"; she does not claim to have been a part of any such discussions or the alleged meeting with Herbert. (¶95.)

"Broad allegations about what [a confidential witness] 'understood' about 'executive management' do not support" a strong inference of scienter. *Medtronic*, 2024 WL 1332262, at *30. And confidential-witness allegations do not give rise to a "strong inference of scienter as to senior management if none of the witnesses were senior managers and they had little contact with such managers." *Biogen*, 857 F.3d at 43. This Court should treat FE1's allegations like Judge Menendez treated similar confidential witness allegations in *Medtronic*. The court concluded that such allegations "adds little, if anything, to the scienter calculus," where the witness was "not alleged to have interacted with any Defendant or to have overheard any admissions by any Defendant. And as the manager of a single sales territory, there are no allegations establishing how [the witness] was in a position to discuss or understand what any of the individual Defendants knew or should have known about [the allegedly undisclosed problem]." *Medtronic*, 2024 1332262, at *30.

FE4 likewise does not have reliable knowledge that would indicate scienter. FE4 was a low-level territory manager for Wisconsin (¶50 n.4), who claims that Inspire executives "used Microsoft Dynamics software, to monitor patients' progress through the entire process, all the way from setting up new accounts to seeking prior authorization to scheduling surgery." (¶96.) The Complaint does not explain how FE4 knows what executives many levels removed from her did: FE4 is not alleged to have

40

spoken to any of the Defendants, nor to know how often or on which dates executive management tracked patient progress through the PA Pilot. *See, e.g., Sakkal v. Anaplan, Inc.*, 557 F. Supp. 3d 988, 998-99 (N.D. Cal. 2021) (confidential witness accounts were insufficient where they were not specific as to time, were not tied to false or misleading statements, and the witnesses did not have interactions with the defendants). All FE4 alleges is that "Defendants" had "access" to a tracking database (¶96), but "access" is not enough. *See Shoemaker*, 300 F. Supp. 3d at 1055. Moreover, Plaintiff fails to allege how the software could *ever* have been tracking Pilot center customer submissions when the point of the PA Pilot was that the Pilot centers were controlling submissions. Indeed, the FEs themselves complained that the result of the PA Pilot was to *lose* access to this information; as Plaintiff admits elsewhere, Inspire lost "visibility" during the PA Pilot. (¶¶40, 49.)

Because the two confidential-witness allegations fall far short of showing that Defendants "were aware that they were withholding vital information" when they made the alleged misstatements, "or at least were warned by others that this was so," *In re Bos. Sci. Corp. Sec. Litig.*, 686 F.3d 21, 31 (1st Cir. 2012), they are insufficient to support a strong inference of scienter as to any Defendant.

**C.     The More Cogent and Compelling Inference Is That Defendants Disclosed Problems Once They Became Known.**

Finally, under *Tellabs*, the Court must compare "plausible, nonculpable explanations for the defendant's conduct" with "inferences favoring the plaintiff." 551 U.S. at 324. Here, that analysis yields an easy conclusion: the more cogent and compelling inference is that Defendants disclosed the PA Pilot at the beginning of the Class Period, did not know of any problems immediately because of "lack of visibility" into PA Pilot center submissions, reasonably attributed changes in revenue to seasonality that occurs every year in Q1 and Q2, and then when PA Pilot problems became apparent early in the third quarter, disclosed them soon after. (*Supra* at 35-36.)

Indeed, the entire point of a "pilot" program is to see if a change works. When Inspire learned that the PA Pilot was not having the results intended, it disclosed as much to the market, and then made successful course corrections. Inspire ultimately earned $624.8 million in 2023—$12 million **more than** even its **increased** third-quarter projection. (*See* Ex.19 (2023 10-K) at 94; *supra* at 14.) Quite simply, the Complaint fails to allege that fraud is the more compelling and cogent inference, *see Apogee*, 2020 WL 1445856, at *13, or that Inspire's actions were an "extreme departure from the standards of ordinary care," *Green Tree*, 270 F.3d at 654.

Accordingly, the Court should dismiss the Complaint for lack of sufficient allegations of scienter.

42

## III.    The Claim Against Buchholz Fails For Additional Reasons.

Plaintiff's securities-fraud claim against Buchholz should also be dismissed because he is alleged to have made only *one* false statement—that Inspire "had a robust pipeline of patients awaiting therapy" (¶83)—which is non-actionable puffery, was not false or misleading, and is not accompanied by scienter allegations specific to Buchholz. *Supra* at 30; *see also Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 827 (8th Cir. 2003) ("blanket assertions" about how "the Defendants" acted with scienter were nonspecific and "fail to satisfy" the PSLRA); *In re Patterson Cos., Inc. Secs., Deriv. & ERISA Litig.*, 479 F. Supp. 2d 1014, 1028 (D. Minn. 2007) (similar).

## IV.    Plaintiff Fails To Plead Control Person Claims.

Because Plaintiff fails to state a claim for a violation of Section 10(b), its Section 20(a) claims against Herbert and Buchholz (Count II) necessarily fail as well. *See Target*, 955 F.3d at 745.

## CONCLUSION

For these reasons, the Court should dismiss the Complaint with prejudice. *See Apogee*, 2020 WL 1445856, at *14.[7]

---

[7] Upon "final adjudication" of any action governed by the PSLRA, the court is required to "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(c)(1). There is a presumption that when any complaint violates Rule 11(b), the court should award "the opposing party" the "reasonable attorneys' fees and other expenses incurred in the action." *Id.* § 78u-4(c)(3)(ii).

Dated: June 28, 2024

**FAEGRE DRINKER BIDDLE & REATH LLP**

 */s/ Jeffrey P. Justman*
Matthew Kilby (#0335083)
Jeffrey P. Justman (#390413)
Kacie Phillips Tawfic (#0399980)
Anderson C. Tuggle (#0400277)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
matthew.kilby@faegredrinker.com
jeff.justman@faegredrinker.com
kacie.tawfic@faegredrinker.com
anderson.tuggle@faegredrinker.com

Sandra D. Grannum (*pro hac vice*)
600 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 549-7000
sandra.grannum@faegredrinker.com

*Attorneys for Defendants*

44