**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| CITY OF HOLLYWOOD FIREFIGHTERS' PENSION FUND, on behalf of itself and all others similarly situated,<br><br>       Plaintiff,<br><br>INSPIRE MEDICAL SYSTEMS, INC., TIMOTHY P. HERBERT, and RICHARD J. BUCHHOLZ,<br><br>       Defendants. | Case No. 0:23-cv-03884-NEB-DJF<br><br>LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT |

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   STATEMENT OF FACTS ...................................................................................... 9

     A.    Because Commercial Insurance Accounted For 70% Of Inspire's
           Revenue, Successfully Completing The Commercial Insurance-
           Required Prior Authorization Process Was Critical To the
           Company's Business.................................................................................. 9

     B.    Given The Critical Importance Of The Prior Authorization Process,
           Inspire Developed The PAAP, Which The Company Told Investors
           Was a "Pillar of [Inspire's] Reimbursement Strategy" and a
           "Competitive Strength" ......................................................................... 10

     C.    Former High-Level Inspire Employees Confirm That, Unbeknownst
           to Investors, At The Start Of 2023, Inspire Withdrew Support For
           The PAAP To Save Costs, Leading To An *Absolutely Massive
           Slowdown*" In Authorizations........................................................... 12

     D.    Despite Knowing Full Well Of "Massive" Problems In Inspire's
           Business, Defendants Concealed This Highly Material Information
           From Investors And Falsely Assured The Market That The Opposite
           Was True ................................................................................................ 15

     E.    The Truth Emerges: Inspire Had "Minimiz[ed] Our Involvement In
           The Prior Authorization Process," Negatively Impacting Inspire's
           Business For At Least Two Quarters, And Causing The Loss Of
           Hundreds of Procedures .......................................................................16

III.  ARGUMENT ....................................................................................................... 19

     A.    Plaintiff Has Adequately Alleged Falsity ....................................................... 19

          1.    Defendants' Statements Were Materially False And
               Misleading.....................................................................................20

          2.    Defendants' "Fraud by Hindsight" Arguments Fail ........................ 24

          3.    Defendants' Attacks On The FEs Fail ............................................. 28

          4.    Defendants' Self-Serving Arguments About The Purported
               Meaning Of Their Statements Raise Factual Disputes That
               Are Not Appropriate For Resolution At The Pleading Stage ........... 29

5.    Defendants' Statements Were Not Puffery Or Inactionable Opinion ...............................................................................34

6.    Defendants Did Not Disclose During The Class Period That They Had "Minimize[d] Our Involvement With [Their Customers'] Prior Authorization Process" ......................................37

7.    Defendants' Argument That The PAAP Problems Were "Transient" Is Both Contradicted By The Allegations Of The Complaint And Raises Fact Issues Inappropriate For Resolution Here ....................................................................40

B.    Plaintiff Has Adequately Alleged Scienter .................................................41

1.    Defendants Admitted They Knew Facts That Contradicted Their Public Statements ...................................................42

1.    The FE Allegations And Other Allegations Support Scienter ..........45

2.    Plaintiff's "Core Operations" Allegations Further Support Scienter ................................................................46

3.    Analysts' Reaction To The Disclosures Further Supports Scienter ................................................................49

4.    The Complaint's Non-Reliance On "Motive" Allegations Is Irrelevant ...............................................................50

C.    The Amended Complaint Adequately Pleads Control Person Claims ........54

IV.    CONCLUSION ..............................................................................54

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012) ....................................................................... 41

*Atlas v. Accredited Home Lenders Holding Co.*,
   556 F. Supp. 2d 1142 (S.D. Cal. 2008) ..................................................... 26

*Azar v. Yelp, Inc.*,
   2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ...................................... 22, 43

*Baker v. SeaWorld Ent., Inc.*,
   423 F. Supp. 3d 878 (S.D. Cal. 2019) .................................................. 23, 50

*Beaver Cnty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.*,
   94 F. Supp. 3d 1035 (D. Minn. 2015) .................................................. 25, 45

*Campbell v. Transgenomic, Inc.*,
   916 F.3d 1121 (8th Cir. 2019) ............................................................. 20, 36

*City of Pontiac Gen. Employees' Ret. Sys. v. Wal-Mart Stores, Inc.*,
   2014 WL 4823876 (W.D. Ark. Sept. 26, 2014) ......................................... 19

*Elam v. Neidorff*,
   544 F.3d 921 (8th Cir. 2008) .................................................................... 27

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
   270 F.3d 645 (8th Cir. 2001) ............................................................... 51, 54

*Franchi v. SmileDirectClub, Inc.*,
   633 F. Supp. 3d 1046 (M.D. Tenn. 2022) ................................................. 49

*Freedman v. St. Jude Med., Inc.*,
   4 F. Supp. 3d 1101 (D. Minn. 2014) .................................................... 19, 32

*Fryman v. Atlas Fin. Holdings, Inc.*,
   2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ......................................... 42, 52

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023) ..................................................................... 36

*Hall v. Johnson & Johnson*,
   2019 WL 7207491 (D.N.J. Dec. 27, 2019) ................................................. 49

*Hedick, v. Kraft Heinz Co.*,
  2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ...................................................... 36

*Homyk v. ChemoCentryx, Inc.*,
  2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) .................................................... 35

*IBT Emp. Grp. Welfare Fund v. Compass Mins. Int'l, Inc.*,
  2023 WL 8596108 (D. Kan. Dec. 12, 2023) ...................................................... 34

*In re 3M Co. Sec. Litig.*,
  2021 WL 4482987 (D. Minn. Sept. 30, 2021) ............................................. 38, 48

*In re Acadia Pharms. Inc. Securities Litig.*,
  2020 WL 2838686 (S.D. Cal. June 1, 2020) ............................................... 42, 47

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) .............................................................................. 51

*In re Amgen Inc. Sec. Litig.*,
  2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ................................................... 42

*In re Apogee Enter., Inc. Sec. Litig.*,
  2020 WL 1445856 (D. Minn. Mar. 25, 2020) ........................................... 26, 38

*In re AppHarvest Sec. Litig.*,
  684 F. Supp. 3d 201 (S.D.N.Y. 2023) .............................................................. 28

*In re Apple Inc. Sec. Litig.*,
  2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ............................................. 22, 43

*In re Bank of Am. Corp.*,
  2011 WL 740902 (N.D. Cal. Feb. 24, 2011) .................................................... 43

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) .............................................................. 26

*In re Biogen Inc. Sec. Litig.*,
  857 F.3d 34 (1st Cir. 2017) .............................................................................. 48

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
  403 F. Supp. 3d 712 (D. Minn. 2019) ....................................................... *passim*

*In re Ceridian Corp. Sec. Litig.*,
  542 F.3d 240 (8th Cir. 2008) ........................................................................... 53

*In re Cerner Corp. Sec. Litig.*,
  425 F.3d 1079 (8th Cir. 2005)............................................................34

*In re Dentsply Sirona, Inc. Sec. Litig.*,
  665 F. Supp. 3d 255 (E.D.N.Y. 2023)...............................................29

*In re Grab Holdings Ltd. Sec. Litig.*,
  2024 WL 1076277 (S.D.N.Y. Mar. 12, 2024).....................................32

*In re HD Supply Holdings, Inc. Sec. Litig.*,
  341 F. Supp. 3d 1342 (N.D. Ga. 2018)...............................................26

*In re Intuitive Surgical Sec. Litig.*,
  65 F. Supp. 3d 821 (N.D. Cal. 2014)..................................................37

*In re InvenSense, Inc. Sec. Litig.*,
  2017 WL 11673462 (N.D. Cal. Apr. 12, 2017) ..................................30

*In re Iso Ray, Inc. Sec. Litig.*,
  189 F. Supp. 3d 1057 (E.D. Wash. 2016) ...........................................47

*In re James River Grp. Holdings, Ltd. Sec. Litig.*,
  2023 WL 5538218 (E.D. Va. Aug. 28, 2023) .....................................49

*In re K-tel Int'l, Inc. Sec. Litig.*,
  300 F.3d 881 (8th Cir. 2002)..............................................................51

*In re Medtronic Inc., Sec. Litig.*,
  618 F. Supp. 2d 1016 (D. Minn. 2009)...............................................19

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)................................................36

*In re Nash Finch Co.*,
  502 F. Supp. 2d 861 (D. Minn. 2007)...........................................25, 29

*In re Navient Corp. Sec. Litig.*,
  2019 WL 7288881 (D.N.J. Dec. 30, 2019)..........................................28

*In re Nielsen Holdings PLC Sec. Litig.*,
  510 F. Supp. 3d 217 (S.D.N.Y. 2021)................................................44

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010)..............................................................23

v

*In re Read-Rite Corp. Sec. Litig.*,
335 F.3d 843 (9th Cir. 2003)................................................................................48

*In re Resideo Techs., Inc., Sec. Litig.*,
2021 WL 1195740 (D. Minn. Mar. 30, 2021)........................................................25

*In re Salix Pharms., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ...............................................23, 50

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011) ...................................................................45

*In re St. Jude Med., Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011) .............................................................*passim*

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
45 F.4th 1236 (10th Cir. 2022) .......................................................................*passim*

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)..................................................................................35

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
14 F.4th 141 (2d Cir. 2021)...................................................................................29

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018)................................................................................38

*Kloss v. Argent Tr. Co.*,
2023 WL 8603131 (D. Minn. Dec. 12, 2023) ...........................................7, 17, 18

*Kushner v. Beverly Enters.*,
317 F.3d 820 (8th Cir. 2003)................................................................................19

*Lowry v. RTI Surgical Holdings, Inc.*,
532 F. Supp. 3d 652 (N.D. Ill. 2021) ...................................................................44

*Mart v. Tactile Sys. Tech., Inc.*,
595 F. Supp. 3d 788 (D. Minn. 2022).............................................................*passim*

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) ............................................................................49

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019).............................................................42, 50

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) ...................................................................47

*Plymouth Cnty. Ret. Sys. v. Patterson Companies, Inc.*,
2019 WL 3336119 (D. Minn. July 25, 2019) ........................................ 19, 20

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014).................................................................. 8, 47

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003).....................................................................48

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008).....................................................................48

*Sakkal v. Anaplan Inc.*,
557 F. Supp. 3d 988 (N.D. Cal. 2021) .......................................................46

*Sanchez v. Centene Corp.*,
407 F. Supp. 3d 831 (E.D. Mo. 2019) ................................................*passim*

*Shash v. Biogen, Inc.*,
84 F.4th 1 (1st Cir. 2023).........................................................................35

*Shoemaker v. Cardiovascular Sys., Inc.*,
300 F. Supp. 3d 1046 (D. Minn. 2018).......................................................29

*Sinnathurai v. Novavax, Inc.*,
645 F. Supp. 3d 495 (D. Md. 2022)............................................................47

*Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*,
365 F.3d 353 (5th Cir. 2004).....................................................................50

*Steamfitters Local 448 Pension & Ret. Sec. Funds v. Sleep Number Corp.*,
2023 WL 4421688 (D. Minn. July 10, 2023) ..............................................29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) ........................ 42, 48

*Trustees of Welfare & Pension Funds of Loc. 464A - Pension Fund v.*
*Medtronic PLC*,
2024 WL 1332262 (D. Minn. Mar. 28, 2024) ............................... 29, 38, 45

*Yates v. Mun. Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014).....................................................................48

Lead Plaintiff City of Hollywood Firefighters' Pension Fund ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss.[1]

## I.   PRELIMINARY STATEMENT

Inspire's sole product is a $25,000 surgical implant that treats obstructive sleep apnea.  Given the implant's high cost, commercial insurers will not agree to reimburse Inspire for the procedure unless and until prospective patients have successfully completed a complex "prior authorization" process, including a thorough medical evaluation and extensive eligibility documentation.  Because Inspire earns 70% of its annual revenue from commercial insurance, it is critically important that this prior authorization process be completed quickly and correctly.

To that end, prior to the Class Period (May 3, 2023 – November 7, 2023), Inspire invested heavily in what it called its Prior Authorization Approval Process (the "Process" or the "PAAP"), which gave the Company direct control over medical providers' prior authorization submissions and ensured that patients received authorization for the procedure as promptly as possible.  The PAAP was so essential that, in its SEC filings, Inspire described it as a "***pillar of our reimbursement strategy***" and a "***competitive***

---

[1] Defendants are Inspire Medical Systems, Inc. ("Inspire"), Timothy P. Herbert ("Herbert"), and Richard J. Buchholz ("Buchholz").  References to "MTD" or "Motion" refer to the Memorandum of Law in Support of Defendants' Motion to Dismiss (Dkt. 40).  All citations to "¶_" are to paragraphs in the Amended Class Action Complaint (the "Amended Complaint" or "AC") (Dkt. 28).  All terms not otherwise defined herein have the same meanings as in the Amended Complaint.  Unless otherwise noted, all emphasis is added, and internal citations and quotations are omitted.

*strength*" for the Company because the Process was "highly effective in working with patients and physicians to obtain prior authorizations for our Inspire system."

In the years leading up to the Class Period, the PAAP was a success, and Inspire's revenue grew 700% from 2018 to 2022. However, the PAAP was also time-intensive and costly, requiring Inspire's team of sales representatives and other employees to manage every step of the complicated prior authorization process for patients and medical providers, including medical testing, form submission, and appeal processing. As a result of these costs, Inspire did not have a single profitable quarter in its first four-and-a-half years as a public company.

Accordingly, and unbeknownst to investors, in January 2023 (four months prior to the start of the Class Period), Inspire made dramatic changes to the PAAP to slash the program's costs. In stark contrast to Defendants' repeated statements about the vital importance of "working with patients and physicians to obtain prior authorization," Inspire now did the exact opposite: it essentially removed itself from the prior authorization process altogether. The Company stopped providing incentive compensation to employees for successful authorizations, and instead left medical providers to navigate the complex, multi-step process on their own. The result was dramatic, and by the start of the Class Period, Inspire's PAAP changes led to significant increases in improper submissions, delayed approvals, and outright denials of prior authorizations, costing the Company millions of dollars in lost revenue.

These issues were independently confirmed by numerous high-level former Inspire employees, including Senior Territory Managers from across the country who were directly

2

responsible for the PAAP.  These former employees confirmed that the PAAP changes "took the incentive away from us to help with the prior authorizations," which led to an "***absolutely [] massive slowdown***" in the prior authorization process precisely because providers "were not very good at" completing the process on their own.  As a result, Inspire's prior authorization "***approval percentage definitely went down dramatically*** by outsourcing the prior authorizations to the clinics," and Inspire "***lost patients*** that were waiting too long and decided to opt out of having the procedure done."  Moreover, these former employees confirmed that Defendants were well aware of these issues, as sales personnel reported these problems to senior executives, Inspire's senior management saw first-hand a "***drastic shift***" in prior authorizations, and Inspire's CEO, Defendant Herbert, specifically discussed these problems during Company meetings.

Despite knowing full well of these issues, throughout the Class Period, Defendants not only failed to disclose this highly material information to investors, but they falsely represented that the PAAP continued to be highly effective and was becoming *even more efficient*, thus purportedly fueling Inspire's growth prospects.  For example, Defendants repeatedly reassured investors that Inspire "steadfastly improved our conversion of [patient] contact to patients receiving therapy [i.e. the implant]," and was thus seeing "continued growth across all of our [third-party medical provider] centers."  Defendants even claimed that due to the Company's efforts, the prior authorization process was speeding up, such that while it used to take "4 to 6 months to get an insurance approval… Now we get approved in just 2 to 5 days."  And as late as August 1, 2023—just two months before the end of the Class Period—Defendant Herbert reaffirmed that "even with the

3

typical summer slowdown in [patient] contact, we steadfastly improved our conversion of patients receiving therapy."

Defendants were finally forced to reveal the truth on November 7, 2023. On this day, Defendants disclosed quarterly revenue that fell short of analyst expectations by as much as $10 million—representing approximately ***400 lost procedures***—marking the first time Inspire had missed analyst estimates in its history as a public company.

Significantly, during the earnings call held that day, Defendant Herbert made clear that the poor results were directly attributable to the fact that, nearly one year earlier, the Company had made a series of undisclosed yet dramatic changes to its core PAAP process. Specifically, Herbert admitted that, in January 2023, Defendants had made the decision to "***minimize our involvement with [our customers'] prior authorization process***." Herbert further admitted that as a direct result of these changes, "***a significant number of our customers experienced challenges with their prior authorization submission process***," which caused a "***decrease in the number of submissions by our customers seeking prior authorization***" and an "***impact on the number of implant procedures***." Herbert also made clear that these "challenges" had existed throughout the Class Period—in his own words, these problems had "become evident" in "the second quarter" (the quarter beginning April 1, 2023), and by the start of the third quarter (the quarter beginning July 1, 2023), the problems had become so significant that Defendants "realized we needed to take some corrective action." On this news, Inspire's stock price plummeted $31.79 per share, or almost 20%, wiping out over $920 million in market capitalization in a single day.

4

Analysts excoriated Defendants for failing to disclose the issue earlier, with JPMorgan pointedly asking: "***why not mention [these issues] on 2Q [call]?***" Truist similarly emphasized that the "***controversy this quarter***" was due to the previously undisclosed PAAP changes that were "***implemented early in the year***," and that "***during Q2***" Inspire management "***began to realize there was a consistent slowdown in prior authorization submissions***." Wells Fargo underscored that management had "noted a slowdown in P[rior] A[uthorizations] ***in early Q3***" (by July 2023) and that "***the signs were probably there in Q2***."

In the face of these damning facts, Defendants argue in their Motion that Plaintiff failed to adequately allege falsity and scienter. Defendants' arguments are meritless.

First, Defendants argue that certain of their statements were not false and misleading because they were purportedly made "before the [PAAP] issues had manifested," and that the Complaint thus pleads "fraud by hindsight." But this ignores Defendant Herbert's own admissions that the PAAP problems had become apparent "in the second quarter" (i.e. even prior to the start of the Class Period), and that "by the beginning of the third quarter" (July 2023), the problems were so profound that Defendants had been forced to "take some corrective action" to address them. Moreover, several of the alleged false and misleading statements were made in August and September of 2023, by which time even Defendants' Motion admits there was already "strong confirmation" of the negative impacts of the PAAP changes. Given these admissions, it cannot be credibly disputed at this stage of the litigation that the PAAP issues had, in fact, manifested by the time Defendants made their alleged false statements in May, August, and September 2023. *See, e.g., Sanchez v. Centene*

5

*Corp.*, 407 F. Supp. 3d 831, 842-44 (E.D. Mo. 2019) (disclosure that company had been "working on [a plan] for the past several months" to mitigate problem revealed that problem existed at time of the challenged statements).

Second, Defendants argue that their statements concerning the rate at which Inspire converted patient contacts to patients receiving therapy and the speed of their prior authorization process were literally true and did not mislead the market. However, Defendants' argument cannot be reconciled with Defendants' disclosures at the end of the Class Period, which revealed that Inspire lost approximately 400 procedures as a result of the PAAP changes—prospective patient contacts that were *not* "converted" to "patients receiving therapy." Moreover, numerous FEs confirmed that Inspire not only experienced "delays" in obtaining prior authorizations, but "had more denials with forgetting documentation," such that Inspire's "approval percentage [by insurers] definitely went down dramatically" and Inspire "lost patients that were waiting too long and decided to opt out of having the procedure done." For these reasons, Defendants' statements specifically claiming that the rate and speed at which Inspire obtained prior authorizations were improving were materially false and misleading.

Third, while Defendants argue that certain of their statements were immaterial puffery, Defendants are wrong on the facts and the law. Indeed, Defendants' wholly positive statements touting improvements in conversion rates and authorization times were rendered materially misleading in light of the undisclosed material problems with the PAAP. This is particularly so given that, in Defendants' own words, the changes to the PAAP affected a "***significant number of our customers***"; those changes led to millions of

6

dollars in lost revenue due to hundreds of delayed and denied procedures; and Inspire's stock price plummeted nearly 20% in a single trading day following Defendants' disclosures. *See, e.g., Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 810 n.17 (D. Minn. 2022) (Brasel, J.) (finding statements about "strong growth" not puffery). In addition, several of Defendants' statements were "provided in direct response to questions from financial analysts at conferences held expressly to discuss [defendants'] earnings and guidance," further evidencing the materiality of Defendants' representations. *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 888 (D. Minn. 2011).

Fourth, Defendants ask the Court to conclude—at the pleading stage, and in direct contravention to the plain allegations of the Complaint, the accounts of numerous former employees, and Defendants' own admissions—that the PAAP changes were immaterial to Inspire's business. In so arguing, Defendants assert that the PAAP changes were merely a "pilot program" involving a small percentage of Inspire's customers, and the effects of the changes merely "deferred" revenue to future quarters. Courts are clear that such disputed "facts" cannot be resolved on a motion to dismiss, and, at best, only underscore the myriad issues of fact that cannot be resolved at this stage. *See Kloss v. Argent Tr. Co.*, 2023 WL 8603131, at *3 (D. Minn. Dec. 12, 2023) (a "high degree of indisputability is the essential prerequisite" for judicial notice).

Fifth, Defendants argue that they lacked scienter for their statements. This is nonsense. The PAAP was a "core" "pillar of [Inspire's] reimbursement strategy"—a critical component of the Company's business that accounted for 70% of its revenue and which Defendants repeatedly touted to investors. Defendant Herbert admitted that, at the

7

beginning of 2023, Inspire had dramatically changed the PAAP to "minimize our involvement with [our customers'] prior authorization process," and that he had closely "tracked the results" of these dramatic changes. Defendants further admitted that Inspire was not only aware of the resulting problems prior to the start of the Class Period, but that by the beginning of the third quarter, they had "strong confirmation" of the extent of the problems (MTD at 11, 18, 37), which forced Inspire to abruptly reverse its changes to the PAAP. Moreover, numerous former employees directly involved in the PAAP not only attested to the pervasive and "absolutely massive slowdown" in prior authorizations and the fact that management closely tracked the problem, but recalled meetings in which these problems were directly discussed with management, including Herbert. Given the "prominence" of these issues, it would be "absurd to suggest that management was without knowledge of" the PAAP slowdown. *Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014); *see also In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 731 (D. Minn. 2019) ("reasonable to assume that top management were aware of matters central to that business's operation.").

For all of the reasons discussed below, Defendants' motion to dismiss should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    Because Commercial Insurance Accounted For 70% Of Inspire's Revenue, Successfully Completing The Commercial Insurance-Required Prior Authorization Process Was Critical To the Company's Business

Inspire's implant is designed to treat obstructive sleep apnea in patients who do not tolerate traditional CPAP machine therapy, which requires wearing a breathing mask during sleep.  ¶23.  Inspire earns roughly 70% of its revenue from commercial insurance reimbursements for its device—with the Company receiving roughly $25,000 per procedure.  ¶¶23, 25.

Inspire's devices are implanted by third-party medical providers.  ¶26.  Before a patient can receive insurance approval for an Inspire device, they must go through a rigorous "prior authorization" process via these medical providers.  *Id.*  This process requires that the medical provider develop evidence of the patient's difficulty with CPAP treatment, and that the patient undergo extensive medical testing, including an overnight observed "sleep study" and drug-induced sleep endoscopy.  ¶¶26-27, 50.  The process also requires extensive documentation, which requires medical providers to complete numerous complex forms.  ¶26.

Inspire can only recognize revenue from a procedure after a patient is approved and the device is shipped to the implanting medical provider.  ¶31.  Accordingly, if there is an error in completing any part of the authorization process, approval could be delayed or denied, and Inspire could lose tens of thousands of dollars in revenue.  *Id.*

9

**B.**    **Given The Critical Importance Of The Prior Authorization Process, Inspire Developed The PAAP, Which The Company Told Investors Was a "Pillar of [Inspire's] Reimbursement Strategy" and a "Competitive Strength"**

In the years leading up to the Class Period, Inspire developed the multi-faceted PAAP to maximize its revenue and ensure that patients got approved as often and as quickly as possible. ¶¶2, 28. On the front end, the PAAP developed sophisticated television, print, and internet campaigns to bring patients to Inspire's website and telephone hotline, which could connect them directly with ENT doctors and other providers so that they could schedule an evaluation for the device. ¶29. Once a patient connected with a medical provider and began the process, the PAAP dedicated entire teams of employees to overseeing and managing every step of each patient's prior authorization, from initial evaluation through sleep testing through submission of the application. ¶30. Inspire employees not only directly oversaw and advised on each medical provider's testing for each individual patient, but they also filled out the complex authorization forms for the providers and even handled appeals when authorizations were initially denied. *Id*.

Given the PAAP's central importance to Inspire's business model, the Company regularly emphasized to investors that the Process was a "pillar" of its business and a key "competitive strength." ¶¶32-33. For example, the Company's 2022 Form 10-K (filed February 10, 2023), in a section specifically entitled "Prior Authorization Approval Process," made clear that the PAAP was one of two "*core*" "*pillars*" of the Company's reimbursement strategy, and that the key to the "highly effective" Process was that the Company was intimately involved in it, to the point that Inspire employees worked directly

10

with patients and physicians to obtain authorization for the Company's implant.  Moreover, the 2022 Form 10-K not only failed to disclose the changes that Inspire had made to this "pillar of [its] reimbursement strategy," but it expressly represented that the Company would "continue to benefit from this efficient prior authorization process":

### Prior Authorization Approval Process

*A second pillar of our reimbursement strategy includes leveraging our market access team to assist patients and physicians in obtaining appropriate prior authorization approvals in advance of treatment. We believe our market access team is highly effective in working with patients and physicians to obtain prior authorizations for our Inspire system including assisting with the appeals process.* We have received hundreds of prior authorization approvals from all of the largest commercial payors, for example Anthem, Cigna, Blue Cross Blue Shield, United Healthcare, and Humana. *We believe we will continue to benefit from this efficient prior authorization process*.  ¶33.

Similarly, another section of the 2022 Form 10-K highlighted under a section entitled "*Our Competitive Strengths*" the fact that the Company maintained a "[d]edicated team focused on providing market access for patients and providers," and that this team "helps patients and providers work with payors to secure prior authorization approvals in advance of initial treatment." ¶32.  The 2022 Form 10-K further emphasized that this "refined, efficient approach" was highly material to the Company's business, as the PAAP was "highly effective" and "successful in helping to secure reimbursement from hundreds of commercial payors to date."  ¶¶32-33.

Analysts responded favorably to Defendants' positive representations concerning the PAAP, specifically highlighting that the Process was a key to the Company's continued growth. ¶34.  For example, Baird emphasized that Inspire's "clinical support team [] guides

11

local physicians and patients through prior authorization," and Truist cited Inspire's "years of experience navigating the challenging reimbursement landscape" as a "sustainable competitive advantage" for Inspire. *Id.*

> **C.** **Former High-Level Inspire Employees Confirm That, Unbeknownst to Investors, At The Start Of 2023, Inspire Withdrew Support For The PAAP To Save Costs, Leading To An "*Absolutely Massive Slowdown*" In Authorizations**

Due to the extensive manpower involved, the PAAP was expensive to maintain. Because of these high costs, Inspire failed to post a single profitable quarter in its first four and a half years as a public company. ¶35. Accordingly, beginning in January 2023—and in direct contravention to Inspire's repeated representations about the central importance of its intimate involvement in patients' prior authorization process—Defendants made drastic and undisclosed changes to the PAAP in order to slash the Company's costs. Specifically, Inspire ceased offering assistance with prior authorizations to medical providers and restructured its incentive compensation so that sales representatives were no longer incentivized to ensure that medical providers completed each step of the complex process quickly and correctly. ¶¶35-36. Instead, medical providers—who often lacked the proper training and staffing—were suddenly left to handle the complex prior authorization process on their own. ¶¶36-38.

Former Inspire employees directly involved in overseeing the PAAP confirmed that these changes had an immediate deleterious impact on Inspire's business, causing severe slowdowns in the authorization process and often leading to approvals being denied or forms never being submitted at all. Additionally, delays in the process led many patients

12

to simply drop out of the pipeline as they became frustrated or lost interest while waiting for an approval. For example, FE 1, a former Senior Territory Manager, recalled that it quickly became apparent that providers could not handle the prior authorizations on their own because they lacked the staffing and knowhow to complete the "intricate" process. ¶¶39-40. As FE 1 explained, prior to 2023, "Inspire did these [prior authorizations] every day" and were highly skilled at them, but "now the clinics were doing them weekly and [they] were not very good at it." ¶40. FE 1 said that this led to stalled procedures and outright denials by insurers: "***they had more denials with forgetting documentation. The approval percentage definitely went down dramatically by outsourcing the prior authorizations to the clinics. It was not a good setup for success***." *Id.*

Another Senior Territory Manager, FE 2,[2] explained that, prior to the changes, "the Inspire prior authorization team was so good. They were our best weapon in our offices and in getting patients on the table quicker," and thus were critical to Inspire's revenue. ¶41. This, she explained, was because the process was extraordinarily complex, and often turned on subtle differences in medical testing such that Inspire's team often made "the

---

[2] Defendants' Meet-and-Confer Statement (Dkt. No. 42) claims that Plaintiff "refused" to provide Defendants with a copy of the FE 2 interview. However, Defendants omit the fact that, after Defendants requested the document, Plaintiff's counsel informed Defendants' counsel that (1) discovery is presently stayed under the PSLRA; (2) it was not typical practice for a plaintiff to provide defendants with copies of documents relied on in a complaint prior to discovery (nor had Plaintiff's counsel ever been asked to do so before); and (3) Plaintiff's counsel was aware of no legal requirement that they do so. Plaintiff's counsel thus asked Defendants' counsel to send any authority they had that would require Plaintiff to produce documents relied on in the Complaint while discovery was stayed. Defendants never provided any such authority.

difference between losing a patient and maybe keeping a patient" for Inspire's device.  ¶42. However, FE 2 said, Inspire's withdrawal of prior authorization support immediately "slow[ed] down the time that it takes from patient to get submitted to patient on table." ¶44.  As FE 2 explained, "[i]t really slows down that process versus the Inspire team…if [the Inspire team is] doing it, you can affect the process and get patients implanted quicker." *Id.*  FE 2 confirmed that the PAAP changes resulted in "***absolutely a massive slowdown***." *Id.*  This, she said, was in large part because medical offices typically had high turnover and limited capacity to train their staff adequately to perform and submit the complex prior authorizations.  As she explained, the medical provider staff were "never going to be as quick and efficient as the dedicated Inspire team." ¶45.

A former Inspire Territory Manager, FE 3, similarly corroborated that the Company entirely removed itself from the prior authorization process, leading to an immediate and significant loss of business. ¶46.  FE 3 said that, after Inspire's removal of itself from the process, understaffed and ill-trained medical offices were unable to handle the process themselves.  ¶47.  For example, in one instance she observed, "there was one person trying to handle several hundred prior authorizations and trying to keep up with the demand." *Id.* Consequently, she said "[Inspire] lost patients that were waiting too long and decided to opt out of having the procedure done," as "patients quickly lost interest" when their procedures were delayed.  ¶48.

FE 4, another Territory Manager, also corroborated that Inspire had pulled its support for the enormously complex prior authorization process, leading to disastrous results.  ¶¶50-52, 54. Indeed, FE 4 said that she warned her immediate supervisor of the

14

likely consequences of the changes, and that several medical offices pushed back on the PAAP changes with Inspire, but that these concerns fell on deaf ears.  ¶52.

Notably, these former employees also confirmed that Inspire's top management was fully aware of the Company's prior authorization problems from "early in the process" (early in 2023). ¶55.  For example, FE 1 stated that employees, including her manager and the Area Vice President, "were all referencing this up to the CEO" and that "this started pretty early in the process." *Id.*  FE 1 recalled a specific meeting no later than the second quarter of 2023 in which CEO Herbert discussed Inspire's problems with prior authorizations. *Id.*  Similarly, FE 4 confirmed that Inspire's executives used Microsoft Dynamics software to monitor patients' progress through the entire process, all the way from setting up new accounts, to seeking prior authorization, to scheduling surgery—enabling them to observe slowdowns in the process in real time.  ¶54.

**D.    Despite Knowing Full Well Of "Massive" Problems In Inspire's Business, Defendants Concealed This Highly Material Information From Investors And Falsely Assured The Market That The Opposite Was True**

Notwithstanding the "absolutely massive slowdown" in prior authorizations, Defendants concealed their decision to "minimize our involvement with [our customers'] prior authorization process," and instead assured investors that the prior authorization process was *improving*.  For example, on May 2, 2023—the day before the start of the Class Period—Herbert stated during an investor call that Inspire had "***steadfastly improved our conversion of contact to patients receiving therapy*** ..."—i.e., had improved the rate at which patients who made initial inquiries about Inspire devices wound up getting the

implant. ¶57.  Further, Herbert assured investors that this "conversion" process was in fact speeding up, touting supposed "signs of improvement in the patient pathway [] specifically by *reducing the time from patient contact to implant*." *Id.*

Similarly, during a May 16, 2023 investor call, Herbert again expressly claimed that Inspire's prior authorization process was actually *improving* and *speeding up*, stating that, while it had once taken "4 to 6 months to get an insurance approval…*Now we get approved in just 2 to 5 days*." ¶60.  During the Company's August 1, 2023 earnings call (by which time—Herbert later admitted—the Company was already receiving "strong confirmation" of the problems caused by the PAAP changes (MTD at 11, 18, 37)), Herbert again insisted that the Company's "conversion" of contacts was continuing to improve, stating that "even with the typical summer slowdown" the Company "steadfastly improved our conversion of patients receiving therapy." ¶61.  Herbert further touted "continued growth across all of our centers," and stated that the Company's "efficiency and conversions of patients through implant continues to be strong." *Id.*

Significantly, at no time during the Class Period did Defendants breathe a word of their fundamental changes to the PAAP, or the "massive slowdown" in prior authorizations that these changes caused.

### E.    The Truth Emerges: Inspire Had "Minimiz[ed] Our Involvement In The Prior Authorization Process," Negatively Impacting Inspire's Business For At Least Two Quarters, And Causing The Loss Of Hundreds of Procedures

The truth finally emerged on November 7, 2023, when the Company reported its financial results for the third quarter of 2023.  Specifically, Inspire issued a press release

16

reporting its financial results for the third quarter of 2023, including disappointing total revenue of $153.3 million—the first time in Inspire's history as a public company that it missed analyst estimates. ¶62. The press release attributed the poor results to a "***decline in prior authorization submissions***," which Defendants blamed on a "pilot program regarding prior authorization submissions by our customers" that had been implemented at the start of 2023. *Id.*

During Inspire's earnings call the same evening, Defendant Herbert starkly admitted that Inspire's revenue shortfall was due entirely to Defendants' decision to make dramatic changes to the PAAP and abandon its direct involvement in the prior authorization process that the Company had repeatedly touted as a "core" "pillar" of its success and a "competitive strength." Specifically, Herbert admitted that "in early 2023," Defendants had made the decision to "***minimize our involvement with [our customers'] prior authorization process***." ¶63. Herbert explained that, as a result of these changes, "***a significant number of our customer[s] experienced challenges with their prior authorization submission process***," which led to a "decrease in the number of submissions by our customers seeking prior authorization" and an "***impact on the number of implant procedures***."[3] *Id.* Herbert further acknowledged that Defendants had been fully aware of

---

[3] The MTD retroactively describes these changes as a mere "pilot program" that was "limited to a small percentage of Inspire's customers," and that they merely sought to "see if [the] change work[ed]." MTD at 6, 42. But this is not what Defendants said at the time, as Defendants specifically blamed the Company's disappointing results on these changes, and analysts noted that the changes cost the Company approximately $10 million in revenue, representing 400 lost procedures. Indeed, Defendants' assertion contradicts Defendant Herbert's own admission that the PAAP changes led to a "significant number"

the issues throughout the Class Period.  Indeed, Herbert explicitly admitted that the problems had "started to become evident" in "the second quarter" (the quarter beginning April 1, 2023), and that, by the start of the third quarter (the quarter beginning July 1, 2023), the problems had become so significant that Defendants "realized we needed to take some corrective action" and reverse the changes that were made to the Process.  ¶64.

In the immediate wake of these disclosures, Inspire stock price dropped $31.79 per share—nearly 20% in a single day—from a closing price of $161.74 per share on November 7, 2023, to a closing price of $129.95 per share on November 8, 2023, on unusually high volume, wiping out over $920 million in market capitalization.  ¶65.

Analysts were shocked that Defendants had failed to disclose this issue earlier in the year.  For example, JPMorgan questioned "*why not mention [these issues] on 2Q [call]*?" ¶64.  Truist cited the "*controversy this quarter*" around the previously undisclosed PAAP changes "implemented early in the year that put the burden of preauthorization submissions more into customers hands," which led to "slowing private insurance prior-auth submissions."  ¶66. Truist specifically highlighted that "*during Q2*" Inspire management "began to realize there was a consistent slowdown in prior authorization submissions …

---

of Inspire's customers experiencing "challenges with their prior authorization submission process."  ¶¶63, 100.  Moreover, Defendants cite no contemporaneous evidence in support of this assertion—only a self-serving reference in the corrective disclosure.  At base, Defendants' assertions raise fact issues inappropriate for resolution at the pleading stage, and the "facts" they state should not be judicially noticed. *See, e.g., Kloss v. Argent Tr. Co.*, 2023 WL 8603131, at *3 (D. Minn. Dec. 12, 2023) ("[i]t is improper for a court to take judicial notice of disputed facts, as a high degree of indisputability is the essential prerequisite for taking judicial notice.").

moving through the year into the summer months." *Id.* Wells Fargo similarly took note of this timing, observing that Inspire management had "***noted a slowdown in P[rior] A[uthorizations] in early Q3***" (by July 2023) and that "***the signs were probably there in Q2***" (April-June 2023). ¶67. And Oppenheimer noted that management had been "***unclear***" and "***confusing***" in describing how this had occurred. ¶68.

## III.   ARGUMENT

### A.   Plaintiff Has Adequately Alleged Falsity

"On a motion to dismiss an action covered by the [PSLRA], the Court views factual allegations in the light most favorable to the plaintiff ... and assumes the truth of particularly pleaded allegations." *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1022 (D. Minn. 2009). "A misrepresentation or omission is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Plymouth Cnty. Ret. Sys. v. Patterson Companies, Inc.*, 2019 WL 3336119, at *13 (D. Minn. July 25, 2019).

The law is clear that "a party who voluntarily discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on these subjects." *Kushner v. Beverly Enters.*, 317 F.3d 820, 831 (8th Cir. 2003). Indeed, "[t]he law is well-settled . . . that so-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud." *Freedman v. St. Jude Med., Inc.*, 4 F. Supp. 3d 1101, 1121 (D. Minn. 2014). "Generally, the issue of whether a public statement is misleading is a mixed question of law and fact for the jury." *City of*

*Pontiac Gen. Employees' Ret. Sys. v. Wal-Mart Stores, Inc.*, 2014 WL 4823876, at *8 (W.D. Ark. Sept. 26, 2014). Similarly, in most cases, "[t]he trier of fact should determine [] materiality...." *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1125 (8th Cir. 2019); s*ee also Patterson*, 2019 WL 3336119, at *13 ("The trier of fact is uniquely competent to determine materiality, as that inquiry requires delicate assessments of inferences a [reasonable investor] would draw from a given set of facts."). The Complaint readily meets this standard here.

### 1.    Defendants' Statements Were Materially False And Misleading

Throughout the Class Period, Defendants repeatedly made highly positive statements about the PAAP and Inspire's success in getting prospective patients authorized by insurers and converting them to customers. For example, on May 2, 2023, Defendant Herbert emphasized that Inspire had "steadfastly improved our conversion of contact to patients receiving therapy"—*i.e*., had improved the rate at which patients who made initial inquiries about Inspire devices wound up getting the Inspire implant. ¶¶69-71, 78-80. Defendant Herbert further assured investors that Inspire had seen "improvement in the patient pathway and specifically by reducing the time from patient contact to implant." ¶69. Herbert similarly claimed dramatic reductions in the time it took to obtain prior authorizations, claiming that while previously, "it could take 4 to 6 months to get an insurance approval," "[n]ow we get approved in just 2 to 5 days." ¶74.

Defendants made similar statements as late as August 1, 2023—a full month into the third quarter of 2023, and just three months before the end of the Class Period— insisting that "even with the typical summer slowdown," the Company was still

20

"steadfastly improving" its conversion of contacts to patients receiving implants. ¶78. Moreover, in response to an analyst's question about whether there was a "backlog or pent-up demand that's continuing to come in and support strong results," Defendant Herbert emphatically responded "[y]es," touted the Company's supposed "continued growth across all of our centers," and again insisted that the Company's "efficiency and conversions of patients through implant *continues to be strong*." ¶¶81-82. Indeed, as late as September 6, 2023—more than two months into the third quarter, and just three weeks before the end of the Class Period—Defendant Buchholz responded to analyst concerns about changes in the Company's Medicare versus commercial insurance mix by assuring that there was no "headwind" to the Company's growth and that there remained a "robust pipeline of patients." ¶83.

These statements were materially false and misleading. In reality, the opposite was true—in direct contravention to Defendants' repeated statements about Inspire's intimate involvement in the prior authorization process, at the beginning of 2023, Defendants had made the decision to slash operating costs by "*minimiz[ing] our involvement with [our customers'] prior authorization process*." ¶84. As a result of Defendants' dramatic changes to the PAAP, Inspire's rate of "conversion" of patients was not "steadfastly improving," but instead had significantly deteriorated, and the speed at which the Company could get patients authorized had slowed down dramatically. Herbert himself acknowledged that the slowdown "started to become evident" in "the second quarter" (prior to his May 2023 statements) and then worsened so much that by "the beginning of

21

the third quarter" (prior to Defendants' August and September 2023 statements), Defendants had already taken "corrective action" to try to fix the problem. ¶64.

Indeed, as Defendants' own Motion acknowledges, by the beginning of the third quarter—a full month before Herbert made his false statement on August 1, 2023, and more than two months before Buchholz made his false statements on September 6, 2023—Defendants were fully aware of the problems Inspire was experiencing with prior authorizations, as they had a "strong confirmation" that their PAAP changes were having a negative effect on the Company's business. MTD at 11, 18, 37. Defendants' own admissions thus provide strong confirmation that their statements were false and misleading when made. *See, e.g., Centene*, 407 F. Supp. 3d at 842-44 (disclosure that company had been "working on [a plan] for the past several months" evidenced falsity of positive statements two months earlier); *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *10 (N.D. Cal. Nov. 4, 2020) (fact that CEO ultimately acknowledged he saw "troubling signs" of a slowdown "*as the quarter went on*" evidenced falsity of statement made in the middle of the quarter); *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *17 (N.D. Cal. Nov. 27, 2018) (company's acknowledgement of a "*modest slowdown*" felt "*halfway through the quarter*" evidenced falsity of statements made at "*almost the exact halfway point of*" the quarter and later).

Furthermore, analysts' visceral reaction to Defendants' admissions supports Plaintiff's allegations. For example, JPMorgan pointedly questioned why Defendants did not disclose these issues earlier in the year, asking Herbert "***why not mention on 2Q [earnings call, held on August 1, 2023]***." Truist similarly emphasized that, by the second

22

quarter, "mgmt…began to realize there was a consistent slowdown in prior authorization submissions occurring."   Analysts' understanding of Defendants' admissions provides additional support for the falsity of Defendants' Class Period statements.  *See, e.g.*, *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1262 (10th Cir. 2022) (analyst who questioned "why didn't we hear this on last quarter's call?" supported falsity of statements during that call); *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 927 (S.D. Cal. 2019) (discussing *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 393 (9th Cir. 2010) and noting that "the Ninth Circuit relied on 'analyst reports' in determining how the market understood" the corrective disclosure); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (analyst interpretation of defendant's statement supported plaintiffs' interpretation).

Additionally, numerous former employees located in geographically dispersed locations who were directly involved in the PAAP confirmed that, by the time Defendants made their statements, Inspire's conversion of patients and speed of prior authorization were not "improving."   Instead, there was an "***absolutely [] massive slowdown***" in authorizations, to the point that Inspire "lost patients that were waiting too long and decided to opt out" of the device implant, and because the PAAP changes led to "more denials," Inspire's "approval percentage definitely went down dramatically."  *See, e.g.,* ¶¶39-55.[4]

---

[4] For similar reasons, the Complaint adequately alleges that Defendants' statements about the digital scheduling pilot and its purported "30% improvement in physician appointments in the pilot centers" was materially misleading, as it touted the success of the digital scheduling pilot—a key aspect of the PAAP—without also disclosing that, at the same time, Defendants had radically changed the PAAP by "minimiz[ing] our involvement with

Accordingly, the Complaint sets forth a plethora of well-pled allegations that adequately establish that Defendants' statements were materially false and misleading when made.

### 2. Defendants' "Fraud by Hindsight" Arguments Fail

Throughout their Motion, Defendants argue that their statements were not false and misleading when made because there were purportedly no facts contradicting the statements at the times they were made. *See, e.g.,* MTD at 18-21, 25. As such, Defendants argue that the Complaint pleads mere "fraud by hindsight." MTD at 16, 18-19. Defendants are wrong.

First, as explained *supra* at III.A.1, Defendants admitted in their corrective disclosure that contradictory facts *did* exist at the time of their statements—i.e., that such facts were "evident" as early as "the second quarter," and that by the beginning of the third quarter (July 2023), Defendants had received such "strong confirmation" of the negative results of their PAAP changes that they had to immediately take corrective action. And as further explained *supra* at III.A.1, analysts confirmed that Defendants' disclosures constituted admissions that there existed contrary facts at the time of their statements. *See, e.g., Pluralsight*, 45 F.4th at 1262 (rejecting district court's "nonculpable, hindsight" interpretation of defendant's disclosure where analysts viewed it as an admission).

Second, FEs directly involved in the PAAP described an "absolutely [] massive slowdown" in prior authorizations, "lost patients that were waiting too long and decided to

---

[our customers'] prior authorization process," as well as the fact that this decision caused millions of dollars in lost revenue. ¶¶72-73.

24

opt out of having the procedure done," and "more denials with forgetting documentation," such that Inspire's "approval percentage [by insurers] definitely went down dramatically." These FE allegations not only "corroborate each other," but they are entirely consistent with and confirmed by Defendants' own admissions at the end of the Class Period. *In re Nash Finch Co.*, 502 F. Supp. 2d 861, 874–75 (D. Minn. 2007); *see also Beaver Cnty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1053 (D. Minn. 2015) (crediting former employee allegations that were "corroborated by [defendant company's] own representations."). Plaintiff has thus adequately established that Defendants' statements were materially false and misleading when made. *In re Resideo Techs., Inc., Sec. Litig.*, 2021 WL 1195740, at *5 (D. Minn. Mar. 30, 2021) (rejecting fraud-by-hindsight argument where plaintiffs "allege[d] that [defendant company's] executives knew or should have known that [the company's] statements were false" when made and the plaintiffs "support[ed] their allegations with confidential witnesses who attest to [d]efendants' knowledge that [defendants'] statements were false or materially misleading when [they] made them.").

Defendants nonetheless argue that, with respect to their May 3 and May 16, 2023 statements, the Complaint's allegations are too "vague" or not "specific" enough with respect to the timing and impact of the prior authorization slowdown as of that time. MTD 19-22. But, in addition to Defendants' admissions—which were specific as to timeframe—the FEs reported a marked slowdown "early in the process" of the PAAP changes (which began in January 2023), and these former employees made clear that the PAAP problems were significant enough for Defendant Herbert himself to discuss them during a meeting

in Q2 2023.  Moreover, the Class Period begins a full *four months* after the PAAP changes were implemented, and throughout the entirety of the Class Period, the impact of the changes was unquestionably material to Inspire's business.  Indeed, Inspire's disclosures at the end of the Class Period revealed that the Company had lost approximately $10 million in revenue—which analysts highlighted represented roughly 400 procedures (¶¶62, 67)—and this shortfall marked the first time in the Company's history that it missed analysts' estimates.[5] ¶100.  Defendant Herbert himself admitted that the PAAP changes led to "***a significant number of our customer[s] experienc[ing] challenges with their prior authorization submission process***," which led to a "decrease in the number of submissions by our customers seeking prior authorization" and an "impact on the number of implant procedures."  *Id.*; *see, e.g., Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (materiality of information underscored by defendants' own statements emphasizing it).[6]  Greater specificity is not required at this stage.  *See, e.g., In*

---

[5] Defendants complain that Plaintiff failed to "quantify" the impact of the Company's slowdown in prior authorizations, and argue that the 400 lost procedures and $10 million in lost revenue cited in the Complaint is unreliable because it was based on analysts' estimates.  MTD at 11.  But it was Herbert himself who blamed the Company's disappointing results on the PAAP changes and said that those changes had impacted a "significant number of our customers."  Plaintiff is not required to quantify the impact with precision at this stage.  *See, e.g., In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 519 (S.D.N.Y. 2011) (rejecting argument that "to plead materiality, it is necessary to quantify [defendants'] overstatements [of their assets].").  Indeed, if the impact of the slowdown were not highly material, it defies credulity to believe that the Company would have discussed it at length in both their earnings press release and earnings conference call and taken "corrective action" to fix it.

[6] *In re Apogee Enter., Inc. Sec. Litig.*, 2020 WL 1445856 (D. Minn. Mar. 25, 2020) (Brasel, J.) is distinguishable, as there, the plaintiffs misread a disclosure that the CEO had "realized

*re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1356 (N.D. Ga. 2018) (plaintiffs were not required to "specifically quantify how false the statements were when made" as "[p]laintiffs have sufficiently alleged the problems that were existing by [the timeframe of defendants' false statements]" and "further quantifiable details can be obtained through discovery.").

Finally, Defendants cannot plausibly argue that the impact of the slowdown was immaterial by the time of their August and September 2023 statements. Indeed, by that time, Defendants themselves admitted to having had "strong confirmation" of the problems, to the point that they took "corrective action." For this reason alone, Defendants' August and September 2023 statements cannot be dismissed as "fraud by hindsight."

---

that the problems were more substantial than learned in due diligence" to mean that defendants knew of problems *during* due diligence. Moreover, the so-called "admission" stated that the company only realized the problems were more substantial "in the second half of calendar year 2017," whereas the alleged false statement was made prior to that. Here, by contrast, the admissions expressly state that Defendants knew of the PAAP problems before the times the statements were made—and even before the start of the Class Period. Similarly, *Elam v. Neidorff*, 544 F.3d 921, 927 (8th Cir. 2008) (MTD at 18) is inapposite, because there, the "plaintiffs ask[ed] th[e] court to infer that defendants' …statements must be false based solely on defendants' representations as to their ability to estimate medical costs," with no other supporting allegations. *Id.* at 927. Plaintiff's allegations here do not rest on any such assumption, let alone "solely" on such an assumption, particularly given the corroborating accounts from numerous former Inspire employees. *Compare Centene*, 407 F. Supp. 3d at 841-43 (distinguishing *Elam* and rejecting "fraud by hindsight" argument because "plaintiffs point to statements made by Defendants indicating that Defendants knew about" and "had in their possession facts… that they omitted from their […] statements, which rendered those statements materially false or misleading.").

27

### 3. Defendants' Attacks On The FEs Fail

Defendants' repeated attempts to minimize the FEs as mere "low-level" employees (MTD at 20, 21, 34, 40) are also unavailing. Indeed, numerous courts have rejected similar arguments, particularly where the former employees had direct involvement in the facts forming the nexus of the allegations—here, Senior Territory Managers and Territory Managers that had direct oversight of the PAAP in separate geographic areas across the country. *See, e.g., In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 262–63 (S.D.N.Y. 2023) (noting that "[a] comprehensive survey of employees is not needed at the pleading stage," and that "accounts of confidential witnesses support a [c]ompany-wide inference where…they emanate from several geographic areas" and "remain consistent."); *In re Navient Corp. Sec. Litig.*, 2019 WL 7288881, at *9 (D.N.J. Dec. 30, 2019) (rejecting argument that "confidential witness statements ... 'must be totally discounted' due to the [witnesses'] low-level employment status," where their experiences "circumstantially" supported the allegations).

Accordingly, "Defendants' complaints about the reliability of FE statements [are] unavailing at this stage, when the Complaint provides ample detail to show that the FEs had personal experience with" the PAAP changes. *CenturyLink*, 403 F. Supp. 3d at 726. Indeed, "Plaintiff has described the [FEs] with sufficient particularity to support the probability that persons in their job positions would possess the information alleged," has "described the [FEs'] job titles and duties with particularity, as well as the information possessed by the various [FEs]," and "[i]t is probable that the [FE]s would know, based on

28

job title, job description, and time period, about the various problems alleged." *Nash*, 502

F. Supp. 2d at 874–75.[7]

### 4.    Defendants' Self-Serving Arguments About The Purported Meaning Of Their Statements Raise Factual Disputes That Are Not Appropriate For Resolution At The Pleading Stage

In interpreting the meaning of alleged false statements at the pleading stage, the

relevant inquiry is what a "reasonable investor could have understood th[e] statement[s] to

mean." *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 283 (E.D.N.Y. 2023).

At this stage, the Court is "required to credit Plaintiff's plausible reading of the statements,

not Defendants' competing explanation." *Id.* at 287 (citing *IWA Forest Indus. Pension Plan*

*v. Textron Inc.*, 14 F.4th 141, 146 (2d Cir. 2021)).  Defendants nonetheless argue that certain

of their statements were not literally false because they purportedly mean something

---

[7] Defendants' cases are inapposite.  For example, in *Shoemaker v. Cardiovascular Sys., Inc.*, 300 F. Supp. 3d 1046, 1055 (D. Minn. 2018) (MTD at 20) the complaint included allegations from only two former employees who spoke about two different types of alleged misconduct, thus failing to provide any support for the idea of a company-wide scheme.  *Id.*  Here, by contrast, all four territory managers described consistent problems that were not only the same across geographic territories, but also consistent with the problems ultimately admitted by Defendant Herbert.  Similarly, *Steamfitters Local 448 Pension & Ret. Sec. Funds v. Sleep Number Corp.*, 2023 WL 4421688, at *8-9 (D. Minn. July 10, 2023) (MTD at 20) is inapposite because there, one former employee's description of a "meeting" specifically implied that it took place after the alleged false statement, while the "only relevant" former employee merely stated that management met in advance of a storm to discuss inventory problems that "could" occur as a result.  *Id.*  And in *Trustees of Welfare & Pension Funds of Loc. 464A - Pension Fund v. Medtronic PLC*, 2024 WL 1332262, at *30 (D. Minn. Mar. 28, 2024) (MTD at 21), one of two confidential witnesses gave facts that were entirely unrelated to the topic of the false statements (the possibility of FDA approval of a new medical device), while the other could not provide facts that demonstrated that anyone in the company, let alone senior management, knew that they would not obtain approval.

29

different than what the Complaint alleges, and what analysts and former employees understood the statements to mean. MTD at 22, 25, 27-28, 30. These arguments lack merit.

For example, Defendants argue that Herbert's statement that the Company had "steadfastly improved our conversion of [patient] contact to patients receiving therapy" was not false because Herbert was supposedly speaking about the "the percentage of people who visit Inspire's website, have contact with physicians, and ultimately become Inspire patients," while "[t]he PA Pilot, by contrast, affected the speed at which prior authorization requests were being submitted." MTD at 28. Of course, that is not what Herbert actually said during the earnings call, and there is nothing in the record that supports Defendants' attempted minimization of Herbert's statement.

Moreover, even assuming Defendants' statement only referred narrowly to the "percentage" of contacts being converted to patients and not the "speed" at which they received prior authorization, Defendants' argument fails. The Complaint plainly alleges that Defendants' undisclosed PAAP changes not only slowed down the prior authorization process (and Inspire's ability to recognize revenue therefrom), but also led to (i) patients dropping out of the process entirely, and (ii) insurers rejecting claims. Thus, by definition, the impact of Defendants' changes to the PAAP clearly impacted the "conversion" of contacts to patients receiving therapy. ¶¶38-52.[8]

---

[8] *In re InvenSense, Inc. Sec. Litig.*, 2017 WL 11673462, at *3 (N.D. Cal. Apr. 12, 2017) is inapposite. There, the court found a "mismatch" because the subject matter of the alleged false statement and the alleged undisclosed information were entirely unrelated. Here, Defendants' statements concerned, *inter alia*, the rate of "conversion" of patient contacts to patients receiving therapy and the speed at which they received authorization, and the

In addition, Defendants' argument ignores the fact that Plaintiff separately alleged false statements that expressly *were* about the speed of the prior authorization process. For example, Defendant Herbert assured investors that, while it used to take "4 to 6 months to get an insurance approval… Now we get approved in just 2 to 5 days," and that Inspire was "see[ing] signs of improvement in the patient pathway and specifically by reducing the time from patient contact to implant, which continues to be approximately six months." Given that Defendants concede that the PAAP changes "affected the speed" of prior authorizations (MTD at 28), these statements were demonstrably false and misleading, as they omitted the highly material fact that Defendants' decision to "*minimize our involvement with [our customers'] prior authorization process*," had led to a "massive slowdown" in the process and hundreds of lost procedures.

Recognizing this, Defendants again ask the Court to interpret Herbert's "2 to 5 days" statement in their favor, claiming that it supposedly referred only to the time it took *submitted* prior authorization forms to get approval, and that any unsubmitted applications would not impact the "average time between submission and approval." MTD at 22. But this is wrong. The Complaint expressly alleges that the "massive slowdown" due to Defendants' PAAP changes not only slowed down the time it took medical providers to *submit* applications, but slowed down the *approval process itself* due to incomplete or improper submissions and inability to handle appeals. *See, e.g.,* ¶¶38, 40, 71, 73, 76, 80,

corrective disclosures revealed that the PAAP changes had impacted the conversion rate and the speed of prior authorizations.

31

82, 85.  In addition, it was materially misleading for Defendants to boast about how fast they were getting authorizations, and yet fail to disclose the fact that their dramatic changes to the PAAP were causing hundreds of patients' submissions to be rejected outright by insurers or never submitted at all by providers.  *Freedman*, 4 F. Supp. 3d at 1121; *In re Grab Holdings Ltd. Sec. Litig.*, 2024 WL 1076277, at *15 (S.D.N.Y. Mar. 12, 2024) ("the law is well settled that so-called 'half-truths'–literally true statements that create a materially misleading impression – will support claims under the securities laws").

Similarly, Defendants argue that it was not false and misleading to tout that they were "see[ing] signs of improvement in the patient pathway and specifically by reducing the time from patient contact to implant, which continues to be approximately six months," because "Plaintiffs pleads [sic] no facts suggesting that those delays were so severe as to render Herbert's 'approximately' 'six month' timeline inaccurate."  MTD at 25.  Again, this argument ignores the cold, hard fact that Herbert himself admitted that Defendants' undisclosed PAAP changes caused "***a significant number of our customers [to] experience[] challenges with their prior authorization submission process***," leading to a "***decrease in the number of submissions by our customers seeking prior authorization***" and an "***impact on the number of implant procedures***."  Moreover, it was materially misleading for Defendants to tout "improvement in the patient pathway" by "reducing the time from patient contact to implant," when in fact the process was dramatically "worsening," as the PAAP changes "not only caused prior authorizations to take far longer, but had caused many procedures to either get outright rejected by insurers, or had caused patients to give up on getting the surgery as the wait became too long."  ¶¶70-71.  Plaintiff

32

is not required at this stage to exactly quantify the amount to which these changes lengthened the average timeline for all patients—facts which are exclusively in Defendants' possession.

Finally, Defendants argue that Herbert's August 1, 2023 statement about "continued growth across all of our centers" was not false and misleading because "Plaintiff does not allege that those problems were so severe that Hebert knew they would inhibit Inspire from 'growing' in the 'back half' of 2023, which is what the analyst asked about." MTD at 30. But Defendants misconstrue both the analyst's question and Herbert's answer. The analyst asked Herbert "the extent to which you're seeing any kind of backlog or pent-up demand that's continuing to come in and support strong results"—*i.e.*, current and recent demand. In response, Herbert answered in the present tense: "Yes, we are. ***I think we're seeing continued growth*** across all of our centers." That statement was clearly a present-tense statement as to what the Company was experiencing at that moment in time, and had nothing to do with any future projections. ¶81. That point is proven by the fact that the analyst asked a *separate question* about "what the outlook is from a contribution standpoint as we move into the back half?," and in response, Herbert made a separate forward-looking statement (in the following sentence) that "same-store sales drove the growth…and I think will continue to do so as we move forward." Again, this has no bearing on the meaning of the alleged false statement.[9]

---

[9] For related reasons, Defendants' reliance on *Stratasys* is unavailing. MTD at 30-1 (citing 2016 WL3636992, at *11). There, unlike here, the alleged false statements were "predictions of growth," and thus the fact that those predictions came true was evidence

### 5.    Defendants' Statements Were Not Puffery Or Inactionable Opinion

Defendants argue that certain aspects of their statements were mere "puffery"—for example, Herbert's claim that "we really are in the phase of teaching center[s] that - to help them just kind of submit their own prior authorizations," and that changes to the compensation structure were "well received so far."  But Defendants ignore that the context of the statement was meant to reinforce to the market that the PAAP was not only proceeding smoothly, but was improving, thereby providing comfort to analysts regarding one of the most critical aspects of the Company's business.  ¶¶74-77.  As courts in this District have made clear, "particular statements by Defendants must be evaluated not only in their entirety, but also in context." *St. Jude*, 836 F. Supp. 2d at 888; *see also Mart*, 595 F. Supp. 3d at 810 n.17 (statements about "strong growth" not puffery where "[p]laintiff d[id] not allege that this language alone comprised the fraud."); *CenturyLink*, 403 F. Supp. 3d at 728 (statements about "meeting customer needs and bundling in order to provide value to customers and create customer loyalty" were not puffery in context of allegations); *IBT Emp. Grp. Welfare Fund v. Compass Mins. Int'l, Inc.*, 2023 WL 8596108, at \*13 (D. Kan. Dec. 12, 2023) (portions of statements that were "arguable puffery…served only to strengthen" other more specific parts of the statements).

Defendants also argue that Herbert's statement, "I think we're seeing continued growth across all of our centers," was an inactionable "opinion" merely because it was

---

that the statements were not false.  Similarly, *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1082 (8th Cir. 2005) (MTD at 30) is inapposite because (unlike here) the false statements at issue were financial projections or concerned future performance.

prefaced by the words "I think."  Not so.   As numerous courts have recognized, under *Omnicare*, "using language like 'I think' or 'I believe,' does not automatically render the statement not misleading." *Shash v. Biogen, Inc.*, 84 F.4th 1, 12 (1st Cir. 2023).  Indeed, Herbert's statement was a present-tense representation about the current state of the Company's business, made in response to an analyst's question about current demand.  *See, e.g., St. Jude*, 836 F. Supp. 2d at 891 (holding that defendants' practices "became fraudulent when Defendants informed investors that their sales and growth rates were stable"); *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 260 (3d Cir. 2009) (falsity and materiality where defendants "repeatedly assured analysts and investors that, although there was pressure in the market, there were no significant changes to the pricing environment" while the company was in reality experiencing significant pricing pressures).

Finally, even if the words "I think" render parts of Herbert's statement an opinion—which they do not—his statement was still materially misleading given that it omitted facts that "call[ed] into question [his] basis for offering the opinion."  *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *15 (N.D. Cal. Feb. 23, 2023) (quoting *Omnicare* and sustaining false statement beginning with "I think").  In truth, by the time of the August 1, 2023 statement, Defendants had not only admittedly received "strong confirmation" of the slowdown in prior authorizations that the PAAP changes had caused, but had started to take "corrective action" to rectify the issue.

Defendants also argue that Defendant Buchholz's statement concerning a "robust pipeline of patients" was puffery.  But Defendants ignore that Buchholz's statement was not merely a "general statement of optimism" but was "provided in direct response to

35

questions from financial analysts at conferences held expressly to discuss [defendants']

earnings and guidance," and was intended to dispel specific concerns about that guidance.

*St. Jude*, 836 F. Supp. 2d at 888 ("particular statements by Defendants must be evaluated

not only in their entirety, but also in context"); *Hedick, v. Kraft Heinz Co.*, 2021 WL

3566602, at *10 (N.D. Ill. Aug. 11, 2021) (citing cases) (statements made "in response to

questions from analysts" not puffery even if they "may contain an element of generic

optimism"); *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir.

2023) (same).

Further, while Defendants isolate the word "robust" as puffery, courts have been

clear that the mere use of a particular word or phrase cannot render a statement immaterial,

and that such statements must be evaluated in their full context. *See, e.g., Glazer*, 63 F.4th

at 770 (statement touting company's "very large pipeline" was actionable and not mere

puffery or opinion); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 317

(S.D.N.Y. 2013) (statement about "robust" internal controls not puffery).

Finally, Defendants' statements concerned a subject that was of utmost importance

to investors—the success of the PAAP—while omitting highly material information about

that subject. Indeed, Inspire itself repeatedly touted the PAAP as "core" to its business, a

"pillar" of its reimbursement strategy, and a "competitive strength" for the Company.

Accordingly, the fact that dramatic and undisclosed changes to the PAAP were leading to

a "massive slowdown" in authorizations for Inspire's sole product, which represented a

staggering 70% of the Company's revenue, was indisputably a highly material fact that

would "alter the total mix of information" for investors. *Campbell v. Transgenomic, Inc.*,

916 F.3d 1121, 1125 (8th Cir. 2019); *see also, In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 833 (N.D. Cal. 2014) (undisclosed negative safety reports about the Company's "sole product" were material and rendered generalized statements about safety of the product materially false and misleading where "the success of [defendant company] relied in large part on the perceived safety benefits as a medical device.").

> **6.**   **Defendants Did Not Disclose During The Class Period That They Had "Minimize[d] Our Involvement With [Their Customers'] Prior Authorization Process"**

Contradicting the plain allegations of the Complaint and the visceral reaction of analysts at the end of the Class Period, Defendants also argue that they fully disclosed their changes to the PAAP prior to and during the Class Period, and thus the market could not have been misled.  MTD at 7-8.  Defendants are wrong.  If it were true that the Company had already fully disclosed the extent of its changes to the PAAP, there would have been no need for Inspire and Herbert to make extensive disclosures about those changes in a press release and earnings call at the end of the Class Period.  Tellingly, none of the pre-Class Period and Class Period statements Defendants cite in support of their argument even suggest that the Company had "***minimize[d] our involvement with [our customers'] prior authorization process***," let alone disclose the severe impact that Defendants' undisclosed changes were having on Inspire's business.

First, Defendants cite a February 7, 2023 earnings call in which Defendant Herbert discussed the fact that Inspire had "modified [its] incentive compensation to focus on [higher] utilization at existing centers," and that, as Inspire "continue[d] to mature," it was "important that [it] shift from individual patient count to more utilization at site"—changes

37

that were discussed at a "national sales meeting."[10]  However, nothing in these statements

even slightly reveals that Inspire had "minimized" its involvement with what it repeatedly

described as a "pillar of [its] reimbursement strategy" and a "competitive strength" for the

Company.  Nor do Defendants explain why investors would understand a "focus on higher

utilization at existing centers" to mean that, contrary to its repeated representations, Inspire

was now essentially removing itself from assisting patients and providers with prior

authorizations.  The same is true of Defendants' May 2, 2023 statement that "we have

changed the compensation structure with the territory managers to really focus on higher

utilization at existing centers"—this statement says nothing about drastically changing the

"core" aspect of the Company's reimbursement strategy or removing the financial incentive

for Inspire employees to assist with prior authorizations.

Second, Defendants cite a March 2023 *third-party analyst report*[11] (MTD at 8)

opining that with "much of the prior-authorization process getting streamlined/automated,

---

[10] Judicial notice of the February 7, 2023 transcript is also inappropriate because the document was not referenced by or incorporated into the Complaint and the substance of the transcript is subject to varying interpretations.  *See, e.g., Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1000 (9th Cir. 2018) ("It is improper to judicially notice a transcript when the substance of the transcript is subject to varying interpretations, and there is a reasonable dispute as to what the [transcript] establishes.").  Defendants' cases do not suggest otherwise (MTD at 2, n. 2) as they stand only for the proposition that transcripts may be judicially noticed where the plaintiff does not object (*Apogee*, 2020 WL 1445856, at *7 n.6), or where the transcript was incorporated into the complaint by reference (*Medtronic*, 2024 WL 1332262, at *28 n.35).

[11] The March 2023 Truist report quoted by Defendants was not cited or relied upon in the Complaint.  As such, it is inappropriate for judicial notice.  Defendants' case does not suggest otherwise (MTD at 2, n.2), as it only took judicial notice of analyst reports referenced in the complaint. *In re 3M Co. Sec. Litig.*, 2021 WL 4482987, at *8, *10 (D. Minn. Sept. 30, 2021) (Brasel, J.).

mgmt. feels very comfortable diverting time and resources from prior-authorization focus to (more important and relevant) go-forward areas." But Defendants omit the critical context here: the same analyst report downplays these compensation changes as mere "*tweak[s]*" and includes a representation from Inspire's management that "*[t]he compensation changes do not represent a major change*." Indeed, there is nothing in the analyst report to suggest that management disclosed that Inspire had "minimize[d] our involvement with [our customers'] prior authorization process." And in any case, even if investors understood prior to the Class Period that Inspire was making some compensation changes, this has nothing to do with the fact that Defendants never disclosed that those and other PAAP changes were having a material detrimental impact on Inspire's business—an impact that Defendants admitted they saw *prior to the start of the Class Period.* ¶64.

Third, Defendants assert that one of the alleged false and misleading statements—namely that Inspire was "in the phase of teaching center[s] that - to help them just kind of submit their own prior authorizations"—fully disclosed the alleged fraud. As with the other examples, nothing about this statement reveals that the Company had *already* "minimize[d] our involvement with [our customers'] prior authorization process," nor does it reveal that the PAAP changes were already having a profound and obvious impact on the Company's business. To the contrary, this statement only underscores that Defendants materially misled investors. Indeed, the statement that the Company was "in the phase of teaching centers" and was "help[ing] them…submit their own prior authorizations" conveys the exact opposite to the truth: that Inspire remained heavily involved in the prior authorization

39

process and was actively engaged in assisting medical providers to submit their own prior authorization documentation.

### 7.    Defendants' Argument That The PAAP Problems Were "Transient" Is Both Contradicted By The Allegations Of The Complaint And Raises Fact Issues Inappropriate For Resolution Here

Defendants argue that, even if their statements were false and misleading when made, the Court should overlook them because the PAAP changes purportedly only had a *de minimis* impact on Inspire's business, and the 20% single-day stock drop that resulted from Defendants' disclosure of the PAAP changes was merely a "stock-price fluctuation." MTD at 14.   Defendants' argument is not only contradicted by the allegations of the Complaint, but raises fact issues on which no discovery has been taken and which are inappropriate for resolution at this stage.

For example, Defendants argue that the PAAP changes merely resulted in some "defer[red] revenue." MTD at 14 (citing Def. Ex. 19) (arguing that Inspire's purportedly "strong [post-Class Period] performance" demonstrated that "to the extent PA Pilot issues impacted revenue at all, its impact was merely to defer some revenue to quarters following Q3 2023.").[12]   But this self-serving characterization of extraneous facts contradicts the allegations of the Complaint and Defendants' own admissions that the changes had caused a "decrease in the number of submissions by our customers seeking prior authorization,"

---

[12] As noted *supra* at II.E n.3, Defendants also provide no evidence for their conclusory claim that the PAAP changes impacted only a "small percentage of Inspire's customers" (MTD at 6), and Herbert in fact said that a "significant number" of customers had been impacted.

40

impacted a "significant number of our customers," and had an "impact on the number of implant procedures" completed, causing analysts to estimate approximately $10 million in lost revenue. ¶¶6, 62-63, 67-68, 100. Further, a turnaround in revenue *after* the Class Period is consistent with Defendants' admission that they eventually took "corrective action" and reversed course on the PAAP—or, alternatively, could have an entirely unrelated explanation. There is simply nothing in the record that establishes that revenue earned *after* the Class Period represents revenue "deferred" *during* the Class Period.

For similar reasons, any purported rebound in Inspire's stock price after the Class Period (MTD at 14) is not appropriately considered here, as "we do not know whether the price rebounds represent the market's reactions to the disclosure of the alleged fraud or whether they represent unrelated gains." *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012) (declining to consider post-Class Period stock price movements).

### B.       Plaintiff Has Adequately Alleged Scienter

In evaluating scienter, the Court "takes the factual allegations as true, and, assessing them collectively, determines whether a reasonable person would find "the inference of scienter at least as strong as any opposing inference." *Mart*, 595 F. Supp. 3d at 815. In doing so "courts must consider the complaint in its entirety, inquiring whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *St. Jude*, 836 F. Supp. 2d at 895.

41

"The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *CenturyLink*, 403 F. Supp. 3d 712, 730 (D. Minn. 2019) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (citation omitted)). Moreover, courts around the country have recognized that, under *Tellabs*, "where two contrary inferences of scienter are equally probable, the tie goes to the plaintiff." *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *21 (N.D. Ill. Apr. 18, 2022); *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 39 (S.D.N.Y. 2019) (same); *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014) (same). The Complaint establishes a strong and compelling inference of scienter.

### 1.     Defendants Admitted They Knew Facts That Contradicted Their Public Statements

As courts in this district and elsewhere have recognized, "[o]ne classic fact pattern giving rise to a strong inference of scienter is that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate." *CenturyLink*, 403 F. Supp. 3d at 730.

Here, Defendants expressly *admitted* that they were aware of such information at the time that they made their statements. As described further, *supra*, during Inspire's November 7, 2023 earnings call, Defendant Herbert fully admitted that he had been "tracking the results" of the PAAP changes in real time. *In re Acadia Pharms. Inc. Securities Litig.*, 2020 WL 2838686, at *7 (S.D. Cal. June 1, 2020) (scienter where

42

"Defendants admitted they tracked" the relevant data).[13]  Moreover, Defendants admitted the problems "started to become evident" in "the second quarter" (prior to the start of the Class Period, in the quarter beginning April 1, 2023), and that, by "the beginning of the third quarter" (early July 2023), Defendants "realized we needed to take some corrective action" and "implemented that change."  *See Centene*, 407 F. Supp. 3d at 842-44 (statements in corrective disclosure regarding plan undertaken over "the past several months" constituted an admission of knowledge of facts contradicting statements two months earlier); *Yelp*, 2018 WL 6182756, at *21 ("[d]efendants' statements regarding when they became aware" of the problems contradicting their statements supported scienter where the false statements were made halfway through the quarter, and defendants later admitted to a "*modest slowdown*" felt "*halfway through the quarter*"); *Apple*, 2020 WL 6482014, at *6, 10 (CEO's acknowledgement of "troubling signs" of a slowdown "*as the quarter went on*" constituted admission with respect to mid-quarter false statement).

---

[13] Defendants implausibly argue that when Herbert admitted to "tracking" the results of the PAAP changes, he did not actually mean that he had been personally involved in tracking them.  MTD at 37-38, n.6.  Defendants' argument is contradicted by Herbert's own words, which conveyed to the market that Herbert and other Inspire senior executives had "implemented" the PAAP changes "[e]arly in the year," and "in tracking the results of the program, *we* observed a decline in prior authorization submissions for patients seeking Inspire therapy."  ¶62; *see also* Def. Ex. 14 at 4 ("*we* tracked the decrease in the number of submissions by our customers seeking prior authorization to the Inspire procedure.").  Defendants' reliance on *In re Bank of Am. Corp.*, 2011 WL 740902, at *11 (N.D. Cal. Feb. 24, 2011) for the proposition that Herbert's admission was "too vague" as to the timing of his "tracking" of the PAAP problems also fails. MTD at 37-38, n.6.  In that case, plaintiffs "d[id] no more than allege generally that '[defendant] earned substantial fees for its services'" as their sole scienter allegation, whereas here, Herbert himself admitted to tracking the results of the PAAP changes from "early in the process" (early 2023)—an admission that was consistent with and corroborated by numerous FEs.  ¶¶55, 95.

43

Moreover, significantly, Herbert made these admissions in direct response to a question from a JPMorgan analyst who was asking "when you knew about [the problems] and why not mention [these issues] on 2Q [call]?" In response, Herbert fully admitted that Defendants had already been aware of the problems for some time and, at the time of the misstatements, Defendants were *already* working to correct them.  *See, e.g., Centene*, 407 F. Supp. 3d at 846 ("Defendants' remedial actions could evidence undisclosed knowledge …sufficient to indicate that their statements were knowingly false when made.").  Indeed, Defendants' own brief acknowledges that they received "strong confirmation" of these problems "early in the third quarter"—the quarter beginning a full month before the August 1, 2023 false statement and more than two full months before Buchholz's September 6, 2023 statement.  MTD at 11, 18, 37.

Accordingly, by Defendants' own admission, they indisputably had contemporaneous material information rendering their statements misleading.  *See also In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 227 (S.D.N.Y. 2021) (finding scienter from defendants' admissions, during earnings call, that "*[e]arlier this year, as we saw these more challenging trends unfolding*, we realigned our [] business to be more focused in our product development and more efficient in our overhead" and that "*[m]ore recently as the trends continued for our clients, we stepped up our efforts* to reduce our cost base, reallocate resources and accelerate our investments" where false statements omitted those trends) (emphasis in original); *Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d

44

652, 661 (N.D. Ill. 2021) (crediting scienter allegations based on post-class period admissions in corrective disclosure).[14]

### 1.    The FE Allegations And Other Allegations Support Scienter

Just as they support falsity, Plaintiff's FE allegations also provide compelling support for a strong inference of scienter.  For example, FE 1 not only recalled that her manager and the Area Vice President "were all referencing [problems with the PAAP changes] up to the CEO" from "early in the process," but remembered a meeting no later than the second quarter of 2023 in which Defendant Herbert himself discussed Inspire's problems with prior authorizations.  And FE 4 confirmed that Inspire's executives used Microsoft Dynamics software to monitor patients' progress through every step of the prior authorization process and provided real time data on the slowdown emanating from the PAAP changes.   Further, the FEs' accounts are corroborated by Defendants' own admissions at the end of the Class Period, including Defendant Herbert's acknowledgement that he had "tracked the results" of the Company's changes to the PAAP.  *See Tile Shop*, 94

---

[14] Defendants cite *Medtronic* for the proposition that "awareness of a problem on its own is not enough to demonstrate that a defendant acted with the requisite mental state." 2024 WL 1332262, at *27.  But in *Medtronic*, the allegations were found insufficient because mere "problems" could not have enabled defendants to predict that the FDA would subsequently issue a recall for its product.  By contrast, Defendants here knew that the undisclosed changes to the PAAP already had a "significant" impact on the Company's business.  Defendants also cite *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 534 (S.D.N.Y. 2011) for the proposition that "alleged knowledge of problems with the design of clinical trials was insufficient to support an inference of scienter."  But the court in *Sanofi-Aventis* sustained the complaint and found the allegations supported a strong inference of scienter.  Notably, the pincite to which Defendants refer (*534) does not exist in the opinion, and it is unclear what part of the opinion they are drawing from.

F. Supp. 3d at 1053 (D. Minn. 2015) (crediting former employee allegations that were "corroborated by [defendant company's] own representations.").[15]

### 2.   Plaintiff's "Core Operations" Allegations Further Support Scienter

The Complaint's "core operations" allegations further support an inference of scienter. Among other things, the Inspire implant was the Company's sole product; prior authorization from commercial insurers was required for approximately 70% of Inspire's total revenue; and the Company devoted multiple paragraphs of its Annual Reports filed with the SEC to discussing the critical importance of the PAAP to the Company's business. Indeed, the Company's SEC filings described at length the fact that the PAAP was a "*pillar of our reimbursement strategy*" that was "highly effective in working with patients and physicians to obtain prior authorizations for our Inspire system including assisting with the appeals process, and a "*competitive strength*." The Individual Defendants were indisputably aware of the radical changes that had been made to the PAAP—indeed, they were the ones who made them—and they were clearly aware of the impact that these changes were having on Inspire's business.

These are unusually strong "core operations" allegations, and courts regularly credit such allegations as contributing significantly to an inference of scienter. *See, e.g.*, *CenturyLink*, 403 F. Supp. 3d at 731 (finding it "reasonable to assume that top management

---

[15] *Sakkal v. Anaplan Inc.*, 557 F. Supp. 3d 988, 999 (N.D. Cal. 2021) (MTD at 41) is inapposite. There, unlike here, the CW allegations did not evidence that the individual defendants were aware of any specific problems with sales or billings, but only that a purportedly "toxic corporate culture within the sales team created the risk that …billings momentum was slowing." *Id.* at 998.

were aware of matters central to that business's operation"); *Acadia Pharms.*, 2020 WL 2838686, at *8 (scienter where allegations concerned company's sole product); *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1079 (E.D. Wash. 2016) ("[t]he notion that [defendant CEO], who frequently commented on [the company's sole product] and was running a company entirely devoted to [that product], did not appreciate the import of the actual results of [a study of that product] ... is absurd."); *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 527–28 (D. Md. 2022) ("[b]ecause the development of the vaccine was so critical to [defendant company's] success, the Court finds that it was a core operation …and that this fact makes it more plausible that [defendant officers] were aware of the facts underlying the allegedly false statements and material omissions.").

Defendants nonetheless argue that "[c]ore-operations allegations have not been recognized in the Eighth Circuit" and that the "Fifth and Ninth Circuits have rejected" such allegations (MTD at 34-5). But this is entirely wrong—both circuits continue to recognize core operations allegations as supportive of an inference of scienter. *See, e.g., Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 219 (5th Cir. 2023) ("[t]he core operations allegations here … contribute to the inference of scienter, because a court considers whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter."); *Reese v. Malone*, 747 F.3d at 576 (scienter based on core operations

47

"where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.").[16]

In fact, in the very case Defendants cite, *Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d at 821, this Court found it could "reasonably infer" that certain officers and directors "had access to information" about the underlying alleged fraud where they were "deeply involved in the sales strategy," "closely followed representatives' sales performance" and one of them discussed the relevant program as "the most effective tool ever."[17] Other courts

---

[16] In support of their incorrect claim that the Fifth and Ninth Circuits have "rejected" core operations allegations, Defendants cite two twenty-year-old decisions that were subsequently limited by the Supreme Court's decision *Tellabs*. *See* MTD at 21 (citing *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 848 (9th Cir. 2003) and *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003)). As the Supreme Court clarified in *Tellabs*, "the court's job is not to scrutinize each [scienter] allegation in isolation but to assess all the allegations holistically." 551 U.S. at 310. *See, e.g., S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (recognizing that *Tellabs* limited the applicability of *Read-Rite* and finding that "[a]llegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis."). Defendants' other authority is similarly inapposite. In *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014), the court rejected a core operations inference where the relevant accounting error was "not especially obvious," the defendant company had less than a 1% interest in the relevant funds, and the "the practical effect of proper consolidation on the Company's financial statements was relatively small." *Id.* at 889-90. That is not the case here.

[17] While "a plaintiff must at least show that the relevant information was known within the company at that time," (595 F. Supp. 3d at 821), Plaintiff has done so here. Among other things, the Complaint pleads that (1) Senior Territory Managers across disparate geographic regions were experiencing slowdowns, increased denials, and lost procedures due to Defendants' PAAP changes in early 2023; (2) this information was being reported up the chain to management; and (3) Defendant Herbert himself discussed the issue at a meeting no later than the second quarter. By contrast, in *In re 3M Co. Sec. Litig.*, 2021 WL 4482987, at *21 (MTD at 34-5) the Court found that the allegations rested on "speculation that 'this information must have existed and must have been known.'" Similarly, in *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 44 (1st Cir. 2017) (MTD at 35) the court found that "the evidence does not establish that, at the time the challenged statements were made,

in this District and around the country have similarly recognized that core operations allegations are relevant to a holistic scienter analysis. *See, e.g., CenturyLink*, 403 F. Supp. 3d at 731 ("reasonable to assume that top management were aware of matters central to that business's operation"); cases cited *supra.*[18]

### 3. Analysts' Reaction To The Disclosures Further Supports Scienter

As discussed *supra* at III.A.1, the fact that multiple analysts understood Herbert's disclosures to be admissions of knowledge during the Class Period only further confirms that those disclosures were admissions. These analysts thus support scienter just as they support falsity.

Specifically, one analyst noted that "during Q2" Inspire management "began to realize there was a consistent slowdown in prior authorization submissions … moving through the year into the summer months," while another pointed out that management had

there existed reasonably accessible data within the company materially contradicting those statements" because the allegations only supported a drop in sales following the statements.

[18] *See also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) ("allegations of a company's core operations… can provide supplemental support for allegations of scienter"); *In re James River Grp. Holdings, Ltd. Sec. Litig.*, 2023 WL 5538218, at *21 (E.D. Va. Aug. 28, 2023) ("Where a certain product is so critical to a company's success, a complaint can establish that the product constitutes a core operation, elevating the plausibility that senior officers were aware of the facts underlying the allegedly false statements and material omissions."); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *21 (D.N.J. Dec. 27, 2019) ("each of the alleged misrepresentations at issue involve the 'core operations' of [defendant company], supporting an inference of scienter"); *Franchi v. SmileDirectClub, Inc.*, 633 F. Supp. 3d 1046, 1086 (M.D. Tenn. 2022) ("reasonably inferable that these Individual Defendants were situated to be extremely familiar with [defendant company's] operations such that they would be aware of core financial metrics.").

49

"noted a slowdown in P[rior] A[uthorizations] in early Q3" (by July 2023) and that "the signs were probably there in Q2" (April-June 2023).  ¶¶66-67, 94, 102.  Similarly, another analyst asked during the Company's earnings call why the Company had not mentioned the slowdown during the Q2 2023 earnings call on August 1, 2023, by which time they had obviously been aware of the problem.  ¶¶64, 92.  Analysts' understanding of Defendants' admissions provides further support for scienter.  *See, e.g.*, *Pluralsight*, 45 F.4th at 1260-62; *SeaWorld Ent., Inc.*, 423 F. Supp. 3d at 927; *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11.[19]

### 4.    The Complaint's Non-Reliance On "Motive" Allegations Is Irrelevant

Defendants argue that they lacked a financial motive to commit fraud.  MTD at 32-3.  But Plaintiff's scienter allegations do not rest on motive; "[r]ather, to allege scienter, Plaintiff[] focus[es] on a theory of conscious misbehavior or recklessness." *Lexmark*, 367 F. Supp. 3d at 36.  Indeed, "the absence of a motive allegation is not fatal to a plaintiff's claim" as "motive and opportunity is only one of several general means of establishing scienter." *St. Jude*, 836 F. Supp. 2d at 898.  As set forth above, the Complaint's other

---

[19] Defendants cite *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 375 (5th Cir. 2004) for the proposition that Plaintiff supposedly cannot rely on analyst reports to help prove scienter. MTD at 38.  But that case stands for the wholly unrelated (and irrelevant) proposition that Defendants cannot be held *liable* for statements by third party analysts.  Moreover, Defendants' claim that Plaintiff is "cherry picking" statements from the analyst reports does not hold water.  The quotes speak for themselves, and the analysts' overall opinion of the Company has no bearing on whether there was scienter with respect to the alleged false statements.

50

scienter allegations are more than sufficient to establish, at a minimum, Defendants' recklessness.[20]

Moreover, the Complaint's allegations support an inference of motive—namely, to buy time with the hope that the negative trend caused by the PAAP changes could be reversed and its impact smoothed over without investors noticing. *See, e.g., Green Tree*, 270 F.3d at 662 (crediting "motive theory" that "defendants knew facts that showed the assumptions were materially inadequate," but "recklessly attempted to sweep [a] problem under the rug hoping a change in the economy would ameliorate the problem"); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 697 (9th Cir. 2021) (crediting allegations that defendants believed their "'decision to buy time' would reduce the detrimental effects of eventual disclosure"); *Pluralsight*, 45 F.4th at 1262 (crediting scienter inference that defendant knew facts contradicting his statement but "hoped [the company] could maintain its billings growth and obscure his misrepresentation").

Defendants nonetheless argue that "[w]ithout a showing of motive or opportunity [to commit fraud], other allegations tending to show scienter would have to be particularly strong in order to meet the [PSLRA] standard."  MTD at 33 (quoting *In re K-tel Int'l, Inc.*

---

[20] Defendants argue that "[w]ithout a showing of motive or opportunity [to commit fraud], other allegations tending to show scienter would have to be particularly strong in order to meet the [PSLRA] standard."  MTD at 33 (quoting *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002) and citing *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001)).  But Plaintiff has pled exactly the kind of scienter facts that are regularly recognized as sufficient even in the absence of motive, namely, "that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate." *St. Jude*, 836 F. Supp. 2d at 896.

*Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002)).  But Plaintiff has pled exactly the kind of facts that are regularly recognized as sufficient to establish scienter at the pleading stage, namely, "that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate." *St. Jude*, 836 F. Supp. 2d at 896 (finding scienter where "undisclosed internal numbers contradicted what Defendants were telling the public," even though no financial motive existed); *CenturyLink*, 403 F. Supp. 3d at 730 (scienter even in absence of motive where defendants "had access to real time data and reviewed regular reports on" the relevant metrics).

### 5.   Defendants' "Competing Inference" Is Not More Compelling

As noted *supra* at II.B, in order to defeat an inference of scienter by proposing an alternative innocent inference, Defendants must demonstrate that their inference is more compelling than Plaintiff's inference, as, under *Tellabs*, "the tie goes to the plaintiff." *Atlas*, 2022 WL 1136577, at *21; *see also Pluralsight*, 45 F.4th at 1268 (reversing district court and finding scienter because plaintiff's culpable inference was "at least as compelling" as defendants' "also plausible" alternative inference).

Defendants argue that the more compelling inference here is that Inspire "did *not* fully appreciate the extent of the problems with the PA Pilot until the third quarter" because "(1) Inspire 'lost . . . visibility' into the timing and number of prior authorization submissions once pilot centers began submitting their own prior authorization paperwork and (2) [because of] the seasonality of Inspire's business, which 'negatively impacts" Inspire's commercial sales during the first part of the year." MTD at 37.  But this argument ignores Defendants' own admission in their Motion that Defendants got "strong

52

confirmation" of the problems by the beginning of the third quarter—*i.e.*, at a minimum, before they made their August and September 2023 statements.[21]   Moreover, even assuming that this "lost visibility" rendered Inspire completely blind to its own pipeline, that only supports an inference of severe recklessness.   Under that scenario, Defendants would have had no reasonable basis whatsoever to tout to investors that Inspire maintained a "robust pipeline" and that its "conversion of patients receiving therapy" was "steadfastly improving" "even with the typical summer slowdown"—in truth, they had no ability whatsoever to support those statements.

Further, the fact that Herbert deliberately insisted that Inspire's "conversion" rate was "improv[ing]" "even with the summer slowdown" belies any suggestion that Defendants were merely confused by typical "seasonality" and therefore unable to recognize negative trends.   Indeed, even as late as September 6, 2023—more than two thirds of the way through the third quarter—Defendants expressly assured investors that seasonality did *not* account for certain shifts in their payor mix (while also insisting this would not be a "headwind").   Specifically, in response to a Wells Fargo analyst's line of questioning about whether there was "anything different about this year" in light of

---

[21] Defendants' argument that Herbert's admissions "support an inference of candor" is paradoxical.  If eventually admitting to having known something meant that one lacked scienter, defendants could always avoid liability by admitting to the truth.  Defendants' reliance on *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008) (MTD at 37) is unavailing, as that case stands only for the proposition that "[a]llegations that accounting errors were discovered months and years later do not give rise to a strong inference that the [defendants' Sarbanes-Oxley] certifications were knowingly false when made" – a principle that has no applicability here whatsoever.

guidance that "implies more seasonality than we've typically seen" and whether there would be a "headwind" as a result, Defendant Buchholz responded "no…we have a robust pipeline of patients awaiting therapy.  So I don't expect that to be a headwind."  Defendants' argument that they "did not fully appreciate the extent of the problems with the PA Pilot until the third quarter" due to "the seasonality of Inspire's business" is thus unavailing, as they continued to conceal the problems even well into the third quarter, while simultaneously denying that there was "more seasonality" than typical.

Instead, the more compelling inference is that Defendants attempted to "sweep the problem under the rug" in the hopes that they could reverse the negative impact of their undisclosed PAAP changes, but were forced to admit the truth when they were unable to do so and needed to explain the Company's disappointing results. *Centene*, 407 F. Supp. 3d at 846 (quoting *Green Tree*, 270 F.3d at 662).

### C.     The Amended Complaint Adequately Pleads Control Person Claims

Because Defendants do not dispute that Defendants Herbert and Buchholz were control persons, and because Plaintiff has pled a primary violation of the federal securities laws, Plaintiff's control person liability claims should not be dismissed. *Mart*, 595 F. Supp. 3d at 824-25.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

Dated:  September 6, 2024

Respectfully submitted,

**LOCKRIDGE GRINDAL NAUEN PLLP**

By: */s/ Kate M. Baxter-Kauf*
Kate Baxter-Kauf (Bar No. 392037)
Gregg M. Fishbein (Bar No. 0202009)
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Tel.: (612) 596-4007
Fax: (612) 339-0981
kmbaxter-kauf@locklaw.com
gmfishbein@locklaw.com

*Local Counsel for Lead Plaintiff*

**SAXENA WHITE P.A.**
Lester R. Hooker (admitted *pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
lhooker@saxenawhite.com

-and-

**SAXENA WHITE P.A.**
Steven B. Singer (*pro hac vice* forthcoming)
Joshua H. Saltzman (admitted *pro hac vice*)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 216-2220
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com

*Lead Counsel for Lead Plaintiff*

**KLAUSNER KAUFMAN JENSEN
& LEVINSON**
Robert D. Klausner (admitted *pro hac vice*)
7080 NW 4th Street
Plantation, FL 33317

55

Tel.: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Lead Plaintiff*